








JPP    11/18/02    9:42

3:02-CV-02258    SUNDANCE IMAGE V. CONE EDITIONS PRESS

*1*

*NTCREM.*



1  EDWARD D. CHAPIN, State Bar No. 53287
   PETER B. MARETZ, State Bar No. 144826
2  CHAPIN SHEA MCNITT & CARTER
   501 WEST BROADWAY, 15TH FLOOR
3  SAN DIEGO, CALIFORNIA 92101-3541
   TELEPHONE:      (619) 232-4261
4  TELEFAX:        (619) 232-4840

5  Attorneys for Defendants CONE EDITIONS PRESS, LTD.
     and INKJETMALL.COM

6

7

8              UNITED STATES DISTRICT COURT - ~~COUNTY OF SAN DIEGO~~

9                    SOUTHERN DISTRICT OF CALIFORNIA

10

11 SUNDANCE IMAGE TECHNOLOGY, INC., a)   CASE NO.:
   California Corporation,            )
12                                    )   '02 CV  2258 G  (AJB)
              Plaintiff,              )
13                                    )
   vs.                                )
14                                    )   NOTICE OF REMOVAL [28 U.S.C. §§ 1332,
   CONE EDITIONS PRESS, LTD., a Vermont)   1338]
15 Corporation, and Does 1 through 10, )
                                      )
16            Defendants.             )
   _____)
17 CONE EDITIONS PRESS LTD., a Vermont )
   Corporation; and INKJETMALL.COM, LTD, a )
18 Vermont Corporation;               )
                                      )
19            Cross-Complainant,      )
                                      )
20 vs.                                )
                                      )
21 GARY ROGERS, d/b/a "SUNDANCE IMAGE )
   TECHNOLOGY, INC." and d/b/a "R9   )
22 CORPORATION;" and EQUIN           )
   TECHNOLOGY, INC., d/b/a            )
23 www.DigitalArtSupplies.com, a California )
   corporation, and ROES 1 through 100, )
24 inclusive,                         )
                                      )
25            Cross-Defendants.       )
                                      )
26 _____)

27 ///

28 ///

K:\data\users\PBM\Cone\Notice of Removal.wpd

NOTICE OF REMOVAL

1    TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:

2

3    PLEASE TAKE NOTICE that Defendant and Cross-Complaint CONE EDITIONS

4   PRESS, LTD. and Cross-Complainant INKJETMALL.COM (collectively "Removing Parties")

5   the above-described action is hereby remove to the United States District Court, Southern District

6   of California San Diego Superior Court Case No. GIC730397 (consolidated with GIC797940)

7   ("State Action").

8

9        Removal is based upon federal question jurisdiction in that the State Action includes a

10   claim concerning copyrights (28 U.S.C. § 1338).

11

12        Removal is further based on diversity of citizenship (28 U.S.C. § 1332(a)).  The citizenship

13   of the parties is as follows:

14

15        1.    Removing Parties are informed and believe and there on allege that Plaintiff and

16   Cross-Defendant SUNDANCE IMAGE TECHNOLOGIES, INC., is a Nevada corporation

17   organized and existing under the laws of the State of Nevada with a California principal place of

18   business;

19

20        2.    Removing Parties are informed and believe and there on allege that Cross-

21   Defendant GARY ROGERS is a resident of and domiciled in the State of California;

22

23        3.    Removing Parties are informed and believe and there on allege that Cross-

24   Defendant R9, is an unknown entity whose corporate charter was dissolved by the State of

25   Nevada.  The Removing Parties are informed, believe and thereon allege that R9 has its principal

26   place of business in the State of California.

27   ///

28   ///

K:\data\users\PBM\Cone\Notice of Removal.wpd                    -2-

NOTICE OF REMOVAL

4. Removing Parties are informed and believe and thereon allege that EQUIN TECHNOLOGY, INC. is a corporation organized and existing under the laws of the State of California with its principal place of business in the State of California.

5. CONE EDITION PRESS, LTD. is a corporation organized and existing under the laws of the State of Vermont with its principal place of business in Vermont.

6. INKJETMALL.COM, LTD. is a corporation organized and existing under the laws of the State of Vermont with its principal place of business in Vermont.

By virtue of the filing of a cross-complaint on October 15, 2002, the amount in controversy exceeded $75,000 in that the Removing Parties alleged that Cross-Defendants have breached and/or interfered with certain described distribution and licensing agreements resulting in damages in the form of unnecessary expenses and lost profits in an amount in excess of $300,000.

DATED: November 14, 2002

CHAPIN SHEA MCNITT & CARTER

By: _____
Peter B. Maretz
Attorneys for Defendant CONE
EDITIONS PRESS, LTD. and
INKJETMALL.COM

**EXHIBIT 1**

# SUMMONS
## (CITACION JUDICIAL)

ON CROSS-COMPLAINT

CROSS-
**NOTICE TO DEFENDANT:** *(Aviso a Acusado)*

GARY ROGERS, d/b/a "SUNDANCE IMAGE TECHNOLOGY, INC." and d/b/a "R9 CORPORATION;" and EQUIN TECHNOLOGY, INC., d/b/a www.DigitalArtSupplies.com, a California corporation; and ROES 1 through 100, inclusive,

| FOR COURT USE ONLY |
| --- |
| *(SOLO PARA USO DE LA CORTE)* |

**YOU ARE BEING SUED BY PLAINTIFF:** CROSS-COMPLAINANT
*(A Ud. le está demandando)*

CONE EDITIONS PRESS LTD., a Vermont Corporation and INKJETMALL.COM, LTD. a Vermont Corporation

You have **30 CALENDAR DAYS** after this summons is served on you to file a typewritten response at this court.

A letter or phone call will not protect you; your typewritten response must be in proper legal form if you want the court to hear your case.

If you do not file your response on time, you may lose the case, and your wages, money and property may be taken without further warning from the court.

There are other legal requirements. You may want to call an attorney right away. If you do not know an attorney, you may call an attorney referral service or a legal aid office (listed in the phone book).

*Después de que le entreguen esta citación judicial usted tiene un plazo de 30 DIAS CALENDARIOS para presentar una respuesta escrita a máquina en esta corte.*

*Una carta o una llamada telefónica no le ofrecerá protección; su respuesta escrita a máquina tiene que cumplir con las formalidades legales apropiadas si usted quiere que la corte escuche su caso.*

*Si usted no presenta su respuesta a tiempo, puede perder el caso, y le pueden quitar su salario, su dinero y otras cosasde su propiedad sin aviso adicional por parte de la corte.*

*Existen otros requisitos legales. Puede que usted quiera llamar a un abogado inmediatamente. Si no conoce a un abogado, puede llamar a un servicio de referencia de abogados o a una oficina de ayuda legal (vea el directorio telefónico).*

The name and address of the court is: *(El nombre y dirección de la corte es)*
SAN DIEGO SUPERIOR COURT
330 WEST BROADWAY
SAME
SAN DIEGO, CA 92101
CENTRAL

| CASE NUMBER *(Número del Caso)* |
| --- |
| GIC 790 397 |

The name, address, and telephone number of plaintiff's attorney, or plaintiff without an attorney, is:
*(El nombre, la dirección y el número de teléfono del abogado del demandante, o del demandante que no tiene abogado, es)*

Peter B. Maretz, SBN: 144826       619-232-4261       Fax No. 619-232-4840
Chapin Shea McNitt & Carter
501 West Broadway
15th Floor
San Diego, CA  92101

**STEPHEN THUNBERG**
Clerk of the Superior Court
County of San Diego State of California

**S. WICKER**

DATE: **OCT 2 9 2002**
*(Fecha)*

Clerk, by _____ , Deputy
*(Actuario)*                                      *(Delegado)*

[SEAL]

**NOTICE TO THE PERSON SERVED:** You are served
1. ☐ as an individual defendant.
2. ☐ as the person sued under the fictitious name of *(specify)*:

3. ☐ on behalf of *(specify)*:

   under: ☐ CCP 416.10 (corporation)        ☐ CCP 416.60 (minor)
          ☐ CCP 416.20 (defunct corporation) ☐ CCP 416.70 (conservatee)
          ☐ CCP 416.40 (association or partnership) ☐ CCP 416.90 (individual)
          ☐ other:
4. ☐ by personal delivery on *(date)*:

Form Adopted by Rule 982
Judicial Council of California
982(a)(9) [Rev. January 1, 1984]
Mandatory Form

**(See reverse for Proof of Service)**
**SUMMONS**


Legal Solutions Plus

CCP 412.20

**PROOF OF SERVICE—SUMMONS**
*(Use separate proof of service for each person served)*

1. I served the
   a. ☐ summons  ☐ complaint  ☐ amended summons  ☐ amended complaint
      ☐ completed and blank Case Questionnaires  ☐ Other *(specify):*
   b. on defendant *(name):*

   c. by serving  ☐ defendant  ☐ other *(name and title or relationship to person served):*

   d. ☐ by delivery  ☐ at home  ☐ at business
      (1) date:
      (2) time:
      (3) address:

   e. ☐ by mailing
      (1) date:
      (2) place:

2. Manner of service *(check proper box):*
   a. ☐ **Personal service.** By personally delivering copies. (CCP 415.10)
   b. ☐ **Substituted service on corporation, unincorporated association (including partnership), or public entity.** By leaving, during usual office hours copies in the office of the person served with the person who apparently was in charge and thereafter mailing (by first-class mail, postage prepaid) copies to the person served at the place where the copies were left. (CCP 415.20(a))
   c. ☐ **Substituted service on natural person, minor, conservatee, or candidate.** By leaving copies at the dwelling house, usual place of abode, or usual place of business of the person served in the presence of a competent member of the household or a person apparently in charge of the office or place of business, at least 18 years of age, who was informed of the general nature of the papers, and thereafter mailing (by first-class mail, postage prepaid) copies to the person served at the place where the copies were left. (CCP 415.20(b)) *(Attach separate declaration or affidavit stating acts relied on to establish reasonable diligence in first attempting personal service.)*
   d. ☐ **Mail and acknowledgment service.** By mailing (by first-class mail or airmail, postage prepaid) copies to the person served, together with two copies of the form of notice and acknowledgment and a return envelope, postage prepaid, addressed to the sender. (CCP 415.30) *(Attach completed acknowledgment of receipt.)*
   e. ☐ **Certified or registered mail service.** By mailing to an address outside California (by first-class mail, postage prepaid, requiring a return receipt) copies to the person served. (CCP 415.40) *(Attach signed return receipt or other evidence of actual delivery to the person served.)*
   f. ☐ Other *(specify code section):*
      ☐ additional page is attached.

3. The "Notice to the Person Served" (on the summons) was completed as follows (CCP 412.30, 415.10, and 474):
   a. ☐ as an individual defendant.
   b. ☐ as the person sued under the fictitious name of *(specify):*
   c. ☐ on behalf of *(specify):*
      under:  ☐ CCP 416.10 (corporation)  ☐ CCP 416.60 (minor)  ☐ other:
             ☐ CCP 416.20 (defunct corporation)  ☐ CCP 416.70 (conservatee)
             ☐ CCP 416.40 (association or partnership)  ☐ CCP 416.90 (individual)
   d. ☐ by personal delivery on *(date):*

4. At the time of service I was at least 18 years of age and not a party to this action.
5. Fee for service: $
6. Person serving:
   a. ☐ California sheriff, marshal, or constable.
   b. ☐ Registered California process server.
   c. ☐ Employee or independent contractor of a registered California process server.
   d. ☐ Not a registered California process server.
   e. ☐ Exempt from registration under Bus. & Prof. Code 22350(b).

   f. Name, address and telephone number and, if applicable, country of registration and number:

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Date:

▶ _____
   *(SIGNATURE)*

*(For California sheriff, marshal, or constable use only)*
I certify that the foregoing is true and correct.

Date:

▶ _____
   *(SIGNATURE)*

982(a)(9) [Rev. January 1, 1984]

CIVIL BUSINESS OFFICE 12
CENTRAL DIVISION

2002 OCT 15 P 4: 15

STEPHEN TRUNBERG
CLERK-SUPERIOR COURT

**CONFORM**

1  EDWARD D. CHAPIN, State Bar No. 53287
   PETER B. MARETZ, State Bar No. 144826
2  CHAPIN SHEA MCNITT & CARTER
   501 WEST BROADWAY, 15TH FLOOR
3  SAN DIEGO, CALIFORNIA 92101-3541
   TELEPHONE:      (619) 232-4261
4  TELEFAX:        (619) 232-4840

5  Attorneys for Defendant CONE EDITIONS PRESS, LTD.
      and INKJETMALL.COM

6

7

8            SUPERIOR COURT OF CALIFORNIA - COUNTY OF SAN DIEGO

9                          CENTRAL DIVISION

10

| | |
|---|---|
| 11  SUNDANCE IMAGE TECHNOLOGY, INC., a) | CASE NO. GIC 790397 |
| 12  California Corporation, ) | Action Date:  June 12, 2002 |
| ) | Judge:        Hon. Kevin Enright |
| 13  Plaintiff, ) | |
| vs. ) | |
| 14  ) | |
| 15  CONE EDITIONS PRESS, LTD., a Vermont ) | CROSS-COMPLAINT OF CONE EDITIONS |
| Corporation, and Does 1 through 10, ) | PRESS, LTD. and INKJETMALL.COM |
| 16  Defendants. ) | |
| 17  CONE EDITIONS PRESS LTD., a Vermont ) | |
| Corporation; and INKJETMALL.COM, LTD, a ) | |
| 18  Vermont Corporation; ) | |
| 19  Cross-Complainant ) | |
| 20  vs. ) | |
| 21  GARY ROGERS, d/b/a "SUNDANCE IMAGE ) | |
| TECHNOLOGY, INC." and d/b/a "R9 ) | |
| 22  CORPORATION;" and EQUIN ) | |
| TECHNOLOGY, INC., d/b/a ) | |
| 23  www.DigitalArtSupplies.com, a California ) | |
| corporation, and ROES 1 through 100, ) | |
| 24  inclusive, ) | |
| 25  Cross-Defendants. ) | |

26

27  ///

28  ///

K:\data\users\PBM\Cone\Cross-Complaint.wpd

Cross- Complainants CONE EDITIONS, LTD. ("CEP") and INKJETMALL.COM ("IJM") allege on their cross-complaint as follows:

## THE PARTIES

1.      CEP is a corporation organized and existing under the laws of the State of Vermont with its principal office in Topsham, Vermont.  It was founded by and is primarily owned and managed by Jonathon Cone.  Its principal business is providing services, education and products for fine art quality conventional and digital photography.

2.      IJM is a corporation organized and existing under the laws of the State of Vermont with its principal office in Bradford, Vermont. It was founded by and is primarily owned and managed by Jonathan Cone. Its principal business is to act as the online retail presence for Cone Editions Press, Ltd.  CEP and IJM are referred to sometimes herein collectively as Cross-Complainants.

3.      Gary Rogers (hereinafter: "Rogers") is a California individual with an address of 911 Saint Albans Drive, Encinitas, California.  Cross-Complainants are informed and believe and thereon allege that Rogers' principal business is developing software and inks for specialty computerized inkjet printing.

4.      "Sundance Image Technology, Inc." (hereinafter: "Sundance") is the name of the business that is the signatory to an agreement between "Sundance" and  Cone Editions Press, Ltd. relating to the exclusive right to distribute so-called "MAGMA" inks for computerized inkjet printers. Its purported address is 2001c San Elijo Avenue, Cardiff-by-the-Sea, California.

5.      On information and belief, there is no "Sundance Image Technology, Inc." registered with the State of California as a valid corporation or other entity.  At all relevant times it was Rogers or an agent of Rogers who dealt with CEP and IJM on behalf of "Sundance" with regard to the MAGMA ink distribution agreement.

6. "R9 Corporation" (hereinafter: "R9") is the name of the business that is the signatory to an agreement between "R9" and Cone Editions Press, Ltd. relating to the right to distribute the so-called "Photoshop Plug In Software" for specialty black-and-white print effects with computerized inkjet printers. Its purported address is 3315 H East Russell Road, Las Vegas, Nevada.

7. On information and belief, the corporate charter of the "R9 Corporation" has been revoked by the State of Nevada as a valid corporation or other entity. At all relevant times it was Rogers or an agent of Rogers, who dealt with CEP and IJM on behalf of "R9" with regard to the Photoshop Plug In distribution agreement.

8. CEP and IJM are informed and believe and thereon allege, that they exists and at all times herein mentioned there existed, a unity of interest and ownership between defendants ROGERS, SUNDANCE and R9 such that any individuality and separateness between Defendants ROGERS, SUNDANCE and R9 ceased and Defendants SUNDANCE and/or R9 are the alter ego of Defendant ROGERS in that Defendants SUNDANCE and/or R9 were used merely as a conduit for the personal business of Defendant ROGERS. Adherence to the fiction of the separate existence of the Defendants SUNDANCE and R9 as entities distinct from Defendant ROGERS would permit an abuse of the corporate privilege.

9. Equin Technology, Inc., (hereinafter: "DAS") is a corporation existing under the laws of the State of California. It does business as "www.DigitalArtSupplies.com," an online retailer of products for specialty computerized printing.

10. The identity, true names and capacities of the cross-defendants named herein as well as Roes 1-100, inclusive, and each of them, are not known to Cross-Complainants. Cross-Complaints will amend this cross-complaint to allege their true names and capacities when ascertained. Cross-Complainants are informed and believe and thereon allege that each of the fictitiously named Cross-Defendants are responsible in some way for the occurrences alleged herein, and that Cross-

1  Complainants' damages as alleged herein were proximately caused by the conduct of each of these

2  cross-defendants.

3

4      11.    Cross-Complainants are informed and believe and thereon allege that at all times

5  mentioned herein, Cross-Defendants, and each of them, including but not limited to Roes 1-100, and

6  each of them, were acting as the agents, servants and/or employees of co-Cross-Defendants and were

7  at all times acting within the course and scope of such agency/employment.

8

9                          **NATURE OF THIS ACTION**

10

11     12.    This action concerns several products which CEP and IJM distributed. The "Plug In

12 Software" is a computer program to permit high resolution black-and-white printing that is a "plug-in"

13 for the popular color photofinishing program known as "PhotoShop." The "BWPro Software" is a

14 computer program to permit high resolution black-and-white printing that is a stand-alone application

15 supporting a greater variety of printer types and image sizes and formats. The "MAGMA" inks are

16 specialty black-and-white inks for use in inkjet printers to create actual prints using the Plug In

17 Software or the BWPro Software.

18

19     13.    This is an action for multiple, substantial and material breaches of a variety of written,

20 oral and implied agreements between CEP (and IJM as its designee) and Rogers, as principal of two

21 non-existent corporations, and against DAS for interference with such economic relations between

22 CEP and Rogers.  It is also a claim for declaratory relief in which cross-complainants seek a

23 declaration that the copyright in the BWPro software is a derivative, compilation work in which

24 Rogers, CEP and IJM share joint tenancy.

25

26                        **BUSINESS OF THE PARTIES**

27     14.    CEP is primarily owned by Cone. CEP began as a fine art quality photo printing

28 business. It then expanded into teaching photofinishing techniques and selling related supplies.

15.   IJM was formed by Cone to be the online retail presence for CEP. Its purpose is to sell digital photo supplies, many of which are purchased from original equipment manufacturers and labeled with a variety of CEP trademarks, the most predominant of which is PIEZOGRAPHY and a slew of variants including the PIEZO element.

16.   Rogers does business as two entities, neither of which are currently validly registered in the states in which Rogers claims to have been incorporated. "Sundance Image Technology, Inc." is the name Rogers uses for his business manufacturing and distributing to plaintiffs the specialty replacement inks and cartridges for computer-generated printing. "R9 Corporation" is the name Rogers uses for his business developing software for computer printing.

17.   DAS does business under the name "Digital Art Supplies." It operates a retail web site at the URL www.DigialArtSupplies.com. Its principal is one Karen S. Ernest.

## FORMATION OF THE CONTRACTS AT ISSUE

18.   For numerous years, CEP has been highly regarded in the fine art quality photo finishing industry as an innovator and trendsetter.  CEP has substantial fame and accumulated goodwill as a result of its years of success in the industry.

19.   In late 1999, Rogers contacted Cone after a CEP exhibition that Rogers attended about distributing Rogers's software and inks.  After reviewing Rogers's offerings, Cone declined.

20.   In early 2000, Rogers once again contacted Cone, in Vermont, about distributing Rogers's inks and negotiations began.  The agreement contemplated that the inks would be shipped to Vermont where plaintiffs would resell them and would service its customers including redressing customer complaints.

21.     Cone provided specifications of the Plug In Software and Rogers developed the Plug In Software.

22.     Rogers and Cone agreed that CEP would market the Plug In Software by making copies of it from a master disc. For each copy distributed by Cone, Rogers would earn a royalty. The program was re-named, repackaged and was distributed to end users under Cone's trademark as "PiezographyBW" (hereinafter: the "Plug In Software").

23.     The parties executed a written agreement memorializing this arrangement with respect to the Plug In Software with a 15 page document including two addenda, simply entitled "Software License Agreement" (hereinafter: the "Plug In Software Agreement"). The initial term of the Plug In Software Agreement is three (3) years, ending on February 17, 2003. CEP waived its claim to copyright in the Plug In Software in exchange for the three-year commitment to permit CEP distribute it. A true and correct copy of the Plug In Software Agreement is attached hereto as Exhibit "A."

24.     During the same negotiations, Rogers and Cone also agreed that CEP would be the exclusive distributor of the so-called MAGMA inks, which were designed to function exclusively with the Plug In Software. The parties agreed CEP would have to fulfill a certain minimum purchase requirement to maintain such exclusivity. The parties negotiated and drafted a one page memorandum agreement entitled "Agreement for Exclusive Distribution of Sundance four density black inks Feb 14, 2000" (hereinafter: the "MAGMA Ink Agreement"). A true and correct copy of the Magma Ink Agreement is attached hereto as Exhibit "B."

25.     At the time that Rogers and Cone negotiated such exclusivity, Rogers sought to except DAS from the exclusivity provision. However, Cone explicitly refused this exception on the basis that exclusivity was one of CEP's primary objectives in entering into the agreement.

26.     The written MAGMA Ink Agreement was sent to Cone in Vermont, where he executed

1   it on February 14, 2000.

2

3       27.    On information and belief, the MAGMA Ink Agreement was executed on February 18,

4   2000 by Stuart M. Hurwitz acting as agent of Rogers and Sundance.

5

6       28.    The written Plug In Agreement was sent to Cone in Vermont, where he executed it on

7   February 17, 2000.

8

9       29.    On information and belief, The Plug In Agreement was executed by Rogers on

10  February 17, 2000.

11

12      30.    CEP has a master disk of the Plug In Software which it uses to make copies for

13  distribution.

14

15      31.    Such master disk of the Plug In Software was periodically updated to correct minor

16  programming errors and to update it for compatibility with the latest versions of the primary

17  "Photoshop" program on which it depends as well as for the operating systems for which it is

18  designed, either Microsoft Windows or the Apple Macintosh operating systems.

19

20  **THE DEVELOPMENT OF THE BWPro SOFTWARE**

21

22      32.    Based in part on the success of the Plug In Product, on or about September 1, 2000,

23  CEP requested that Rogers develop a similar product for wide format printers intended for the

24  professional or amateur power user to be distributed by CEP and IJM as PiezographyBWPro

25  (hereinafter: "BWPro Software").

26

27      33.    CEP and Rogers worked together to develop the BWPro Software.

28

34.     Rogers began with a previous product he developed for the color printing market known as "Pixel Picasso."

35.     CEP and IJM contributed proprietary and confidential market information and analysis, plus design specifications.

36.     Rogers contributed computer programming.

37.     CEP and IJM contributed interface design, editorial, testing and debugging services.

38.     Rogers contributed interface design, editorial, testing and debugging services.

39.     CEP/IJM and Rogers both intended that their contributions to creating the BWPro Software be merged into inseparable or interdependent parts of a unitary whole, the product distributed as PiezographyBWPro, referred to herein as the BWPro Software.

40.     In March of 2001, CEP and IJM commenced distribution of the BWPro Software.

41.     CEP/IJM had a master disk that they could use to make copies for distribution. However, the BWPro Software employs a copy protection scheme wherein the user is required to possess both a hardware "dongle" and an "unlock code" to activate the BWPro Software. The user must install the dongle in a port on the user's computer, and then during the installation of the BWPro Software, the user must enter a separate unlock code provided with the dongle and media. In the absence of the appropriate dongle and valid unlock code, the BWPro Software will not function.

42.     CEP/IJM would pre-purchase dongles from Rogers, but such dongles were not supplied with unlock codes.

43.     Upon receiving an order, CEP/IJM would contact Rogers, who would forward an unlock code that CEP/IJM would transmit to the user for installation.

44.     On September 17, 2001, Rogers submitted to CEP new draft license document for the BWPro Software which was substantially identical to the Plug In Software Agreement, but which did not reflect changes that CEP believed had been negotiated.

45.     CEP objected to the proposed BWPro document for two principal reasons: (1) it did not recognize CEP's property rights in CEP's proprietary confidential information and (2) it did not adequately address CEP's concerns about protecting its trademarks.

46.     On October 19, 2001, CEP's counsel communicated these concerns to Rogers by letter.

47.     On November 28, 2001, Rogers repudiated the draft BWPro document and instead proffered an addendum to the Plug In Agreement which would tie the BWPro Software into the terms of the Plug In Agreement.

48.     CEP did not assent to or execute the proffered addendum bringing the BWPro Software within the ambit of the Plug In Agreement, and as a result, the BWPro Software was not brought within the ambit of the Plug In Software Agreement.

49.     The parties had further negotiations which negotiations became soured by the problems with the MAGMA inks.  They never executed a written agreement with respect to the BWPro Software.

50.     In the course of performance under the various CEP - Rogers agreements, CEP supplied to Rogers important and valuable product and design recommendations and market information.

51.     In the course of performance under the various CEP - Rogers agreements, Rogers accepted and used in the creation of the BWPro Software such valuable product and design recommendations, market information and analysis, and related services provided by CEP.

52.     CEP supplied these valuable product and design recommendations, market information and analysis, and related services to Rogers with the expectation of that both parties would have a long term business association and mutual profit from the sale of products incorporating them and a source of supply that would provide CEP with all its requirements for the BWPro Software.

53.     In reliance upon the  ongoing business relationship with Rogers, CEP incurred advertising and marketing expenditures.

54.     In reliance upon the  ongoing business relationship with Rogers, CEP expanded www.InkjetMall.com and designated it to distribute Rogers's software and ink products online.

55.     In the course of performance under the various CEP-Rogers agreements, IJM supplied to Rogers important and valuable product and design recommendations.

56.     In the course of performance under the various CEP - Rogers agreements, IJM supplied to Rogers important and valuable market information.

57.     In the course of performance under the various CEP-Rogers agreements, Rogers accepted such valuable product and design recommendations and related services and information provided by IJM.

58.     IJM supplied such valuable product and design recommendations, market information and analysis and related services with the expectation the parties would have a long term business association and mutual profit from the sale of products incorporating them and a source of supply such

1  that would provide IJM with all its requirements for the BWPro Software.

2

3      59.    In reliance of an ongoing business relationship with Rogers, IJM also incurred

4  advertising and marketing expenditures.

5

6              **DISCOVERY OF THE DEFECTIVE INKS**
              **AND FAILURE TO DELIVER THE MOST**

7          **UP-TO-DATE VERSIONS OF THE SOFTWARE**

8

9  **A.    The Magma Ink Agreement**

10

11     60.    During the course of performance under the MAGMA Ink Agreement, CEP and IJM

12  discovered that an unreasonably high number of the MAGMA inks delivered to CEP and IJM in

13  Vermont were defective.

14

15     61.    Customers contacted CEP or IJM in Vermont with technical support issues related to

16  the MAGMA inks.  This directly and proximately caused CEP and IJM damages in the form of

17  unnecessary technical support expenses incurred in Vermont.

18

19     62.    CEP/IJM MAGMA ink customers experienced the following defects with the Magma

20  Inks:

21          a.    unacceptable "greening" effect for prints that were supposed to be black-and-

22                white;

23

24          b.    unacceptably rapid fading of black-and-white images to unacceptable duller

25                tones and shades of brown;

26

27          c.    unacceptable clogging of inkjet cartridges;

28

d.      unacceptable clogged printer ink delivery systems; and

e.      unacceptable mislabeling of inks.

63.     Such defective inks were nonconforming goods with respect to the MAGMA Ink Agreement.

64.     Customers returned the defective MAGMA inks and CEP or IJM in Vermont. CEP/IJM then either replaced the inks or issued a refund.

65.     CEP incurred damages in Vermont in the form of the cost of replacement inks and ink cartridges sent to dissatisfied customers.

66.     CEP incurred damages in Vermont in the form of handling and shipping charges related to replacing the defective MAGMA inks.

67.     CEP and IJM incurred damages in the form of replacing customer's ink systems, including technical support, handling and shipping expenses related to replacing the defective MAGMA inks.

68.     CEP complained informally to Rogers on numerous occasions that too much of the inks supplied by Rogers were defective.

69.     Under the MAGMA Ink Agreement, CEP is obligated to pay for inks purchased within 30 days from date summons is served from date summons is served of purchase.

70.     Upon tabulating the damages incurred by delivery of the nonconforming Sundance inks, CEP began to withhold payments and slowed the rate of payment to 60 days.

71.     Rogers complained that payment in 60 days was too slow.

72.     CEP renewed to Rogers its claims for compensation for the nonconforming inks delivered by Rogers.

73.     On or about June 12, 2002, "Sundance Image Technology, Inc." filed this lawsuit against CEP seeking declaratory relief which would relieve it from the exclusivity provision of the MAGMA Ink Agreement and based on alleged nonpayment.

74.     At the time such lawsuit was filed, CEP/IJM was not more than 60 days late on payment of any invoice from Rogers, Sundance or R9.

75.     On or about July 2, 2002, CEP sent to Rogers a formal notice of nonconforming goods under Uniform Commercial Code Section 2-607 by certified or registered mail.

76.     Rogers refused to accept delivery of CEP's notice of nonconforming goods.

77.     On information and belief, such refusal to accept delivery of CEP's notice of nonconforming goods was deliberate and in bad faith.

78.     On July 17, 2002, CEP re-sent the notice of nonconforming goods to Rogers's agent Stuart Hurwitz both by facsimile and U.S. Mail.

79.     To date, Rogers has not addressed or cured the defects alleged in CEP's notice of nonconforming goods.

80.     The defective, nonconforming inks have caused CEP's and IJM's customers to seek and purchase competing products.

81.     As a direct and proximate result, CEP's and IJM's competitors' market share has increased, while CEP's and IJM's market share has decreased.

**B.      The Plug In Software Agreement**

82.     Under the terms of the Plug In Software Agreement, Rogers is obligated to deliver to CEP and IJM the latest version of the Plug In Software.  Rogers refused to deliver the latest version of the Plug In Software.

83.     The failure to deliver the latest version of the Plug In Software has caused CEP's and IJM's customers to seek and purchase competing products.

84.     As a direct and proximate result, CEP's and IJM's competitors' market share has increased, while CEP's and IJM's market share has decreased.

**C.      BWPro Software**

85.     Rogers promised CEP and IJM that Rogers would deliver to CEP and IJM the latest version of the BWPro Software in human readable or "source code" form.  Rogers further promised it would deliver to CEP and IJM "unlock codes" necessary for use of the BWPro Software.

86.     In reliance on the aforementioned promises of Rogers, CEP and IJM marketed and sold the BWPro Software.

87.     Rogers has possession of the latest version of the BWPro Software and has refused to deliver it to CEP or IJM in human-readable or "source code" form and has refused to deliver unlock codes.

88.    It is impossible for CEP and IJM to use the BWPro Software or to register the copyright in the BWPro Software without possession of the latest version of the human-readable or "source code" version. It is impossible for CEP and IJM's customers to use the BWPro Software without the proper unlock codes.

89.    The failure to deliver the latest version of the BWPro Software and the unlock codes has caused CEP's and IJM's customers to seek and purchase competing products.

90.    As a direct and proximate result, CEP's and IJM's competitors' market share has increased, while CEP's and IJM's market share has decreased.

## DECLINE OF THE PARTIES' ASSOCIATION

91.    In the ordinary course of business, CEP and Rogers developed new products as new printers gained in popularity and the popularity of older printers waned.

92.    In the ordinary course of business, CEP has exceeded the minimum volume of ink purchases from Rogers under the MAGMA Ink Agreement to require exclusivity under the MAGMA Ink Agreement.

93.    The volume of physical ink CEP purchased from Rogers has exceeded the minimum volume contemplated by the MAGMA Ink Agreement to require exclusivity.

94.    The volume of ink in dollar value purchased by CEP from Rogers has exceeded the minimum volume contemplated by the MAGMA Ink Agreement to require exclusivity.

95.    In the course of performance under the MAGMA Ink Agreement both parties have performed with the expectation of and reliance upon exclusivity.

96.     On or about June 25, 2002, Rogers began selling the MAGMA inks to DAS.

97.     On or about June 25, 2002, DAS began selling the MAGMA inks under the trademark "Sundance Neutral Warm Inks."

98.     At the time that DAS began selling Rogers's MAGMA inks, DAS knew about the MAGMA Ink Agreement and in particular knew that the MAGMA Ink Agreement granted CEP the exclusive right to distribute the MAGMA inks.

99.     On or about June 25, 2002, DAS released a statement to the press announcing that it was selling MAGMA inks to the public. In that statement DAS represented that the exclusivity that CEP had with respect to Rogers's MAGMA inks had been terminated, and that therefore DAS had begun selling the MAGMA inks.

100.    Rogers's sale of the MAGMA inks to DAS breached the covenant of exclusivity expressly set forth in the written MAGMA Ink Agreement.

101.    Rogers breached this covenant of exclusivity in the MAGMA Ink Agreement without reasonable advance notice to plaintiffs.

102.    Rogers breached the covenant of exclusivity in the MAGMA Ink Agreement without justifiable excuse.

103.    On or about June 25, 2002, Rogers refused to take orders from CEP and has since refused to fulfill all preexisting orders.

104.    DAS improperly induced Rogers to breach the MAGMA Ink Agreement by selling the MAGMA inks to DAS and by refusing to sell the MAGMA inks to CEP/IJM.

105.   Each sale of MAGMA inks by DAS is a sale lost by CEP and IJM in Vermont.

106.   Rogers's sales of its MAGMA inks to DAS has caused CEP and IJM to lose profits in Vermont.

107.   DAS's sales of the MAGMA inks to the public has caused CEP and IJM to lose profits in Vermont.

108.   Rogers's refusal to sell the MAGMA inks to CEP has caused CEP and IJM to lose profits in Vermont.

109.   It was foreseeable to both Rogers and DAS that CEP and IJM would lose profits by breaching the covenant of exclusivity set forth in the MAGMA Ink Agreement and that these damages would be sustained by plaintiffs in Vermont.

110.   It was foreseeable to Rogers that CEP and IJM would lose profits by Rogers's refusal to sell inks to CEP and IJM.

111.   On July 11, 2002, Rogers wrote to CEP attempting to unilaterally impose a different arrangement with respect to the distribution of the BWPro Software by seeking to require disclaimer language regarding the Sundance inks and requiring prepayment for all software licenses.

112.   CEP and IJM did not assent to the new arrangement proposed by Rogers in the letter dated July 11, 2002.

113.   After July 11, 2002, Rogers refused to deliver "unlock codes" to activate BWPro Software for end users for BWPro Software prepurchased by IJM.

114.     Such refusal to deliver "unlock codes" caused damage to IJM by causing IJM to cancel orders already placed by customers, thereby depriving IJM of profits and damaging IJM's reputation in the industry.

115.     After July 11, 2002, Rogers refused to deliver new dongles or unlock codes for the BWPro Software ordered by IJM.

116.     Such refusal to deliver dongles and unlock codes for the BWPro Software has damaged IJM by causing IJM to cancel orders already placed by customers, thereby depriving IJM of profit and damaging IJM's reputation in the industry.

117.     The damages Rogers's conduct caused plaintiffs were foreseeable consequences.

118.     The damages DAS's conduct caused plaintiffs were foreseeable consequences.

### FIRST CAUSE OF ACTION
### BREACH OF CONTRACT (AGAINST ROGERS AND SUNDANCE)

119.     Plaintiffs herewith reallege and incorporate by reference all statements and allegations made in paragraphs number 1-118.

120.     CEP has a valid contract for CEP to be the exclusive distributor of the MAGMA inks. It is memorialized by a one page written agreement referred to herein as the MAGMA Ink Agreement.

121.     The inks provided under the MAGMA Ink Agreement were required to perform as specified and claimed: to wit, appear black and not green, not rapidly dull or fade to brown, and not clog cartridges and ink delivery systems.

////

////

122.   Rogers breached The MAGMA Ink Agreement by delivering inks that looked green instead of black, that rapidly dulled or faded to brown, and that clogged cartridges and ink delivery systems.

123.   Such defective inks were nonconforming goods.

124.   CEP validly rejected such nonconforming goods by various notices including formal notice.

125.   Rogers failed to cure the defects in the nonconforming goods.

126.   Rogers replaced some defective MAGMA inks but sometimes with more defective inks. To date Rogers has refused and failed to cure, credit or refund to CEP or IJM the complete value of the nonconforming inks.

127.   Rogers's refusal to cure, credit or refund to CEP the complete value of the defective inks has directly and proximately caused damage to CEP's and IJM's business.

145.   CEP and IJM have been consequentially damaged by Rogers's delivery of nonconforming goods, in that this cost CEP and IJM unnecessary expenses in the form of processing returns and refunds, providing refunds or replacement inks, providing replacement printer parts, lost personnel time, and shipping expenses. The amount of these consequential damages already exceeds an amount calculated to be at least Sixty-Two-Thousand dollars ($62,000+).

128.   Rogers's acts and omissions have directly and proximately caused CEP and IJM special damages in the form of lost profits in sales to competitors in an amount estimated to exceed Two-Hundred-Fifty-Thousand dollars ($250,000+/-).

## SECOND CAUSE OF ACTION

## INTENTIONAL INTERFERENCE WITH PROSPECTIVE ECONOMIC ADVANTAGE (AGAINST DAS)

129.    Plaintiffs herewith reallege and incorporate by reference all statements and allegations made in paragraphs number 1-128.

130.    CEP had a valid business relationship or expectation with Rogers/Sundance with respect to the exclusive distribution of MAGMA inks.

131.    Defendant DAS knew of such business relationship between CEP and Rogers/Sundance.

132.    Defendant DAS willfully and intentionally interfered in such business relationship between CEP and Rogers by disparaging CEP by publishing or causing to be published in the relevant marketplace misrepresentations regarding the state of the relationship between Rogers/Sundance and CEP, and particularly regarding the existence of an agreement of exclusivity thereby inducing Rogers/Sundance to breach the MAGMA Ink Agreement.

133.    DAS knew, or reasonably should have known, that its actions would damage plaintiffs.

134.    These actions by DAS were and are improper.

135.    DAS so acted to further its own financial interest.

136.    DAS's acts and omissions and the resulting interference directly and proximately caused damage to CEP and IJM.

137.   DAS's acts and omissions directly and proximately caused special damages to CEP and IJM in the form of lost profits in sales to competitors in an amount estimated to exceed Two-Hundred-Fifty-Thousand dollars ($250,000+/-).

138.   The Aforementioned acts of DAS were willful and malicious therefore entitling cross-complaints to punitive damages.

## THIRD CAUSE OF ACTION

### NEGLIGENT INTERFERENCE WITH PROSPECTIVE ECONOMIC ADVANTAGE (AGAINST DAS)

139.   Plaintiffs herewith reallege and incorporate by reference all statements and allegations made in paragraphs number 1-138.

140.   CEP had a valid business relationship or expectation with Rogers/Sundance with respect to the exclusive distribution of MAGMA inks.

141.   Defendant DAS knew of such business relationship between CEP and Rogers/Sundance.

142.   DAS disparaged CEP by publishing or causing to be published statements in the relevant marketplace misrepresenting the state of the relationship between Rogers/Sundance and CEP, particularly regarding the existence of an agreement of exclusivity.  DAS failed to exercise ordinary care such that the disparaging statements by DAS resulted in a disruption in the economic relationship between Rogers/Sundance and CEP.

143.   DAS knew, or reasonably should have known, that its actions would damage plaintiffs.

144.   These actions by DAS were and are improper.

145. DAS so acted to further its own financial interest.

146. DAS's acts and omissions and the resulting interference directly and proximately caused damage to CEP and IJM.

147. DAS's acts and omissions directly and proximately caused special damages to CEP and IJM in the form of lost profits in sales to competitors in an amount estimated to exceed Two-Hundred-Fifty-Thousand dollars ($250,000+/-).

## FOURTH CAUSE OF ACTION

### BREACH OF CONTRACT (AGAINST ROGERS AND SUNDANCE)

148. Plaintiffs herewith reallege and incorporate by reference all statements and allegations made in paragraphs number 1-147.

149. The MAGMA Ink Agreement expressly granted to CEP the exclusive right to distribute the MAGMA inks, predicated upon a minimum purchase requirement.

150. Contracts for the sale of goods carry an obligation for the seller to transfer and deliver the goods.

151. Contracts for exclusive dealings carry an obligation for the seller to use best efforts to supply the goods.

152. CEP has performed under the MAGMA Ink Agreement, except to the extent performance was excused or precluded by Defendants non-performance, and has exceeded the minimum purchases required to maintain exclusivity, both in dollar value and physical volume.

153. Rogers is selling the MAGMA inks to CEP's competitor DAS.

154.    Rogers unilaterally and without privilege or justification repudiated or terminated the MAGMA Ink Agreement.

155.    Rogers did not give plaintiffs adequate notice of his intent to repudiate or terminate the MAGMA Ink Agreement.

156.    Rogers did not give plaintiffs reasonable notice of his intent to repudiate or terminate the MAGMA Ink Agreement.

157.    Rogers terminated the MAGMA Ink Agreement prematurely and without just cause.

158.    Such breach of the MAGMA Ink Agreement by selling the MAGMA inks to DAS in contravention of the exclusivity provision set forth in the Magma Ink Agreement has directly and proximately caused damage to plaintiffs' business in the form of lost profits in sales to competitors in an amount estimated to exceed Two-Hundred-Fifty-Thousand dollars ($250,000+/-).

## FIFTH CAUSE OF ACTION

### BREACH OF CONTRACT
### (AGAINST ROGERS AND SUNDANCE)

159.    Plaintiffs herewith reallege and incorporate by reference all statements and allegations made in paragraphs number 1-158.

160.    The MAGMA Ink Agreement expressly granted to CEP the exclusive right to distribute the Rogers MAGMA inks, predicated upon a minimum purchase requirement.

161.    Contracts for the sale of goods carry an obligation for the seller to transfer and deliver the goods.

162.   Contracts for exclusive dealings carry an obligation for the seller to use best efforts to supply the goods.

163.   CEP has performed under the MAGMA Ink Agreement, except to the extent performance was excused or precluded by Defendants for non-performance, and has exceeded the minimum purchases required to maintain exclusivity, both in dollar value and physical volume.

164.   Rogers/Sundance has refused and failed to deliver inks to CEP and IJM as CEP's designee.

165.   Rogers/Sundance unilaterally and without privilege or justification repudiated or terminated the MAGMA Ink Agreement.

166.   Rogers/Sundance did not give plaintiffs adequate notice of his intent to repudiate or terminate the MAGMA Ink Agreement.

167.   Rogers/Sundance did not give plaintiffs reasonable notice of his intent to repudiate or terminate the MAGMA Ink Agreement.

168.   Rogers/Sundance terminated the MAGMA Ink Agreement prematurely and without just cause.

169.   The aforementioned conduct of Rogers/Sundance has directly and proximately caused CEP and IJM special damages in the form of lost profits in sales to competitors in an amount estimated to exceed Two-Hundred-Fifty-Thousand dollars ($250,000+/-).

////

////

////

## SIXTH CAUSE OF ACTION

## BREACH OF CONTRACT (AGAINST ROGERS AND R9)

170.    Plaintiffs herewith reallege and incorporate by reference all statements and allegations made in paragraphs number 1-169.

171.    Contracts for the sale of goods carry an obligation for the seller to transfer and deliver the goods.

172..    CEP and IJM as CEP's designee have performed under the Plug In Software Agreement, except to the extent performance has been excused or precluded by Defendants' breach.

173.    CEP and IJM are entitled to delivery of up-to-date version of the Plug In Software that is viable in the marketplace for the term of the Plug In Software Agreement.

174.    Rogers/R9 has refused and failed to deliver the most up-to-date version of the Plug In Software.

175.    Rogers/R9 unilaterally repudiated the Plug In Software Agreement.

176.    Rogers/R9 did not give plaintiffs adequate notice of his intent to repudiate the Plug In Software Agreement.

177.    Rogers/R9 did not give plaintiffs reasonable notice of his intent to repudiate the Plug In Software Agreement.

178.    Rogers /R9 repudiated the Plug In Software Agreement prematurely and without just cause.

179.   Such breach of the Plug In Software Agreement by refusing and failing to deliver the most up-to-date version of the Plug In Software to CEP and IJM has directly and proximately caused damage to plaintiffs' business.

180.   Rogers/R9 has also directly and proximately caused CEP and IJM damages including but not limited to special damages in the form of lost profits in sales to competitors in an amount estimated to exceed Two-Hundred-Fifty-Thousand dollars ($250,000+/-).

181.   Under the terms of the Plug In Software Agreement, the party prevailing in litigation arising from the Plug In Software Agreement is entitled to recover from the other party "all costs and expense of suit," including reasonable attorneys fees.  CEP and IJM have been required to retained the Chapin Shea McNitt & Carter law firm and the Law Offices of Markus Brakhan (collectively "the Attorneys") to protect their interest as against Rogers/R9.  CEP and IJM are entitled to recover from Rogers/R9 the costs and expenses of suit herein, including but not limited to fees incurred to the Attorneys.

## SEVENTH CAUSE OF ACTION
## BREACH OF CONTRACT (AGAINST ROGERS)

182.   Plaintiffs herewith reallege and incorporate by reference all statements and allegations made in paragraphs number 1-181.

183.   Rogers promised to CEP and IJM that if CEP and IJM prepurchased dongles, Rogers would deliver valid unlock codes upon sale of the dongles and BWPro Software to end users.

184.   In reliance on said promises by Rogers, CEP and IJM have substantially performed their part to trigger the obligation of Rogers to deliver valid unlock codes for dongles by pre-paying for several units.

185.    Rogers has refused and failed to deliver unlock codes to the BWPro Software to CEP and IJM as CEP's designee.

186.    Rogers unilaterally repudiated or terminated its obligation to deliver such unlock codes.

187.    Rogers failed to give adequate notice of his intent to repudiate or terminate the arrangement to deliver unlock codes.

188.    Rogers failed to give reasonable notice of his intent to repudiate or terminate the arrangement to deliver unlock codes.

189.    Rogers prematurely terminated the arrangement to deliver unlock codes without cause.

190.    The aforementioned conduct of Rogers has caused CEP and IJM damages to CEP and IJM including, but not limited to special damages in the form of lost profits in an amount estimated to exceed Two Hundred Fifty Thousand dollars ($250,000 +/-)

## EIGHT CAUSE OF ACTION
### DECLARATORY RELIEF

191.    Plaintiffs herewith reallege and incorporate by reference all statements and allegations made in paragraphs number 1-190.

192.    The BWPro Software is a computer program.

193.    CEP and IJM contributed preexisting material and data to the development of the BWPro Software, to wit, proprietary confidential information, performance and function specifications, trademarks and goodwill, and presence in the marketplace.

194.    CEP and IJM contributed newly created material and data to the development of the BWPro Software, to wit, proprietary confidential information, performance and function specifications, interface design, editorial, testing and debugging services.

195.    Rogers contributed preexisting material and data to the development of the BWPro Software, to wit, the "Pixel Picasso" technology and proprietary confidential information.

196.    Rogers contributed newly created material to the development of the BWPro Software, to wit, proprietary confidential information, additional computer programming, printer function "profiles," interface design, editorial, testing and debugging services.

197.    CEP, IJM and Rogers together selected, coordinated, or arranged the materials contributed to create the BWPro Software.

198.    CEP, IJM and Rogers all intended that their contributions to creating the BWPro Software be merged into inseparable or interdependent parts of a unitary whole, the product distributed under CEP's trademark Piezography BWPro, referred to herein as the BWPro Software.

199.    The BWPro Software is a joint work.

200.    The BWPro Software is a compilation.

201.    The BWPro Software is a derivative work.

202.    A dispute has arising and an actual controversy now exists among the parties whereby CEP and IJM assert that CEP, IJM and Rogers are joint owners of the copyright in the BWPro Software, notwithstanding each party's respective rights in preexisting materials and Rogers denies

1   CEP and IJM any ownership in the copyright in the BWPro Software. CEP and IJM desire a judicial

2   determination of the respective rights of the parties in the copyright of the BWPro Software.

3

4   **NINTH CAUSE OF ACTION**

5   **BREACH OF CONTRACT (AGAINST ROGERS)**

6

7   203.   Plaintiffs herewith reallege and incorporate by reference all statements and allegations

8   made in paragraphs number 1-202.

9

10   204.   Rogers made to CEP and IJM, but later failed to honor, numerous representations to

11   Plaintiff that Rogers would deliver an up-to-date and functional version of the BWPro Software on

12   an as-needed basis.

13

14   205.   When making those representations, Rogers knew, or reasonably should have known,

15   that CEP and IJM would rely upon each of its representations that Rogers would deliver an up-to-date

16   and functional version of the BWPro Software on an as-needed basis.

17

18   206.   CEP  and IJM relied on such representations of Rogers by providing software design

19   suggestions and services, market information and analysis plus association with CEP's pre-existing

20   industry goodwill.

21

22   207.   Said reliance by CEP and IJM was reasonable.

23

24   208.   CEP's and IJM's reliance on Roger's unfulfilled promises was detrimental to CEP and

25   IJM, in that it directly and proximately caused CEP and IJM to suffer expectation damages and

26   damage to CEP's and IJM's business.

27

28

209.   CEP and IJM had an expectation of an ongoing relationship wherein Rogers would deliver an up-to-date and functional version of the BWPro Software on an as-needed basis.

210.   Said expectation was reasonable.

211.   Rogers breached such expectation by failing to deliver  an up-to-date and functional version of the BWPro Software on an as-needed basis.

212.   It would be manifestly unjust to deprive CEP of the opportunity to profit from the sale of Rogers's software due to Rogers's failure to honor his promise to deliver an up-to-date and functional version of the BWPro Software on an as-needed basis.

213.   CEP and IJM have incurred special damages of lost profits in sales to competitors in an amount estimated to exceed Two-Hundred-Fifty-Thousand dollars ($250,000+/-).

## TENTH CAUSE OF ACTION

## BREACH OF CONTRACT (AGAINST ROGERS)

214.   Plaintiffs herewith reallege and incorporate by reference all statements and allegations made in paragraphs number 1-213.

215.   Rogers made to CEP, but later failed to honor, numerous representations to Plaintiff that Rogers would deliver conforming inks on an exclusive as-needed basis.

216.   When making those representations, Rogers knew, or reasonably should have known, that CEP would rely upon each of its representations that Rogers would deliver conforming inks on an exclusive as-needed basis.

217. CEP relied on such representations of Rogers by providing software design suggestions and services, market information and analysis, and association with CEP's pre-existing industry goodwill.

218. Said reliance by CEP was reasonable.

219. CEP's reliance on Roger's unfulfilled promises was detrimental to CEP and IJM, in that it directly and proximately caused CEP and IJM to suffer expectation damages and damage to CEP's and IJM's business.

220. CEP and IJM had an expectation of an ongoing relationship wherein Rogers would deliver conforming inks on an exclusive as-needed basis.

221. Said expectation was reasonable.

222. Rogers breached such expectation by failing to deliver conforming inks on an exclusive as-needed basis.

223. CEP and IJM have also incurred special damages of lost profits in sales to competitors in an amount estimated to exceed Two-Hundred-Fifty-Thousand dollars ($250,000+/-).

224. It would be manifestly unjust to deprive CEP and IJM of the opportunity to profit from the sale of Rogers's inks due to Rogers's failure to honor his promise to deliver to CEP and IJM conforming inks on an exclusive as-needed basis.

225. Wherefore, Rogers should be held liable for the expectation and other damages caused by its failure to honor his promise to deliver conforming inks on an exclusive as-needed basis.

////

WHEREFORE, Cross-Complainants CONE EDITIONS PRESS, LTD and INKJETMALL.COM pray for relief as follows:

1.    Compensatory damages in an amount to be proven at time of trial but not less than $250,000;

2.    General damages;

3.    Punitive damages;

4.    Reasonable Attorney Fees

5.    Cost of suit incurred herein; and

6.    Such other and further relief the Court deem just and proper.

DATED: October 15, 2002          CHAPIN SHEA MCNITT & CARTER

By: _____
Peter B. Maretz
Attorneys for Defendant CONE EDITIONS
PRESS, LTD. and INKJETMALL.COM



# Software License Agreement

This Software License Agreement ("Agreement") is made and entered into as of 12/02/99 (the "Effective Date") by and between R9 Corporation, a Nevada Corporation with its principal place of business located at Las Vegas, Nevada ("Licensor") and Cone Editions Press, Ltd., with its principal place of business located at East Topsham, VT ("Licensee").

## RECITALS

A. Licensor has rights to license and sublicense software technology; and

B. Licensee desires to utilize Licensor's software technology ("Technology", as defined in Exhibit A) for use in its software, and Licensor is willing to grant a license to Licensee to utilize the Technology.

NOW, THEREFORE, in consideration of these premises and the mutual covenants herein contained, the parties agree as follows:

## 1.  License

### 1.1.  Grant of License

Licensor hereby grants to Licensee, subject to the terms and conditions of this Agreement, a non-exclusive, non-transferable, worldwide license to utilize the Technology. Licensee may utilize the Technology to manufacture products incorporating all, or a portion of the Technology, and may sell products that include all, or any of the Technology. Licensed Products shall include those products manufactured by Licensee which utilize the Technology in whole or part, and Licensee may sell Licensed Products to end users, and/or for resale to end users.

### 1.2.  Modifications, Reverse Engineering

Licensee agrees that only Licensor shall have the right to alter, maintain, enhance, and otherwise modify the Technology. Licensee shall not disassemble, decompile, or reverse engineer the Technology.

### 1.3.  Material Terms and Conditions

Licensee specifically agrees that each of the terms and conditions of this Section are material, and that failure of Licensee to comply with these terms and conditions constitute sufficient cause for Licensor to terminate this agreement. The presence of this Subsection shall not be relevant in determining the materiality of any other provision or breach of this Agreement by either party.

EXHIBIT "A"

## 2.    Term

Except as provided in Section 16, "Default and Termination", this Agreement shall remain in effect until, and shall terminate upon the expiration of three (3) years from the date hereof, and may be extended for three (3) years upon mutual agreement of the parties. Neither party will unreasonably withhold such extension.

## 3.    Delivery, Testing, and Acceptance

### 3.1.    Delivery

Licensor shall deliver the Technology, as set forth in Exhibit A, to Licensee's Site designated in Section 24, "Notices" within ten (10) days of the Effective Date of this Agreement.

### 3.2.    Testing

Licensee shall have thirty (30) days, commencing upon delivery of the Technology, to test the Technology for substantial compliance with the specifications set forth in Exhibit A (the "Testing Period"). During the Testing Period, Licensee shall immediately provide notice to Licensor of any failure of the Technology to substantially comply with such specifications. Upon receipt of such notice, Licensor shall use reasonable efforts to remedy the failure and install a fix within thirty (30) days. If such notice is provided by Licensee to Licensor, the Testing Period shall be extended through the thirtieth (30th) day after Licensor's last fix of a failure of the Technology.

### 3.3.    Acceptance

"Acceptance" shall occur:

(i)        upon Licensee's written notice to Licensor that the Technology substantially complies with the specifications set forth in Exhibit A; or

(ii)        if Licensee does not provide notice of failure of the Technology within thirty (30) days of the close of the Testing Period.

(iii)        Licensee shall also be deemed to have accepted the Technology if Licensee makes the Technology available in products Licensee markets.

## 4.    License Fee

### 4.1.    In General

In consideration for the license granted by Licensor under this Agreement, Licensee shall pay Licensor a fee of seventy-five dollars ($75.00) for each Licensed Product sold.

### 4.2. Sales and Returns

Licensed Products shall be deemed to have been sold when delivered. If Licensed Products are returned or allowances made thereon, based upon failure of the Technology to perform satisfactorily, after a Royalty shall have been paid, Licensee shall be entitled to take appropriate credit for such overpayment against Royalties thereafter occurring, or if further royalties are insufficient for such credit, Licensor shall refund such amounts to Licensee.

### 4.3. Internal Use and Demonstration Units

Royalties shall be paid for all Licensed Products sold by Licensee, or manufactured for its own internal purposes.

Notwithstanding the other clauses of this Section, Licensee shall be allowed a total of ten (10) royalty-free copies of the Licensed Products for its own internal use and demonstration.

## 5. Payments and Taxes

### 5.1. Payments

Any and all cash payments of any kind which may be payable by Licensee to Licensor under the terms of this Agreement shall be paid in United States Dollars.

### 5.2. Payment Terms

Each monthly installment of the License Fee shall be due and payable at the end of the following month. All amounts not paid within fifteen (15) days of the due date shall bear interest at the rate of one and one-half percent (1.5%) per month, or at the highest rate allowed by law, whichever is less, from such date until paid. Failure by Licensee to pay any amounts due shall constitute sufficient cause for Licensor to terminate this Agreement.

### 5.3. Taxes

Any taxes, duties or imposts other than income or sales taxes assessed or imposed upon the sums due hereunder to Licensor, or upon or with respect to this Agreement, shall be borne and discharged by Licensee, and no part thereof shall be deducted from the amounts payable to Licensor under any clause of this Agreement, said amounts to be otherwise net to Licensor.

### 5.4. Consents

Licensee and Licensor agree to use reasonable efforts to obtain any necessary approval of this Agreement by governmental authorities, and to obtain the consent of any such authorities to the remittance of payments to Licensor under this Agreement in the event that such consent should become necessary.

## 6.    Accounting

### 6.1.    Statement of Sales

Licensee shall keep accurate records of all transactions relating to the Technology sales and transfers. At the time each royalty payment is due, Licensee shall furnish Licensor with a written statement setting forth the volume of the Technology sold or transferred. Licensor and/or Licensor's agent, upon giving ten (10) days written notice, shall have the right to inspect these records during business hours at Licensee's place of business. Licensor agrees to sign or require Licensor's agent to sign non-disclosure statements obligating Licensor and Licensor's agent not to disclose matters that do not pertain to Licensor or the Technology.

### 6.2.    Statement Information

Licensee's records shall accurately contain total number of licensed products that have been sold or transferred to third parties, or put into internal use by Licensee.

### 6.3.    Payment for Audit

If the audit of Licensee's records initiated by Licensor discloses underpayments by Licensee of more than ten percent (10%) for the period audited, payment for the audit shall be made by Licensee. Otherwise, payment for the audit shall be made by Licensor.

## 7.    Ownership

Licensee agrees that Licensor owns all proprietary rights, including patent, copyright, trade secret, trademark and other proprietary rights, in and to the Technology and any corrections, bug fixes, enhancements, updates or other modifications, including custom modifications, to the Technology made by Licensor or any third party on Licensor's behalf.

## 8.    Confidential Information

### 8.1.    Confidentiality

Licensee agrees that the Technology contains proprietary information, including trade secrets, know-how and confidential information, which is the exclusive property of Licensor. During the period this Agreement is in effect and for a period of ten (10) years thereafter, Licensee and its employees and agents shall maintain confidentiality of this information and not sell, license, publish, display, distribute, disclose, or otherwise make available this information to any third party, and for a period of five (5) years thereafter, Licensee shall not use such information except as authorized by this Agreement. Licensee shall not disclose any such proprietary information concerning the Technology, including any flow charts, logic diagrams, user manuals, screens sketches, drawings, reports and notes, to persons not an employee of Licensee without the written consent of Licensor. To that end, and without limiting the generality of the foregoing provision, Licensor will cause all written materials and other documents relating to or containing such information provided to Licensee, including all source codes, flow charts, logic diagrams, user manuals, screens sketches, drawings, reports and notes,

and all copies, reprints and reproductions, to be plainly marked to indicate the secret and confidential nature thereof, to prevent the unauthorized use or reproduction thereof. Licensee shall use the same degree of care as it uses to protect its own confidential information. Notwithstanding anything herein to the contrary, this provision shall not apply to confidential information a) which can be documented to have already been in the possession of, or known by Licensee prior to disclosure by Licensor; b) which becomes publicly available through no fault of Licensee; c) which is later released publicly by Licensor; d) which is lawfully obtained from third parties not bound to a duty of confidentiality; or e) which can be documented to have been developed by Licensee independently, and independent of confidential information of Licensor.

### 8.2. Permitted Disclosures

Licensee shall have the right to communicate information acquired from Licensor pursuant to this Agreement for the purpose of, and only to the extent necessary for designing, manufacturing and/or selling the Licensed Products, to any officer or employee of Licensee, provided that such officer or employee shall be subject to the provisions of this Section. In the event of any disclosure or use of information in violation of this Agreement by Licensee, or use of others caused by disclosure in violation of this Agreement by Licensee, Licensee will indemnify Licensor for all damages caused by such disclosure or use. Licensee shall be permitted to supply to end users non confidential information, including manuals, OEM manuals or other information or materials necessary for sale or servicing of Licensed Products; provided, however, at least 30 days prior to use of any such materials, Licensee shall have given Licensor the opportunity to review such materials, and Licensor shall have the right to require Licensee to modify or amend such materials to prevent any disclosure of confidential information.

## 9. Maintenance, Updates, and Enhancements

### 9.1. Error Fixes

For the duration of this Agreement, if Licensee notifies Licensor of error(s) in the Technology or notifies Licensor that it has other reason to believe that errors exist in the Technology, Licensor shall use reasonable efforts to verify and fix the error(s) within thirty (30) days following receipt of notification. Licensor shall promptly notify Licensee if an error cannot be fixed within the time specified in this paragraph. If such an error substantially affects the marketability of the Technology, and a fix cannot be effected in a reasonable time, Licensee may declare this Agreement terminated under the provisions of Section 16, "Default and Termination".

### 9.2. Updates

For the duration of this Agreement, Licensor may supply, at no charge to Licensee, any enhancements independently made by Licensor to the Technology that improve performance or utility. At the discretion of Licensee, Licensee may include them in new product versions.

### 9.3. Enhancements

If Licensee requests in writing that an enhancement be made, Licensor may make such enhancements at Licensor's time and materials rate for such work, as specified in Section 10.2, "Reimbursements".

## 10. Services and Training

### 10.1. Services

In the event Licensee should desire technical assistance and/or training in connection with the Technology, Licensor shall make available the services of engineering personnel of Licensor (the "Services").

### 10.2. Reimbursements

There shall be no charge for telephone technical support rendered to Licensee by Licensor for ninety (90) days following Licensee's initial production volume shipment of Licensed Products. Thereafter, Licensee shall reimburse Licensor for telephone technical support at the rate of

$100.00/hour with a $25.00 minimum charge.

For services that cannot be rendered to Licensee by Licensor as telephone technical support, Licensee shall reimburse Licensor for any direct and indirect expenses otherwise incurred by Licensor pursuant to this Section. The rates that Licensor will charge Licensee for services will be in accordance with the following schedules and conditions:

$150.00/hour
$1200.00/day
$5000.00/week

Services that require travel by the engineering personnel of Licensor shall be billed with a two day minimum plus all reasonable travel expenses.

Licensor will notify Licensee in writing thirty (30) days before making any adjustment to the fee schedule.

## 11. Warranty

### 11.1. Scope of Warranty

Licensor warrants to Licensee that for a period of ninety (90) days commencing upon Acceptance the Technology will substantially comply with the specifications set forth in Exhibit A. During this warranty period, Licensor shall also provide Licensee the support and maintenance services set forth in Section 10, "Services and Training". After expiration of the warranty period, Licensor shall provide support and maintenance for the Software pursuant to the terms of Section 9. "Maintenance, Updates, and Enhancements".



### 11.2. Disclaimer of Any Other Warranty

THE LIMITED WARRANTY SET FORTH IN SUBSECTION 11.1 "SCOPE OF WARRANTY" IS IN LIEU OF ALL OTHER WARRANTIES, EXPRESS OR IMPLIED, INCLUDING BUT NOT LIMITED TO THE IMPLIED WARRANTIES OF MERCHANTABILITY AND FITNESS FOR A PARTICULAR PURPOSE.

## 12.  Limitations Period

No arbitration or other action under this Agreement, unless involving death or personal injury, may be brought by either party against the other more than one (1) year after the cause of action arises.

## 13.  No Consequential Damages

Neither party shall be liable to the other for indirect, special, incidental, exemplary or consequential damages (including, without limitation, lost profits) related to this Agreement or resulting from Licensee's use or inability to use the Technology, arising from any cause of action whatsoever, including contract, warranty, strict liability, or negligence, even if notified of the possibility of such damages.

## 14.  Limitation on Recovery

Under no circumstances shall the liability of Licensor to Licensee exceed the amounts paid by Licensee to Licensor under this Agreement.

## 15.  Competitive Technology

If Licensee wishes to utilize any competitive technology, it will first give written notice to Licensor. If, within forty-five (45) days after receipt of such notice Licensor offers Licensee advances on the Technology, or new technologies, which alone or in conjunction with the Technology provide similar functions at least as effectively as the competitive technology, and Licensor offers to promptly incorporate such new or advanced technology into the licensed Technology at no additional cost, Licensee will not use the competitive technology. If Licensor is unable to accomplish this, however, Licensee may then utilize the competitive technology.

## 16.  Default and Termination

### 16.1. Default

In the event of a material default by either party in the performance of its duties, obligations or undertakings under this Agreement, the other party shall have the right to give written notice to the defaulting party, advising such party of the specific default involved and, if, within thirty (30) days after such notice, the defaulting party shall not have remedied or commenced diligently to remedy the default, the other party shall have the right, in addition to any other rights and remedies it may have hereunder, to terminate this Agreement immediately.

### 16.2.  Other Defaults

Notwithstanding any other provision of this Agreement, and in addition to any other rights and remedies it may have, Licensor shall have the right to terminate this Agreement, effective immediately, if:

(i)      Licensee ceases or refuses to pay within thirty (30) days of the due date thereof any Royalties, if and when payable, as provided in Section 5, "Payments and Taxes", hereof; provided that nothing in this subparagraph shall be construed to relieve Licensee of its liability to pay said Royalties on all Licensed Products sold prior to termination of this Agreement; or

(ii)     At any time Licensee is adjudged bankrupt or insolvent, or files a petition in bankruptcy or an answer admitting the material facts recited in such a petition filed by another, or is put or decides to go into dissolution or liquidation (other than in connection with a merger, consolidation or amalgamation), or otherwise discontinues business, makes an assignment for the benefit of its creditors or any other general arrangement with its creditors, becomes insolvent or unable to meet its current payments, has a receiver or other custodian of any kind appointed to administer any substantial amount of its property, is placed or enters into any comparable situation under the laws of the country of its incorporation or any nation, state or province in which its operations may be conducted, otherwise seeks to take advantage of any bankruptcy or insolvency statute now or hereinafter in effect, or suffers any similar financial distress.

### 16.3.  Effect of Termination

Upon termination of this Agreement:

(i)      With the exception of Section 16.3(iii) below, all rights granted to Licensee under this Agreement shall immediately cease, and absolutely no interest whatsoever in any of such rights, in whole or in part, shall thereafter continue in favor of Licensee or any of its sublicensees, agents, employees, or shareholders, or any person or entity in any way affiliated with, or related to Licensee.

(ii)     Licensee shall cease forthwith the manufacture and sale of Licensed Products under the licenses herein granted to it, and shall return immediately to Licensor any and all source codes, samples, specifications, drawings, designs, and any other documents or materials furnished Licensee or otherwise obtained from Licensor under this Agreement or as a result of this Agreement, as well as any and all similar materials which in any way contain, reflect or relate to the Technology obtained by Licensee under this Agreement and are a result of this Agreement, and any and all copies and reproductions of such materials.

(iii)    Licensor shall, if it so elects, have the right to purchase any or all of the Licensed Products manufactured by Licensee which are unsold at the time of such termination. The price to Licensor shall be retail. Only if Licensor does not elect to purchase said Licensed Products or equipment may Licensee continue to sell the same to others.

(iv)    The obligations of Licensee with respect to accrued Royalties under Section 4, "License Fee", and with respect to all the relevant provisions of this Agreement shall survive any termination of this Agreement.

## 17.    No Agency/Joint Venture Created

Neither party shall be deemed to be an agent or partner of the other as a result of, or in any transaction under or relating to, this Agreement, and shall not make any warranty or representation or incur any obligation on behalf of or in the name of the other party.

## 18.    Assignment

Except as provided in this Section, the rights and duties of any party hereunder shall not be assignable by any party. This Agreement and all rights and obligations hereunder may be assigned by either party to, and assumed by, any corporation or other business entity which succeeds to all or substantially all of the assets and business of such party through merger, consolidation, acquisition of assets or stock, or other corporate reorganization. In any event, this Agreement shall inure to and be binding upon the parties and their successors and assigns.

## 19.    Sublicensing

Licensee may not sublicense its rights under this Agreement to third parties; except, however, Licensee may sublicense its rights and duties under this Agreement to any wholly-owned subsidiary of Licensee. In the event that Licensee does assign its rights and duties to any such wholly-owned subsidiary, Licensee shall remain responsible for all obligations and duties under this Agreement notwithstanding any such sublicense. Licensee shall promptly notify Licensor of any sublicense agreement.

## 20.    Injunctive Relief

The remedy at law, if any, of the non-breaching party with respect to any breach of this Agreement by the other shall be inadequate in view of the irreparable and continuing damage which any such breach would cause. The non-breaching party shall be entitled to injunctive relief against any continuation of such breach, in addition to any other remedies, whether legal or equitable, otherwise available to the non-breaching party.

## 21.    Attorney's Fees

Upon the bringing of any action or suit by a party hereto against another party hereunder by reason of any breach of the covenants or agreements herein or otherwise arising out of this Agreement, then the party in whose favor final judgment is rendered shall be entitled to recover from the other party all costs and expenses of suit, including reasonable attorney's fees.



## 22.   Arbitration

The parties agree that any dispute arising out of or relating to this Agreement or its subject matter shall be submitted to binding arbitration in San Diego, California, in accordance with such rules as the parties jointly agree upon. If the parties are unable to agree upon arbitration procedures, arbitration shall be conducted in accordance with the appropriate rules of the American Arbitration Association.

## 23.   Force Majeure

Any delay or failure in performance hereunder by either party hereto shall be excused if and to the extent caused by occurrences beyond such party's control, including but not limited to decrees or restraints of government, natural disaster, war, riot, civil commotion, sabotage or any other such causes.

## 24.   Notices

All notices and other communications required or permitted to be given or made under this Agreement shall be in writing and shall be deemed to have been duly given and received, either: (a) on the day of hand delivery; or (b) upon receipt, or upon attempted delivery, when sent by United States certified mail, postage and certification fee prepaid, return receipt requested, addressed as follows:

To Licensor at:
   3315H East Russell Road, #900
   Las Vegas, NV 89120
   Attn: President

To Licensee at:
   Powder Spring Road
   East Topsham, VT 05076
   Attn: President

or at such other address as either party most recently may have designated in writing in accordance with this Section to the other party for this purpose.

## 25.   Export Control Regulations

Without prior written consent of Licensor and prior authorization of the United States Office of Export Administration, Licensee shall not knowingly export or re-export directly or indirectly any Technology or any portion thereof received from Licensor, and technical data relating to the Technology received from Licensor, or any Licensed Products produced directly by use of any of the Technology, to any country where such export or re-export is restricted by the United States Department of Commerce.



## 26. General Provisions

### 26.1. Complete Agreement

This Agreement contains the entire agreement between the parties with respect to the subject matter hereof and supersedes any and all prior agreements, understandings and commitments, whether oral or written.

### 26.2. Amendment

This Agreement may be amended only by a writing signed by duly authorized representatives of both parties.

### 26.3. Waiver

Either party hereto may expressly waive any breach of this Agreement by the other party, but no such waiver shall be deemed to have been given unless such waiver is in writing, is signed by the waiving party and specifically designates the breach waived, nor shall any such waiver constitute a continuing waiver, or a waiver of similar or other breaches.

### 26.4. Invalid Provision

If, for any reason whatsoever, any one or more of the provisions of this Agreement shall be held or deemed to be inoperative, unenforceable or invalid in a particular case or in all cases, such circumstance shall not have the effect of rendering any of the other provisions of this Agreement inoperative, unenforceable or invalid, and the inoperative, unenforceable or invalid provision shall be construed as if it were written so as to effectuate, to the maximum extent possible, the parties' intent; provided, however, that if any of the provisions of Sections 4, "License Fee", 8, "Confidential Information" or 16, "Default and Termination" are held inoperative, unenforceable or invalid by any court of competent jurisdiction or other relevant authority, Licensor and Licensee shall hold good faith consultations over a period of ninety (90) days in an effort to work out satisfactory terms for continuation of the Agreement. If Licensor and Licensee do not reach agreement within this period, Licensor or Licensee shall have the right to terminate this Agreement, effective immediately.

### 26.5. Governing Law

The existence, validity, construction, operation and effect of any and all terms and provisions of this Agreement shall be determined in accordance with and governed by the laws of the State of California, USA.

### 26.6. Controlling Text

It is understood and agreed that the English Text of this Agreement is controlling.



### 26.7. Nondisclosure

Neither party shall disclose the financial terms of this Agreement to any third person or entity, except as required by law, to comply with any applicable law or as necessary to inform its own private advisors and consultants, such as attorneys and accountants.

### 26.8. Counterparts

This Agreement may be executed in one or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.

### 26.9. Captions

Captions of the Sections and paragraphs of this Agreement are for convenience only, and shall not be considered or referred to in resolving questions or interpretation of this Agreement.

### 26.10. Read and Understood

Each party acknowledges that it has read and understands this Agreement, has had an opportunity to have this Agreement reviewed by independent counsel, and agrees to be bound by its terms.

LICENSOR:

Signature

GARY ROGERS
Name

PRESIDENT
Title

LICENSEE:

Signature

Jon Cone
Name

President
Title

# EXHIBIT A

## LICENSED TECHNOLOGY

The term "Technology" is defined as the technology supplied by Licensor and described in the specifications set forth in this Exhibit. The term "Technology" includes any corrections, bug fixes, enhancements, updates or other modifications, including custom modifications made at the request of Licensee for Licensee, to the Licensed "Technology".

The Technology is described in the attached documents:

- "Introduction to the R9Epson Plug-in from R9 Corporation"
- "Welcome to the R9 Epson Export Module from R9 Corporation (Windows)"
- "Welcome to the R9 Epson Export Module from R9 Corporation (Macintosh)"
- "RIM Files: R9Export Preferences"

Licensor shall deliver the Technology to Licensee for both the Macintosh and Windows (32-bit) operating systems in the formats listed below. The Technology will differ from that documented above in that references to "R9", except for those found in copyright statements, shall be replaced by either "ConeTech Piezography™" or "Piezography™".

## 1.   Macintosh

- ConeTech Piezography™, a Photoshop® Export plug-in
- Piezography™ Preferences, an R9Export Preferences RIM file
- Default RGB and CMYK ICC profiles
- Documentation (see above) in Acrobat™ Exchange 3.01 format
- Piezography™ installer.vct, an Installer VISE document
- ConeTech Piezography™, a Installer VISE installation program
- ICC Profile, an ICC Profile utility application program

## 2.   Windows

- Piezography.8be, a Photoshop® Export plug-in (8BE file)
- Piezography.rim, an R9Export RIM file
- Default RGB and CMYK ICC profiles
- Documentation (see above) in Acrobat™ Exchange 3.01 format
- ConeTech.ipr, an InstallShield® 5.0 Free Edition installation project



# Attachment to Software License Agreement
# dated 12/2/99
# between
# R9 Corporation and Cone Editions Press, Ltd.

## RECITALS

A. R9 Corporation, a Nevada Corporation with its principal place of business located at Las Vegas, Nevada ("Licensor"), and Cone Editions Press, Ltd., with its principal place of business located at East Topsham, VT ("Licensee"), have made and entered into a Software License Agreement dated 12/2/99 ("Agreement dtd 12/2/99"), whereby Licensor granted Licensee a license to utilize Licensor's proprietary technology ("Technology", as defined in Exhibit A of the Agreement dtd 12/2/99); and

B. Licensor has rights to license and sublicense software technology that extends the capabilities of the Technology (the "Extended Technology"); and Licensee desires to utilize the Extended Technology for use in its software; and Licensor is willing to grant a license to Licensee to utilize the Extended Technology; and

C. Unless otherwise specified in this attachment to the Agreement dtd 12/2/99 (the "Attachment"), all terms and conditions of the Agreement dtd 12/2/99 apply to the license granted to the Extended Technology; none of the terms and conditions specified in this Attachment change the terms and conditions of the Agreement dtd 12/2/99 as they apply to the Technology.

NOW, THEREFORE, in consideration of these premises and the mutual covenants herein contained, the parties agree as follows:

## 1. The Extended Technology

The Extended Technology includes two modules, which Licensor will deliver to Licensee on a single CD-ROM (the "B&W Master"), described below:

### 1.1. Macintosh

- ConeTech Piezography™ BW, a Photoshop® Export plug-in
- Piezography™ BW Preferences, an R9Export Preferences RIM file
- A minimum of thirteen ICQ profiles, proprietary data tables for specific ink/media combinations
- A Macintosh program that will install the plug-in, RIM file, and ICQ profiles

### 1.2. Windows

- PiezographyBW.8be, a Photoshop® Export plug-in (8BE file)
- PiezographyBW.rim, an R9Export RIM file
- A minimum of thirteen ICQ profiles, proprietary data tables for specific ink/media combinations
- A Windows program that will install the plug-in, RIM file, and ICQ profiles

## 2. License

### 2.1. Grant of License

Licensor hereby grants to Licensee, subject to the terms and conditions of this Attachment, a non-exclusive, non-transferable, worldwide license to utilize the Extended Technology. Licensee may utilize the Extended Technology to manufacture products incorporating all, or a portion of the Extended Technology, and may sell products which include all, or any of the Extended Technology. Licensed Products shall include those products manufactured by Licensee which utilize the Extended Technology in whole or part, and Licensee may sell Licensed Products to end users, and/or for resale to end users.

## 3. License Fee

### 3.1. In General

In consideration for the license granted by Licensor under this Agreement, Licensee shall pay Licensor a fee of seventy-five dollars ($75.00) for each Licensed Product transferred to third parties.

LICENSOR:

Signature

Name  GARY ROGERS

Title  PRESIDENT

Date  2/17/00

LICENSEE:

Signature

Name  JON CONE

Title  PRESIDENT

Date  2-17-00

Case 3:02-cv-02258-JM-AJB   Document 1   Filed 11/15/02   Page 55 of 122

RECITALS

Sundance Image Technology, Inc., a California Corporation with its principal place of business located at 2011c San Elijo Avenue, Cardiff-by-the-Sea,  CA  92007, and Cone Editions Press, Ltd., with its principal place of business located at Powder Spring Road, East Topsham, VT , have made and entered into an Exclusive Ink Distribution Agreement dated 2/14/00 , whereby Sundance Image Technology, Inc. granted Cone Editions Press, Ltd. an  agreement to exclusively distribute Sundance's MAGMA (four density) inks.

1. Exclusivity will be predicated on:
   a) CONE placing an initial order of one hundred (100) sets of MAGMA 3000 cartridges; and -
   b) CONE reaching an order rate of one hundred (100) sets of MAGMA 3000 cartridges per month, within ninety (90) days after receipt of the initial order.
   c) If the order rate is less than 75 ink sets /month for 3 consecutive months or below 25 ink sets for any month SUNDANCE has the right to terminate the exclusive agreement.

2. Price and payment:
   a) The price when ordering in quantities of twenty-five (25) sets (four cartridges per set) is thirty dollars ($30.00) per cartridge. For quantities of less than 25 sets the price is thirty-five dollars ($35.00) per cartridge.
   b) Payment terms are 2% 10 days, net 30 days.
   c) Prices are F.O.B. Cardiff, California.

3. In the event that the order rate from CONE drops below the rate required for exclusivity, CONE will be able to purchase cartridges at the thirty dollar ($30.00) per cartridge price in lots of twenty-five (25) sets or greater.

4. SUNDANCE reserves the right to sell to OEM customers that either manufacture a printer or sell a system including computer, printer and software and do not sell ink cartridges to anyone other than their system customers.

5. CONE reserves the right to sell to other retailers.

6. CONE reserves the right to distribute Sundance's MAGMA (four density) inks under another product name such as, but not limited to, ConeTech PiezographBW inks.


SUNDANCE IMAGE TECHNOLOGY, INC.:

Signature _Stuart M. Hurwitz_

Name _STUART M. HURWITZ_

Title _ATTORNEY_

Date _FEBR. 18, 2000_


CONE EDITIONS PRESS, LTD.:

Signature _Jon Cone_

Name _JON CONE_

Title _PRESIDENT_

Date _2-14-00_


*Agreement for Exclusive Distribution of Sundance four density black inks   Feb 14, 2000*

EXHIBIT "B"

**EXHIBIT  2**

982.2(b)(1)

ATTORNEY OR PARTY WITHOUT ATTORNEY (Name, number, and address):
PHILIP H. DYSON, ESQ.   SBN#097528
LAW OFFICES OF PHILIP H. DYSON
8461 LA MESA BLVD.
LA MESA, CA 91941
TELEPHONE NO: 619-462-3311    FAX NO: 619-462-3382
ATTORNEY FOR (Name): R9 CORPORATION

INSERT NAME OF COURT, JUDICIAL DISTRICT, AND BRANCH COURT, IF ANY:

SUPERIOR COURT OF CALIFORNIA - COUNTY OF SAN DIEGO

CASE NAME: R9 CORP. vs. CONE EDITIONS PRESS LTD.

FOR COURT USE ONLY
FILED
CIVIL BUSINESS OFFICE 8
CENTRAL DIVISION

02 OCT 11  PM 4:04

STEPHEN THUNBERG
CLERK-SUPERIOR COURT
SAN DIEGO COUNTY, CA

| CIVIL CASE COVER SHEET | Complex Case Designation | CASE NUMBER: |
|---|---|---|
| ☐ Limited  ☒ Unlimited | ☐ Counter  ☐ Joinder  Filed with first appearance by defendant (Cal. Rules of Court, rule 1811) | GIC797940  ASSIGNED JUDGE: |

*Please complete all five (5) items below.*

1. Check **one** box below for the case type that best describes this case:

**Auto Tort**
☐ Auto (22)

**Other PI/PD/WD (Personal Injury/Property Damage/Wrongful Death) Tort**
☐ Asbestos (04)
☐ Product liability (24)
☐ Medical malpractice (45)
☐ Other PI/PD/WD (23)

**Non-PI/PD/WD (Other) Tort**
☐ Business tort/unfair business practice (07)
☐ Civil rights (e.g., discrimination, false arrest) (08)
☐ Defamation (e.g., slander, libel) (13)
☐ Fraud (16)
☐ Intellectual property (19)
☐ Professional negligence (e.g., legal malpractice) (25)
☐ Other non-PI/PD/WD tort (35)

**Employment**
☐ Wrongful termination (36)
☐ Other employment (15)

**Contract**
☒ Breach of contract/warranty (06)
☐ Collections (e.g., money owed, open book accounts) (09)
☐ Insurance coverage (18)
☐ Other contract (37)

**Real Property**
☐ Eminent domain/Inverse condemnation (14)
☐ Wrongful eviction (33)
☐ Other real property (e.g., quiet title) (26)

**Unlawful Detainer**
☐ Commercial (31)
☐ Residential (32)
☐ Drugs (38)

**Judicial Review**
☐ Asset forfeiture (05)
☐ Petition re: arbitration award (11)

☐ Writ of mandate (02)
☐ Other judicial review (39)

**Provisionally Complex Civil Litigation (Cal. Rules of Court, rules 1800-1812)**
☐ Antitrust/Trade regulation (03)
☐ Construction defect (10)
☐ Claims involving mass tort (40)
☐ Securities litigation (28)
☐ Toxic tort/Environmental (30)
☐ Insurance coverage claims arising from the above listed provisionally complex case types (41)

**Enforcement of Judgment**
☐ Enforcement of judgment (e.g., sister state, foreign, out-of-county abstracts) (20)

**Miscellaneous Civil Complaint**
☐ RICO (27)
☐ Other complaint (not specified above) (42)

**Miscellaneous Civil Petition**
☐ Partnership and corporate governance (21)
☐ Other petition (not specified above) (43)

2. This case ☐ is ☒ is not complex under rule 1800 of the California Rules of Court. If case is complex, mark the factors requiring exceptional judicial management:
   a. ☐ Large number of separately represented parties
   b. ☐ Extensive motion practice raising difficult or novel issues that will be time-consuming to resolve
   c. ☐ Substantial amount of documentary evidence
   d. ☐ Large number of witnesses
   e. ☐ Coordination and related actions pending in one or more courts in other counties, states or countries, or in a federal court
   f. ☐ Substantial post-disposition judicial disposition

3. Type of remedies sought (check all that apply):
   a. ☒ monetary   b. ☒ nonmonetary; declaratory or injunctive relief   c. ☐ punitive

4. Number of causes of action (specify): 5 - Breach of Contract, Enforcement of Aribtration, etc.

5. This case ☐ is ☒ is not a class action suit.

Date: OCTOBER 10, 2002

PHILIP H. DYSON, ESQ.
(TYPE OR PRINT NAME)                    ► (SIGNATURE OF PARTY OR ATTORNEY FOR PARTY)

**NOTICE**
- Plaintiff must file this cover sheet with the first paper filed in the action or proceeding (except small claims cases or cases filed under the Probate, Family, or Welfare and Institutions Code). (Cal. Rules of Court, rule 982.2.)
- File this cover sheet in addition to any cover sheet required by local court rule.
- If this case is complex under rule 1800 et seq. of the California Rules of Court, you must serve a copy of this cover sheet on all other parties to the action or proceeding.
- Unless this is a complex case, this cover sheet shall be used for statistical purposes only.

Form Adopted for Mandatory Use
Judicial Council of California
982.2(b)(1) [Rev. January 1, 2000]

CIVIL CASE COVER SHEET

©EB

Cal. Rules of Court, rules 982.2, 1800-1812;
Standards of Judicial Administration, § 19

# SUMMONS
## (CITACION JUDICIAL)

**NOTICE TO DEFENDANT:** *(Aviso a Acusado)*
CONE EDITIONS PRESS, LTD., a Vermont Corporation,
and DOES 1 through 10,

**FOR COURT USE ONLY**
*(SOLO PARA USO DE LA CORTE)*

**YOU ARE BEING SUED BY PLAINTIFF:**
*(A Ud. le está demandando)*
R9 CORPORATION, a Nevada Corporation

| | |
|---|---|
| You have **30 CALENDAR DAYS** after this summons is served on you to file a typewritten response at this court. | *Después de que le entreguen esta citación judicial usted tiene un plazo de 30 DIAS CALENDARIOS para presentar una respuesta escrita a máquina en esta corte.* |
| A letter or phone call will not protect you; your typewritten response must be in proper legal form if you want the court to hear your case. | *Una carta o una llamada telefónica no le ofrecerá protección; su respuesta escrita a máquina tiene que cumplir con las formalidades legales apropiadas si usted quiere que la corte escuche su caso.* |
| If you do not file your response on time, you may lose the case, and your wages, money and property may be taken without further warning from the court. | *Si usted no presenta su respuesta a tiempo, puede perder el caso, y le pueden quitar su salario, su dinero y otras cosasde su propiedad sin aviso adicional por parte de la corte.* |
| There are other legal requirements. You may want to call an attorney right away. If you do not know an attorney, you may call an attorney referral service or a legal aid office (listed in the phone book). | *Existen otros requisitos legales. Puede que usted quiera llamar a un abogado inmediatamente. Si no conoce a un abogado, puede llamar a un servicio de referencia de abogados o a una oficina de ayuda legal (vea el directorio telefónico).* |

The name and address of the court is: *(El nombre y dirección de la corte es)*
SUPERIOR COURT OF CALIFORNIA - COUNTY OF SAN DIEGO
CENTRAL JUDICIAL DIVISION
330 W. BROADWAY
SAN DIEGO, CA 92101

**CASE NUMBER:** *(Número del Caso)*
**GIC 797940**

The name, address, and telephone number of plaintiff's attorney, or plaintiff without an attorney, is:
*(El nombre, la dirección y el número de teléfono del abogado del demandante, o del demandante que no tiene abogado, es)*
PHILIP H. DYSON, ESQ.   SBN#097528          619-462-3311
LAW OFFICES OF PHILIP H. DYSON
8461 LA MESA BLVD.
LA MESA, CA 91941

**DATE:** OCT 1 1 2002
*(Fecha)*

Clerk, by _____, Deputy
*(Actuario)*   **RUSSELL TAYLOR**   *(Delegado)*

[SEAL]

**NOTICE TO THE PERSON SERVED:** You are served
1. ☐ as an individual defendant.
2. ☐ as the person sued under the fictitious name of *(specify)*:

3. ☐ on behalf of *(specify)*:

   under: ☐ CCP 416.10 (corporation)          ☐ CCP 416.60 (minor)
          ☐ CCP 416.20 (defunct corporation)  ☐ CCP 416.70 (conservatee)
          ☐ CCP 416.40 (association or partnership)  ☐ CCP 416.90 (individual)
          ☐ other:
4. ☐ by personal delivery on *(date)*:

Form Adopted for Mandatory Use
Judicial Council of California
982(a)(9) [Rev. January 1, 1984]

**(See reverse for Proof of Service)**
**SUMMONS**



CCP 412.20

# SUMMONS
## (CITACION JUDICIAL)

**NOTICE TO DEFENDANT:** *(Aviso a Acusado)*
CONE EDITIONS PRESS, LTD., a Vermont Corporation,
and DOES 1 through 10,

| FOR COURT USE ONLY |
| :---: |
| *(SOLO PARA USO DE LA CORTE)* |

**YOU ARE BEING SUED BY PLAINTIFF:**
*(A Ud. le está demandando)*
R9 CORPORATION, a Nevada Corporation

| | |
| --- | --- |
| You have **30 CALENDAR DAYS** after this summons is served on you to file a typewritten response at this court. | *Después de que le entreguen esta citación judicial usted tiene un plazo de 30 DIAS CALENDARIOS para presentar una respuesta escrita a máquina en esta corte.* |
| A letter or phone call will not protect you; your typewritten response must be in proper legal form if you want the court to hear your case. | *Una carta o una llamada telefónica no le ofrecerá protección; su respuesta escrita a máquina tiene que cumplir con las formalidades legales apropiadas si usted quiere que la corte escuche su caso.* |
| If you do not file your response on time, you may lose the case, and your wages, money and property may be taken without further warning from the court. | *Si usted no presenta su respuesta a tiempo, puede perder el caso, y le pueden quitar su salario, su dinero y otras cosas de su propiedad sin aviso adicional por parte de la corte.* |
| There are other legal requirements. You may want to call an attorney right away. If you do not know an attorney, you may call an attorney referral service or a legal aid office (listed in the phone book). | *Existen otros requisitos legales. Puede que usted quiera llamar a un abogado inmediatamente. Si no conoce a un abogado, puede llamar a un servicio de referencia de abogados o a una oficina de ayuda legal (vea el directorio telefónico).* |

The name and address of the court is: *(El nombre y dirección de la corte es)*
SUPERIOR COURT OF CALIFORNIA - COUNTY OF SAN DIEGO
CENTRAL JUDICIAL DIVISION
330 W. BROADWAY
SAN DIEGO, CA 92101

CASE NUMBER: *(Número del Caso)*
**GIC797940**

The name, address, and telephone number of plaintiff's attorney, or plaintiff without an attorney, is:
*(El nombre, la dirección y el número de teléfono del abogado del demandante, o del demandante que no tiene abogado, es)*
PHILIP H. DYSON, ESQ.   SBN#097528          619-462-3311
LAW OFFICES OF PHILIP H. DYSON
8461 LA MESA BLVD.
LA MESA, CA 91941

DATE: **OCT 1 1 2002**          Clerk, by **RUSSELL TAYLOR**, Deputy
*(Fecha)*                       *(Actuario)*                        *(Delegado)*

**NOTICE TO THE PERSON SERVED:** You are served

[SEAL]

1. ☐ as an individual defendant.
2. ☐ as the person sued under the fictitious name of *(specify)*:

3. ☐ on behalf of *(specify)*:

under: ☐ CCP 416.10 (corporation)          ☐ CCP 416.60 (minor)
       ☐ CCP 416.20 (defunct corporation)   ☐ CCP 416.70 (conservatee)
       ☐ CCP 416.40 (association or partnership)   ☐ CCP 416.90 (individual)
       ☐ other:

4. ☐ by personal delivery on *(date)*:

Form Adopted for Mandatory Use
Judicial Council of California
982(a)(9) [Rev. January 1, 1984]

**(See reverse for Proof of Service)**
**SUMMONS**



CCP 412.20

PHILIP H. DYSON, Esq.
State Bar No. 097528
8461 La Mesa Boulevard
La Mesa, California 91941
(619) 462-3311

Attorney for Plaintiff,
R9 CORPORATION

FILED
CIVIL BUSINESS OFFICE 8
CENTRAL DIVISION

02 OCT 11 PM 4:04

STEPHEN THUNBERG
CLERK-SUPERIOR COURT
SAN DIEGO COUNTY, CA

SUPERIOR COURT OF THE STATE OF CALIFORNIA

FOR THE COUNTY OF SAN DIEGO

| | |
|---|---|
| R9 CORPORATION, a Nevada Corporation, <br><br> Plaintiff, <br><br> vs. <br><br> CONE EDITIONS PRESS, LTD., a Vermont Corporation, and DOES 1 through 10, <br><br> Defendants. | Case No. GIC 797940 <br><br> PLAINTIFF'S COMPLAINT FOR ENFORCEMENT OF ARBITRATION; OR ALTERNATIVELY BREACH OF CONTRACT, FOR GOODS SOLD AND DELIVERED, DECLARATORY RELIEF: CONTRACT TERMINATION, AND INJUNCTION. |

Plaintiff, R9 CORPORATION complains and alleges as follows:

**ALLEGATIONS COMMON TO AND INCLUDED IN ALL CAUSES OF ACTION**

1.    Plaintiff R9 CORPORATION ("R9" or "Plaintiff") is, and at all times mentioned as relevant to Defendants' acts herein, was a Nevada Corporation, doing business in San Diego County, State of California. Plaintiff is qualified to do business in California, as noted in the files of the Secretary of State. Plaintiff's primary manager regarding all matters involving Defendant is Gary Rogers ("Rogers"). Rogers is a resident of San Diego, California. All contacts relevant herein originated in San Diego with Rogers acting on behalf of Plaintiff.

///

2.    Defendant CONE EDITIONS PRESS, LTD. (hereinafter referred to as "Defendant" or "CEP"), is a Vermont Corporation, and at all times mentioned herein was, doing business in San Diego County, State of California.

3.    Plaintiff is ignorant of the true names and capacities of defendants sued as DOES 1 through 10, inclusive, and therefore sues these defendants by fictitious names.  Plaintiff will amend this Complaint to allege true names and capacities when ascertained.

4.    Plaintiff is informed, believes and alleges that each, every and all Defendants are responsible in some manner for the occurrences alleged, and that the harm alleged was proximately caused by the conduct of said Defendants.

5.    Plaintiffs are informed, believe and thereon allege that each Defendant, including DOES 1 through 10, inclusive, is, and at all relevant times herein mentioned was, the servant, agent, employee, and/or joint venturer of each and every other Defendant, or in some manner allied in interest with each other Defendant such that each acted within the course, scope, purpose and authority of said allied interest, agency or employment, and that each Defendant ratified and approved the actions of the others.

6.    This court is the proper court because the contracts upon which the complaint is based were negotiated, drafted, and entered into in San Diego County.  The contracts were performed here; and the actions complained of herein occurred within its jurisdiction.  Finally, the software involved herein was created in San Diego County, and all witnesses relevant to the creation of the software are found in San Diego County, or California.

**FIRST CAUSE OF ACTION**

**(Enforcement of Arbitration Clause)**

**(Against CEP and Does 1-10)**

7.    Plaintiff here incorporates, alleges and realleges each and every allegation contained in paragraphs numbered 1-6 of the Complaint as though fully set forth herein.

8.    On December 2, 1999, R9 and CEP entered into the contract attached as Exhibit 1 ("the contract"), hereby incorporated by reference as if stated in full.

///

9.      CEP has not paid the royalty payments due under the contract, and as required pursuant to the payment terms of provision 5.2. This constitutes a material breach which has caused damage to R9. The last payment made was for June, 2002, and the amount alleged unpaid, based upon average payments over the last 12 months, is $8,000.00 per month. By the end of October, 2002, there will be approximately $32,000.00 to which R9 is entitled.

10.    As with all contracts, this contract has an implied provision of good faith and fair dealing. In further breach of the agreement, CEP has made disparaging remarks about R9 products.

11.    There is no pending action between R9 corporation and CEP.  CEP, however, has made a claim to ownership of software sold pursuant to the contract, and has sued Rogers in Vermont, Federal District Court, CASE NO. 2:02 CV 173.  Presently, a Motion to dismiss is pending, on the grounds of a lack of personal jurisdiction over Rogers, and that: the forum is not convenient, that R9 is a corporation which actually owns the software (not Rogers), and that the contract between CEP and R9 requires arbitration.

12.    CEP's suit in Vermont violates the arbitration clause of the contract, provision 22, which provides that:

> The parties agree that any dispute arising out of or relating to this Agreement or its subject matter shall be submitted to binding arbitration in San Diego, California, in accordance with such rules as the parties jointly agree upon. If the parties are unable to agree upon arbitration procedures, arbitration shall be conducted in accordance with the appropriate rules of the American Arbitration Association.  Exhibit 1.

13.    The Software Licensing Agreement explicitly states that all rights belong to R9. Exhibit 1, provisions 7 and 8. Therefore, the public claims of ownership by CEP equate to a breach of contract.

14.    R9 demanded the arbitration of all claims between the parties and this was refused. See Exhibits 2 and 3. R9 has not waived its right to compel arbitration, and no grounds exist for the revocation of the contract.

///

15.    On September 17, 2002, one of the bases for refusing arbitration was addressed by showing CEP that R9 was a corporation properly doing business in California. Exhibit 4.

16.    Arbitration was again demanded by R9 on September 26, 2002, and received no response. See Exhibit 5. The failures to submit to arbitration in San Diego, California, and to submit to the procedural law of California which governs the contract (provision 26.5) by suing in Vermont Federal Court, both equate to breaches of contract. Exhibit 1.

17.    In that an agreement to arbitrate the above disputes exists, the California Code of Civil Procedure, Section 1280 et. seq., with particular reference to the California Code of Civil Procedure, Section 1281.2, permits this Court to issue an order compelling arbitration. Plaintiff requests the Court issue an order compelling arbitration.

18.    The contract provides for the recovery of attorney fees regarding the need to enforce any provision, which includes the arbitration provision. CEP is thereby liable for Plaintiffs' attorney fees, and such fees are sought herein. See Exhibit 1, provision 21.

## SECOND CAUSE OF ACTION

### (Breach of Contract)

### (Against CEP and Does 1-10)

19.    Plaintiff here incorporates, alleges and realleges each and every allegation contained in paragraphs numbered 1-18 of the Complaint as though fully set forth herein.

20.    In the alternative, the breaches discussed above should be litigated in this Court, should this Court find arbitration unenforceable or unavailable for any reason.

21.    The provisions of the written contract, and the implied provision of good faith and fair dealing, were breached by Defendants' failure to fulfill their obligations in several ways, including those outlined in paragraphs 9-16, incorporated by reference, and:

a) failure to pay license royalties, more than 30 days past due;

b) failure to make timely payments, according to the contract terms, including interest on unpaid amounts (1.5% monthly; Provision 5.2);

c) improperly claiming a right to litigate disputes in Vermont;

d) disparaging the products of R9 to the general and consuming public;

1      e) on information and belief, the failure to actually pay the amounts owing based

2  upon CEP mis-stating amounts sold;

3      f) CEP has recently disclosed internal workings of the software (8.2); and

4      g) CEP has stated CEP will be using competitive technology (15).

5  22.    Plaintiff fully performed the contracts. In the last two years, the contract, Exhibit 1,

6  was breached in the above alleged ways.

7  23.    The above breaches of contract have caused Plaintiff damage. These breaches,

8  including the cost of attorney fees in the Federal action, have caused Damages which

9  exceed $30,000.00. Such damage also includes the cost of hiring an attorney to gain

10  proper payment.

11  24.    Defendant's conduct in breaching the agreements has not been excused, waived,

12  accepted or compromised.

13  25.    Plaintiff sues herein for recovery of its attorney fees as incurred related to the

14  contractual breach issues above. Exhibit 1, provision 21.

### THIRD CAUSE OF ACTION

### (Declaratory Relief- Contract Termination)

### (Against CEP and Does 1-10)

18  26.    Plaintiff here incorporates, alleges and realleges each and every allegation contained

19  in paragraphs numbered 1-24 of the Complaint as though fully set forth herein.

20  27.    Plaintiff seeks this relief in the alternative to gaining an order ordering CEP to arbitrate

21  this claim.

22  28.    Plaintiff entered into the contract at issue (Exhibit 1), and would not have entered such

23  contract with Defendant had Defendant not agreed to pay for the software licensed.

24  29.    Plaintiff signed the agreement with Defendant upon the understanding that there would

25  be mutual benefit. Furthermore, there was no expectation that Defendant would make

26  disparaging remarks regarding R9's products.

27  ///

28  ///

30.    Defendant agreed to pay within 30 days pursuant to the terms of the contract regarding payment, and the failure to do so should result in a court order stating the contract is terminated pursuant to the contract. Exhibit 1, provision 16.2.

31.    An actual controversy has developed in that CEP has claimed no contract exists, and has not paid. See Exhibit 5, paragraph 4. R9 insists a contract exists, and has attempted to enforce the arbitration clause, and Defendant has been unwilling. See Exhibits 2 and 3.

32.    Complainant seeks the exercise of the court's power to make a declaratory order regarding the termination of the contract. In that there has been a refusal to pay Plaintiff, the contract is alleged to now be terminable by Plaintiff. See Exhibit 1, provision 16.2.

33.    Declaratory relief is necessary in light of the conflicting claims: Plaintiff claims the contract (Exhibit 1) is terminated; and Defendant denies termination.

34.    An order of the court is necessitated under the policy principals that: economic relations are not to be discouraged by the courts; the freedom to contract is hampered by parties denying arbitration clauses in contracts; and the free flow of capital is discouraged by contractual breaches involving non-payment.

35.    Plaintiffs will suffer substantial harm and injury in the event the contract is not terminated. This is due to the continued sale of the product elsewhere by CEP, despite the contractual requirement of payment.

36.    A judicial declaration is necessary and appropriate at this time, under the circumstances, in order that Plaintiff may ascertain its rights, and Plaintiff may manage its corporate affairs.

## FOURTH CAUSE OF ACTION

### (Goods Sold and Delivered)

### (Against CEP and Does 1-10)

37.    Plaintiff here incorporates, alleges and realleges each and every allegation contained in paragraphs numbered 1-23 of the Complaint as though fully set forth herein.

38.    Within the last two years, Defendant CEP has become indebted to Plaintiff for goods sold and delivered by Plaintiff to Defendants who then and there agreed to pay the sum owing for the goods.

39.    Neither the whole nor any part of the sum has been paid, although demand therefor has been made, and there is now due, owing and unpaid the sum of at least $16,000.00, plus interest thereon, at the legal rate, until the obligation is paid in full.

## FIFTH CAUSE OF ACTION

### (Injunction)

### (Against CEP and Does 1-10)

40.    Plaintiff here incorporates, alleges and realleges each and every allegation contained in paragraphs numbered 1-23 of the Complaint as though fully set forth herein.

41.    The contract provides for injunctive relief. Exhibit 1, Provision 20. Beginning, on or about July 2002 and continuing to the present time, defendant,  wrongfully and unlawfully began to claim ownership in the copywritten software created fully and produced by R9. At the same time, defendant continued to advertise the availability of the software, and sell the software, through its website and it is alleged on information and belief in conjunction with its affiliated company InkJetMall.com. This is an unwarranted invasion of, infringement on, or interference with plaintiff's rights and interests.  As a further invasion of these interests, CEP has sued an officer of R9, Gary Rogers, claiming that CEP owns a copyright on the software. Furthermore, on information and belief, Plaintiff alleges that CEP has attempted to re-create the software owned by Plaintiff.  In addition, CEP has disclosed information regarding internal workings of the software on his website.  These equate to violation of the confidentiality clauses (8.1 and 8.2), competitive technology clause (15), and modification clause (1.2) of the Exhibit 1 contract. While these actions occurred, CEP has simultaneously begun disparaging the software created by R9 to other members of the consuming public. CEP has claimed to some individuals that inks it created were suited to use with the R9 software, and then when complaints occurred, has stated that it is a problem with R9's software. Finally, in a recent interview in an industry publication CEP has claimed that it created the software, solely, without crediting Plaintiff.  These acts by CEP equate to an overbearing assumption by CEP of superiority and domination over the copyrights and software products of R9, to the detriment of consumers. This is because consumers are purchasing the software under false

1   pretenses, and are purchasing the software, at times, without any usefulness due to the

2   inappropriate matching of non-compatible inks with the software. These actions should be

3   temporarily, and permanently enjoined.

4   42.    The acts complained of equate to an unfair business practice pursuant to Business and

5   Professions Code, Section 17200 et. seq.  R9 is informed and believes and thereon alleges the

6   acts of CEP that R9 has alleged above (Paragraph 41) are contrary to the laws (such as

7   Business and Professions Code Section 17200 et. seq.) protecting consumers.  R9 alleges that

8   its creation of software sold to consumers by CEP provides R9 with standing to sue herein.

9   R9 alleges the acts alleged above were consistent practices by CEP designed to deprive

10  consumers of their funds and legal rights which offended established public policy regarding

11  proper business practices; violated copyright laws; were unethical, unscrupulous, and

12  substantially injurious to consumers; and were fraudulent and unfair.   R9 alleges on

13  information and belief that CEP's improper conduct is ongoing in that CEP claims a right to

14  funds (and has taken legal action to obtain, or keep, such funds) to which CEP is not entitled.

15  CEP's claim for these funds was created through CEP's acts in contravention of proper

16  business practices.  As a result of the acts of CEP, R9 has suffered a loss of business profits,

17  damage to reputation as a business, a loss of the funds CEP procured and claims by way of its

18  acts and representations, and had to expend needless interest and attorney fees.

19  43.    The acts complained of equate to conversion. R9 is the full owner of the copyrights and

20  software.  CEP does not have right to exercise dominion and control over the copyrights and

21  software, but has done so.

22  44.    Plaintiff has asked CEP to cease this activity and arbitrate the issue, and this has been

23  refused. Exhibits 2,3, and 5.  This results in the necessity for prompt judicial action to protect

24  Plaintiff.

25  45.    Defendants' wrongful conduct, unless and until enjoined and restrained by order of this

26  court, will cause great and irreparable injury to plaintiff in that: the goodwill value of the R9

27  brandname and R9 itself will decline; the value of the copyright will decline; and the monies

28  that would have been attributed to future sales of R9 products will be lost.

46.   Plaintiff has no adequate remedy at law for the injuries currently being suffered. It is difficult to accurately ascertain the damage, or attribute a dollar value to all of the above injuries.   These are actual injuries to a copyright and software product that cannot be compensated by an ordinary damage award.   It will be impossible for Plaintiff to determine the precise amount of damage that Plaintiff will suffer if defendant's conduct is not restrained. Alternatively, because the actions of Plaintiffs occur with different people and businesses at different times, Plaintiff will be forced to institute a multiplicity of suits to obtain adequate compensation for Plaintiff's injuries.

47.   As a proximate result of defendant's wrongful conduct, plaintiff's business has been damaged in the sum of $32,000.00.   Plaintiff will be further damaged in like manner so long as defendant's conduct continues. Plaintiff is also entitled to attorney fees by statute and contract.   The full amount of this damage is not now known to Plaintiff, and Plaintiff will amend this complaint to state this amount when the same becomes known.

**Plaintiff prays as follows:**

<u>ON THE FIRST CAUSE OF ACTION:</u>

1.   For an order of the Court compelling arbitration.

2.   For attorneys fees.

3.   For other relief the Court deems necessary, or equitable.

<u>ON THE SECOND CAUSE OF ACTION:</u>

1.   For general damages, special damages and compensatory damages in a sum to be proved at the time of trial, plus interest thereon.

2.   For attorneys fees.

3.   For consequential damages, in a sum to be proved at the time of trial, plus interest thereon.

4.   For other relief the Court deems necessary, or equitable.

///

///

///

## ON THE THIRD CAUSE OF ACTION:

1.      For a declaration by the Court that the contract attached as Exhibit 1 has been terminated.

2.      For attorneys fees, in a sum to be proved at the time of trial, plus interest thereon.

3.      For other relief the Court deems necessary, or equitable.


## ON THE FOURTH CAUSE OF ACTION:

1.      For general damages, special damages and compensatory damages in a sum to be proved at the time of trial, plus interest thereon.

2.      For attorneys fees.

3.      For consequential damages in a sum to be proved at the time of trial, plus interest thereon.

4.      For other relief the Court deems necessary, or equitable.

## ON THE FIFTH CAUSE OF ACTION:

1.      For an order requiring defendant to show cause, if any it has, why it should not be enjoined as set forth in this complaint,

2.      For a temporary restraining order, a preliminary injunction, and a permanent injunction, enjoining defendant, and each of them, and their agents, servants, and employees, and all persons acting on their behalf from using, selling, modifying, altering, or disparaging, any software or product of R9.

3.      For damages in the sum of $32,000.00, plus damages in such further sums as may be sustained and as are ascertained before final judgment in this action;

4.      For costs of suit and attorney fees incurred in this action; and

5.      For such other and further relief as the court deems proper.

Dated: October /0, 2002.                                    Respectfully submitted,

PHILIP H. DYSON,
Attorney for Plaintiff

Complaint: R9 v. Cone Editions Press                                    16

1                               Verification of:

2                             R9 CORPORATION

3

4       I have read the foregoing document and know its contents: PLAINTIFF'S

5   COMPLAINT FOR ENFORCEMENT OF ARBITRATION; OR ALTERNATIVELY

6   BREACH OF CONTRACT, FOR GOODS SOLD AND DELIVERED, DECLARATORY

7   RELIEF: CONTRACT TERMINATION, AND INJUNCTION.  I declare I am informed

8   and believe that the matters stated therein are true, and on that basis, declare under penalty

9   of perjury under the laws of the State of California that the foregoing is true and correct.

10      Executed this ___9ᵗʰ___ day of October, 2002  at San Diego, California.

11

12

13                     R9 CORPORATION
                             By Its President

14                     Gary Rogers

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# EXHIBIT 1

# Software License Agreement

This Software License Agreement ("Agreement") is made and entered into as of _12 - 2 - 99_ 
(the "Effective Date") by and between R9 Corporation, a Nevada Corporation with its principal place of business located at Las Vegas, Nevada ("Licensor") and Cone Editions Press, Ltd., with its principal place of business located at East Topsham, VT ("Licensee").

## RECITALS

A. Licensor has rights to license and sublicense software technology; and

B. Licensee desires to utilize Licensor's software technology ("Technology", as defined in Exhibit A) for use in its software, and Licensor is willing to grant a license to Licensee to utilize the Technology.

NOW, THEREFORE, in consideration of these premises and the mutual covenants herein contained, the parties agree as follows:

## 1. License

### 1.1. Grant of License

Licensor hereby grants to Licensee, subject to the terms and conditions of this Agreement, a non-exclusive, non-transferable, worldwide license to utilize the Technology. Licensee may utilize the Technology to manufacture products incorporating all, or a portion of the Technology, and may sell products that include all, or any of the Technology. Licensed Products shall include those products manufactured by Licensee which utilize the Technology in whole or part, and Licensee may sell Licensed Products to end users, and/or for resale to end users.

### 1.2. Modifications, Reverse Engineering

Licensee agrees that only Licensor shall have the right to alter, maintain, enhance, and otherwise modify the Technology. Licensee shall not disassemble, decompile, or reverse engineer the Technology.

### 1.3. Material Terms and Conditions

Licensee specifically agrees that each of the terms and conditions of this Section are material, and that failure of Licensee to comply with these terms and conditions constitute sufficient cause for Licensor to terminate this agreement. The presence of this Subsection shall not be relevant in determining the materiality of any other provision or breach of this Agreement by either party.

## 2.   Term

Except as provided in Section 16, "Default and Termination", this Agreement shall remain in effect until, and shall terminate upon the expiration of three (3) years from the date hereof, and may be extended for three (3) years upon mutual agreement of the parties. Neither party will unreasonably withhold such extension.

## 3.   Delivery, Testing, and Acceptance

### 3.1.   Delivery

Licensor shall deliver the Technology, as set forth in Exhibit A, to Licensee's Site designated in Section 24, "Notices" within ten (10) days of the Effective Date of this Agreement.

### 3.2.   Testing

Licensee shall have thirty (30) days, commencing upon delivery of the Technology, to test the Technology for substantial compliance with the specifications set forth in Exhibit A (the "Testing Period"). During the Testing Period, Licensee shall immediately provide notice to Licensor of any failure of the Technology to substantially comply with such specifications. Upon receipt of such notice, Licensor shall use reasonable efforts to remedy the failure and install a fix within thirty (30) days. If such notice is provided by Licensee to Licensor, the Testing Period shall be extended through the thirtieth (30th) day after Licensor's last fix of a failure of the Technology.

### 3.3.   Acceptance

"Acceptance" shall occur:

(i)      upon Licensee's written notice to Licensor that the Technology substantially complies with the specifications set forth in Exhibit A; or

(ii)     if Licensee does not provide notice of failure of the Technology within thirty (30) days of the close of the Testing Period.

(iii)    Licensee shall also be deemed to have accepted the Technology if Licensee makes the Technology available in products Licensee markets.

## 4.   License Fee

### 4.1.   In General

In consideration for the license granted by Licensor under this Agreement, Licensee shall pay Licensor a fee of seventy-five dollars ($75.00) for each Licensed Product sold.



### 4.2.   Sales and Returns

Licensed Products shall be deemed to have been sold when delivered. If Licensed Products are returned or allowances made thereon, based upon failure of the Technology to perform satisfactorily, after a Royalty shall have been paid, Licensee shall be entitled to take appropriate credit for such overpayment against Royalties thereafter occurring, or if further royalties are insufficient for such credit, Licensor shall refund such amounts to Licensee.

### 4.3.   Internal Use and Demonstration Units

Royalties shall be paid for all Licensed Products sold by Licensee, or manufactured for its own internal purposes.

Notwithstanding the other clauses of this Section, Licensee shall be allowed a total of ten (10) royalty-free copies of the Licensed Products for its own internal use and demonstration.

## 5.   Payments and Taxes

### 5.1.   Payments

Any and all cash payments of any kind which may be payable by Licensee to Licensor under the terms of this Agreement shall be paid in United States Dollars.

### 5.2.   Payment Terms

Each monthly installment of the License Fee shall be due and payable at the end of the following month. All amounts not paid within fifteen (15) days of the due date shall bear interest at the rate of one and one-half percent (1.5%) per month, or at the highest rate allowed by law, whichever is less, from such date until paid. Failure by Licensee to pay any amounts due shall constitute sufficient cause for Licensor to terminate this Agreement.

### 5.3.   Taxes

Any taxes, duties or imposts other than income or sales taxes assessed or imposed upon the sums due hereunder to Licensor, or upon or with respect to this Agreement, shall be borne and discharged by Licensee, and no part thereof shall be deducted from the amounts payable to Licensor under any clause of this Agreement, said amounts to be otherwise net to Licensor.

### 5.4.   Consents

Licensee and Licensor agree to use reasonable efforts to obtain any necessary approval of this Agreement by governmental authorities, and to obtain the consent of any such authorities to the remittance of payments to Licensor under this Agreement in the event that such consent should become necessary.



## 6.    Accounting

### 6.1.    *Statement of Sales*

Licensee shall keep accurate records of all transactions relating to the Technology sales and transfers. At the time each royalty payment is due, Licensee shall furnish Licensor with a written statement setting forth the volume of the Technology sold or transferred. Licensor and/or Licensor's agent, upon giving ten (10) days written notice, shall have the right to inspect these records during business hours at Licensee's place of business. Licensor agrees to sign or require Licensor's agent to sign non-disclosure statements obligating Licensor and Licensor's agent not to disclose matters that do not pertain to Licensor or the Technology.

### 6.2.    *Statement Information*

Licensee's records shall accurately contain total number of licensed products that have been sold or transferred to third parties, or put into internal use by Licensee.

### 6.3.    *Payment for Audit*

If the audit of Licensee's records initiated by Licensor discloses underpayments by Licensee of more than ten percent (10%) for the period audited, payment for the audit shall be made by Licensee. Otherwise, payment for the audit shall be made by Licensor.

## 7.    Ownership

Licensee agrees that Licensor owns all proprietary rights, including patent, copyright, trade secret, trademark and other proprietary rights, in and to the Technology and any corrections, bug fixes, enhancements, updates or other modifications, including custom modifications, to the Technology made by Licensor or any third party on Licensor's behalf.

## 8.    Confidential Information

### 8.1.    Confidentiality

Licensee agrees that the Technology contains proprietary information, including trade secrets, know-how and confidential information, which is the exclusive property of Licensor. During the period this Agreement is in effect and for a period of ten (10) years thereafter, Licensee and its employees and agents shall maintain confidentiality of this information and not sell, license, publish, display, distribute, disclose, or otherwise make available this information to any third party, and for a period of five (5) years thereafter, Licensee shall not use such information except as authorized by this Agreement. Licensee shall not disclose any such proprietary information concerning the Technology, including any flow charts, logic diagrams, user manuals, screens sketches, drawings, reports and notes, to persons not an employee of Licensee without the written consent of Licensor. To that end, and without limiting the generality of the foregoing provision, Licensor will cause all written materials and other documents relating to or containing such information provided to Licensee, including all source codes, flow charts, logic diagrams, user manuals, screens sketches, drawings, reports and notes,



and all copies, reprints and reproductions, to be plainly marked to indicate the secret and confidential nature thereof, to prevent the unauthorized use or reproduction thereof. Licensee shall use the same degree of care as it uses to protect its own confidential information. Notwithstanding anything herein to the contrary, this provision shall not apply to confidential information a) which can be documented to have already been in the possession of, or known by Licensee prior to disclosure by Licensor;  b) which becomes publicly available through no fault of Licensee;  c) which is later released publicly by Licensor;  d) which is lawfully obtained from third parties not bound to a duty of confidentiality;  or e) which can be documented to have been developed by Licensee independently, and independent of confidential information of Licensor.

### 8.2.  Permitted Disclosures

Licensee shall have the right to communicate information acquired from Licensor pursuant to this Agreement for the purpose of, and only to the extent necessary for designing, manufacturing and/or selling the Licensed Products, to any officer or employee of Licensee, provided that such officer or employee shall be subject to the provisions of this Section. In the event of any disclosure or use of information in violation of this Agreement by Licensee, or use of others caused by disclosure in violation of this Agreement by Licensee, Licensee will indemnify Licensor for all damages caused by such disclosure or use. Licensee shall be permitted to supply to end users non confidential information, including manuals, OEM manuals or other information or materials necessary for sale or servicing of Licensed Products; provided, however, at least 30 days prior to use of any such materials, Licensee shall have given Licensor the opportunity to review such materials, and Licensor shall have the right to require Licensee to modify or amend such materials to prevent any disclosure of confidential information.

## 9.    Maintenance, Updates, and Enhancements

### 9.1.  Error Fixes

For the duration of this Agreement, if Licensee notifies Licensor of error(s) in the Technology or notifies Licensor that it has other reason to believe that errors exist in the Technology, Licensor shall use reasonable efforts to verify and fix the error(s) within thirty (30) days following receipt of notification. Licensor shall promptly notify Licensee if an error cannot be fixed within the time specified in this paragraph. If such an error substantially affects the marketability of the Technology, and a fix cannot be effected in a reasonable time, Licensee may declare this Agreement terminated under the provisions of Section 16, "Default and Termination".

### 9.2.  Updates

For the duration of this Agreement, Licensor may supply, at no charge to Licensee, any enhancements independently made by Licensor to the Technology that improve performance or utility. At the discretion of Licensee, Licensee may include them in new product versions.



### 9.3.   Enhancements

If Licensee requests in writing that an enhancement be made, Licensor may make such enhancements at Licensor's time and materials rate for such work, as specified in Section 10.2, "Reimbursements".

## 10.   Services and Training

### 10.1.  Services

In the event Licensee should desire technical assistance and/or training in connection with the Technology, Licensor shall make available the services of engineering personnel of Licensor (the "Services").

### 10.2.  Reimbursements

There shall be no charge for telephone technical support rendered to Licensee by Licensor for ninety (90) days following Licensee's initial production volume shipment of Licensed Products. Thereafter, Licensee shall reimburse Licensor for telephone technical support at the rate of

$100.00/hour with a $25.00 minimum charge.

For services that cannot be rendered to Licensee by Licensor as telephone technical support, Licensee shall reimburse Licensor for any direct and indirect expenses otherwise incurred by Licensor pursuant to this Section. The rates that Licensor will charge Licensee for services will be in accordance with the following schedules and conditions:

$150.00/hour
$1200.00/day
$5000.00/week

Services that require travel by the engineering personnel of Licensor shall be billed with a two day minimum plus all reasonable travel expenses.

Licensor will notify Licensee in writing thirty (30) days before making any adjustment to the fee schedule.

## 11.   Warranty

### 11.1.  Scope of Warranty

Licensor warrants to Licensee that for a period of ninety (90) days commencing upon Acceptance the Technology will substantially comply with the specifications set forth in Exhibit A. During this warranty period, Licensor shall also provide Licensee the support and maintenance services set forth in Section 10, "Services and Training". After expiration of the warranty period, Licensor shall provide support and maintenance for the Software pursuant to the terms of Section 9. "Maintenance, Updates, and Enhancements".



### 11.2. Disclaimer of Any Other Warranty

THE LIMITED WARRANTY SET FORTH IN SUBSECTION 11.1 "SCOPE OF WARRANTY" IS IN LIEU OF ALL OTHER WARRANTIES, EXPRESS OR IMPLIED, INCLUDING BUT NOT LIMITED TO THE IMPLIED WARRANTIES OF MERCHANTABILITY AND FITNESS FOR A PARTICULAR PURPOSE.

## 12.   Limitations Period

No arbitration or other action under this Agreement, unless involving death or personal injury, may be brought by either party against the other more than one (1) year after the cause of action arises.

## 13.   No Consequential Damages

Neither party shall be liable to the other for indirect, special, incidental, exemplary or consequential damages (including, without limitation, lost profits) related to this Agreement or resulting from Licensee's use or inability to use the Technology, arising from any cause of action whatsoever, including contract, warranty, strict liability, or negligence, even if notified of the possibility of such damages.

## 14.   Limitation on Recovery

Under no circumstances shall the liability of Licensor to Licensee exceed the amounts paid by Licensee to Licensor under this Agreement.

## 15.   Competitive Technology

If Licensee wishes to utilize any competitive technology, it will first give written notice to Licensor. If, within forty-five (45) days after receipt of such notice Licensor offers Licensee advances on the Technology, or new technologies, which alone or in conjunction with the Technology provide similar functions at least as effectively as the competitive technology, and Licensor offers to promptly incorporate such new or advanced technology into the licensed Technology at no additional cost, Licensee will not use the competitive technology. If Licensor is unable to accomplish this, however, Licensee may then utilize the competitive technology.

## 16.   Default and Termination

### 16.1. Default

In the event of a material default by either party in the performance of its duties, obligations or undertakings under this Agreement, the other party shall have the right to give written notice to the defaulting party, advising such party of the specific default involved and, if, within thirty (30) days after such notice, the defaulting party shall not have remedied or commenced diligently to remedy the default, the other party shall have the right, in addition to any other rights and remedies it may have hereunder, to terminate this Agreement immediately.



(iv)     The obligations of Licensee with respect to accrued Royalties under Section 4, "License Fee", and with respect to all the relevant provisions of this Agreement shall survive any termination of this Agreement.

## 17.   No Agency/Joint Venture Created

Neither party shall be deemed to be an agent or partner of the other as a result of, or in any transaction under or relating to, this Agreement, and shall not make any warranty or representation or incur any obligation on behalf of or in the name of the other party.

## 18.   Assignment

Except as provided in this Section, the rights and duties of any party hereunder shall not be assignable by any party. This Agreement and all rights and obligations hereunder may be assigned by either party to, and assumed by, any corporation or other business entity which succeeds to all or substantially all of the assets and business of such party through merger, consolidation, acquisition of assets or stock, or other corporate reorganization. In any event, this Agreement shall inure to and be binding upon the parties and their successors and assigns.

## 19.   Sublicensing

Licensee may not sublicense its rights under this Agreement to third parties; except, however, Licensee may sublicense its rights and duties under this Agreement to any wholly-owned subsidiary of Licensee. In the event that Licensee does assign its rights and duties to any such wholly-owned subsidiary, Licensee shall remain responsible for all obligations and duties under this Agreement notwithstanding any such sublicense. Licensee shall promptly notify Licensor of any sublicense agreement.

## 20.   Injunctive Relief

The remedy at law, if any, of the non-breaching party with respect to any breach of this Agreement by the other shall be inadequate in view of the irreparable and continuing damage which any such breach would cause. The non-breaching party shall be entitled to injunctive relief against any continuation of such breach, in addition to any other remedies, whether legal or equitable, otherwise available to the non-breaching party.

## 21.   Attorney's Fees

Upon the bringing of any action or suit by a party hereto against another party hereunder by reason of any breach of the covenants or agreements herein or otherwise arising out of this Agreement, then the party in whose favor final judgment is rendered shall be entitled to recover from the other party all costs and expenses of suit, including reasonable attorney's fees.



## 22.   Arbitration

The parties agree that any dispute arising out of or relating to this Agreement or its subject matter shall be submitted to binding arbitration in San Diego, California, in accordance with such rules as the parties jointly agree upon. If the parties are unable to agree upon arbitration procedures, arbitration shall be conducted in accordance with the appropriate rules of the American Arbitration Association.

## 23.   Force Majeure

Any delay or failure in performance hereunder by either party hereto shall be excused if and to the extent caused by occurrences beyond such party's control, including but not limited to decrees or restraints of government, natural disaster, war, riot, civil commotion, sabotage or any other such causes.

## 24.   Notices

All notices and other communications required or permitted to be given or made under this Agreement shall be in writing and shall be deemed to have been duly given and received, either: (a) on the day of hand delivery; or (b) upon receipt, or upon attempted delivery, when sent by United States certified mail, postage and certification fee prepaid, return receipt requested, addressed as follows:

To Licensor at:
    3315H East Russell Road, #900
    Las Vegas, NV 89120
    Attn: President


To Licensee at:
    Powder Spring Road
    East Topsham, VT 05076
    Attn: President

or at such other address as either party most recently may have designated in writing in accordance with this Section to the other party for this purpose.

## 25.   Export Control Regulations

Without prior written consent of Licensor and prior authorization of the United States Office of Export Administration, Licensee shall not knowingly export or re-export directly or indirectly any Technology or any portion thereof received from Licensor, and technical data relating to the Technology received from Licensor, or any Licensed Products produced directly by use of any of the Technology, to any country where such export or re-export is restricted by the United States Department of Commerce.



## 26. General Provisions

### 26.1. Complete Agreement

This Agreement contains the entire agreement between the parties with respect to the subject matter hereof and supersedes any and all prior agreements, understandings and commitments, whether oral or written.

### 26.2. Amendment

This Agreement may be amended only by a writing signed by duly authorized representatives of both parties.

### 26.3. Waiver

Either party hereto may expressly waive any breach of this Agreement by the other party, but no such waiver shall be deemed to have been given unless such waiver is in writing, is signed by the waiving party and specifically designates the breach waived, nor shall any such waiver constitute a continuing waiver, or a waiver of similar or other breaches.

### 26.4. Invalid Provision

If, for any reason whatsoever, any one or more of the provisions of this Agreement shall be held or deemed to be inoperative, unenforceable or invalid in a particular case or in all cases, such circumstance shall not have the effect of rendering any of the other provisions of this Agreement inoperative, unenforceable or invalid, and the inoperative, unenforceable or invalid provision shall be construed as if it were written so as to effectuate, to the maximum extent possible, the parties' intent; provided, however, that if any of the provisions of Sections 4, "License Fee", 8, "Confidential Information" or 16, "Default and Termination" are held inoperative, unenforceable or invalid by any court of competent jurisdiction or other relevant authority, Licensor and Licensee shall hold good faith consultations over a period of ninety (90) days in an effort to work out satisfactory terms for continuation of the Agreement. If Licensor and Licensee do not reach agreement within this period, Licensor or Licensee shall have the right to terminate this Agreement, effective immediately.

### 26.5. Governing Law

The existence, validity, construction, operation and effect of any and all terms and provisions of this Agreement shall be determined in accordance with and governed by the laws of the State of California, USA.

### 26.6. Controlling Text

It is understood and agreed that the English Text of this Agreement is controlling.




### 26.7. Nondisclosure

Neither party shall disclose the financial terms of this Agreement to any third person or entity, except as required by law, to comply with any applicable law or as necessary to inform its own private advisors and consultants, such as attorneys and accountants.

### 26.8. Counterparts

This Agreement may be executed in one or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.

### 26.9. Captions

Captions of the Sections and paragraphs of this Agreement are for convenience only, and shall not be considered or referred to in resolving questions or interpretation of this Agreement.

### 26.10. Read and Understood

Each party acknowledges that it has read and understands this Agreement, has had an opportunity to have this Agreement reviewed by independent counsel, and agrees to be bound by its terms.

LICENSOR:

Signature _____

Name _____

Title _____

LICENSEE:

Signature _____

Name _____

Title _____

# EXHIBIT A

## LICENSED TECHNOLOGY

The term "Technology" is defined as the technology supplied by Licensor and described in the specifications set forth in this Exhibit. The term "Technology" includes any corrections, bug fixes, enhancements, updates or other modifications, including custom modifications made at the request of Licensee for Licensee, to the Licensed "Technology".

The Technology is described in the attached documents:

- "Introduction to the R9Epson Plug-in from R9 Corporation"
- "Welcome to the R9 Epson Export Module from R9 Corporation (Windows)"
- "Welcome to the R9 Epson Export Module from R9 Corporation (Macintosh)"
- "RIM Files: R9Export Preferences"

Licensor shall deliver the Technology to Licensee for both the Macintosh and Windows (32-bit) operating systems in the formats listed below. The Technology will differ from that documented above in that references to "R9", except for those found in copyright statements, shall be replaced by either "ConeTech Piezography™" or "Piezography™".

## 1.    Macintosh

- `ConeTech Piezography™`, a Photoshop® Export plug-in
- `Piezography™ Preferences`, an R9Export Preferences RIM file
- Default RGB and CMYK ICC profiles
- Documentation (see above) in Acrobat™ Exchange 3.01 format
- `Piezography™ installer.vct`, an Installer VISE document
- `ConeTech Piezography™`, a Installer VISE installation program
- `ICC Profile`, an ICC Profile utility application program

## 2.    Windows

- `Piezography.8be`, a Photoshop® Export plug-in (8BE file)
- `Piezography.rim`, an R9Export RIM file
- Default RGB and CMYK ICC profiles
- Documentation (see above) in Acrobat™ Exchange 3.01 format
- `ConeTech.ipr`, an InstallShield® 5.0 Free Edition installation project

# Attachment to Software License Agreement
# dated 12/2/99
# between
# R9 Corporation and Cone Editions Press, Ltd.

## RECITALS

A. R9 Corporation, a Nevada Corporation with its principal place of business located at Las Vegas, Nevada ("Licensor"), and Cone Editions Press, Ltd., with its principal place of business located at East Topsham, VT ("Licensee"), have made and entered into a Software License Agreement dated 12/2/99 ("Agreement dtd 12/2/99"), whereby Licensor granted Licensee a license to utilize Licensor's proprietary technology ("Technology", as defined in Exhibit A of the Agreement dtd 12/2/99); and

B. Licensor has rights to license and sublicense software technology that extends the capabilities of the Technology (the "Extended Technology"); and Licensee desires to utilize the Extended Technology for use in its software; and Licensor is willing to grant a license to Licensee to utilize the Extended Technology; and

C. Unless otherwise specified in this attachment to the Agreement dtd 12/2/99 (the "Attachment"), all terms and conditions of the Agreement dtd 12/2/99 apply to the license granted to the Extended Technology; none of the terms and conditions specified in this Attachment change the terms and conditions of the Agreement dtd 12/2/99 as they apply to the Technology.

NOW, THEREFORE, in consideration of these premises and the mutual covenants herein contained, the parties agree as follows:

## 1.    The Extended Technology

The Extended Technology includes two modules, which Licensor will deliver to Licensee on a single CD-ROM (the "B&W Master"), described below:

### 1.1.    Macintosh
- ConeTech Piezography™ BW, a Photoshop® Export plug-in
- Piezography™ BW Preferences, an R9 Export Preferences RIM file
- A minimum of thirteen ICQ profiles, proprietary data tables for specific ink/media combinations
- A Macintosh program that will install the plug-in, RIM file, and ICQ profiles

### 1.2. *Windows*

- `PiezographyBW.8be`, a Photoshop® Export plug-in (8BE file)
- `PiezographyBW.rim`, an R9 Export RIM file
- A minimum of thirteen ICQ profiles, proprietary data tables for specific ink/media combinations
- A Windows program that will install the plug-in, RIM file, and ICQ profiles

## 2.   License

### 2.1.   *Grant of License*

Licensor hereby grants to Licensee, subject to the terms and conditions of this Attachment, a non-exclusive, non-transferable, worldwide license to utilize the Extended Technology. Licensee may utilize the Extended Technology to manufacture products incorporating all, or a portion of the Extended Technology, and may sell products which include all, or any of the Extended Technology. Licensed Products shall include those products manufactured by Licensee which utilize the Extended Technology in whole or part, and Licensee may sell Licensed Products to end users, and/or for resale to end users.

## 3.   License Fee

### 3.1.   *In General*

In consideration for the license granted by Licensor under this Agreement, Licensee shall pay Licensor a fee of seventy-five dollars ($75.00) for each Licensed Product transferred to third parties.

**LICENSOR:**

Signature

Name  GARY ROGERS

Title  PRESIDENT

Date  2/17/00

**LICENSEE:**

Signature  Jon Cone

Name  President

Title  3-7-00

Date

# EXHIBIT 2

ATTORNEY AT LAW

8451 LA MESA BOULEVARD
LA MESA, CALIFORNIA 91941
TELEPHONE        619.462.3311
FACSIMILE        619.462.3382

August 29, 2002

Markus Brakhan
P.O. Box 5851
44 Church Street, Suite 1
Burlington, VT 05402-5851

By United States certified mail, postage certification fee prepaid, return receipt requested.

Re: R9 v. Cone Editions Press

Dear Mr. Brakhan,

It is our understanding based upon the lawsuit you have filed on behalf of Cone Editions Press (CEP) that you represent CEP with regard to all issues of breach of the Software License Agreement Cone Editions Press has with R9.

The software contract requires notice to "Powder Spring Road," "or at such other address as either party most recently may have designated in writing..." See page 10 of agreement. You have asserted that "all future communication from your office regarding CEP should be directed to this office." See the attached June 10, 2002 letter from you. In addition, all notices must be sent to you by the ethical canons governing attorney conduct.

This letter is to demand arbitration of the Software License Agreement Cone Editions Press has with R9. Provision 22 requires arbitration of any disputes. There is presently a dispute regarding disparaging remarks being made by CEP about R9 products.

In addition, the lawsuit in Vermont filed by CEP raises issues which must be decided at arbitration in San Diego, only. The most serious issue is the claim of software copyright ownership by CEP regarding product which CEP has no right to claim ownership.

Sincerely,

Mark Scott Bagula, Esquire
LAW OFFICES OF PHILIP H. DYSON

THE LAW OFFICE OF MARKUS BRAKHAN
http://sover.net/~brakhanm/index.html
brakhanm@sover.net

**VERMONT**
P.O. Box 5851
44 Church Street, Suite 1
Burlington, VT 05402-5851
Voice: (802) 660-8210
Fax: (802) 660-8241

June 10, 2002

**WYOMING**
P.O. Box 4761
480 Henley Road
Jackson, WY 83001-4761
Voice: (307) 734-9650
Fax: (307) 734-9651

Stuart M. Hurwitz, Esq.
3585 Fourth Avenue
San Diego, CA
92103-4912

**BY FACSIMILE AND U.S. MAIL**
**(619) 574 - 1344**

Re:     Cone Editions Press, Ltd. - Sundance Image Technology, Inc.
        Agreement for Exclusive Distribution of Sundance Four Density Inks

Respond to:    Vermont

Dear Mr. Hurwitz:

Please be advised that this office represents Cone Editions Press, Ltd. ("CEP") and that all future communications from your office regarding CEP should be directed to this office. I am in receipt of your letter to CEP dated June 6, 2002. CEP disagrees with your hypothesis that payment within sixty (60) days is a material breach of the CEP-Sundance Agreement for Exclusive Distribution dated February 14, 2002 (the "Agreement").

CEP believes there are issues with respect to Sundance's performance under the Agreement as well, and that these issues are far more significant than slow, but reasonable, payment. CEP believes that quality control has been unacceptably low, that delivery has been unacceptably slow and unpredictable, and that Sundance is already liable to CEP for substantial amounts of unusable product. CEP has been gathering evidence regarding specific numbers and the associated costs of the breach of the warranty for product already purchased, and has already been considering legal action on this matter for some time.

However, breach of the Agreement's exclusivity provision is completely unacceptable. If Sundance distributes any of the MAGMA inks to any other person or entity in contravention of the Agreement, CEP will bring legal action both against Sundance and such other party to immediately enjoin such distribution, to enforce the Agreement as executed, and for damages.

Please encourage your client to reconsider its position in this matter and to maintain the status quo, and provide a written retraction of the notice of termination immediately.

Sincerely,

Markus Brakhan, Esq.

Cc:    Jon Cone, CEP



U.S. Postal Service
**CERTIFIED MAIL RECEIPT**
*(Domestic Mail Only; No Insurance Coverage Provided)*

OFFICIAL USE

| | |
|---|---|
| Postage | $ |
| Certified Fee | |
| Return Receipt Fee (Endorsement Required) | |
| Restricted Delivery Fee (Endorsement Required) | |
| Total Postage & Fees | $ |

Postmark Here

Sent To: Mark Brathan
Street, Apt. No.; or PO Box No.: 44 Church St, Suite 1
City, State, ZIP+4: Burlington VT 05402-5851

7002 0510 0000 7913 4384

---

**SENDER: COMPLETE THIS SECTION**

- Complete items 1, 2, and 3. Also complete item 4 if Restricted Delivery is desired.
- Print your name and address on the reverse so that we can return the card to you.
- Attach this card to the back of the mailpiece, or on the front if space permits.

1. Article Addressed to:

Mark Brathan
44 Church Street
Suite 1
Burlington VT
     05402-5851

**COMPLETE THIS SECTION ON DELIVERY**

A. Signature
X  ☐ Agent  ☐ Addressee

B. Received by ( Printed Name )   C. Date of Delivery

D. Is delivery address different from item 1?  ☐ Yes
   If YES, enter delivery address below:  ☐ No

3. Service Type
☐ Certified Mail   ☐ Express Mail
☐ Registered       ☐ Return Receipt for Merchandise
☐ Insured Mail     ☐ C.O.D.

4. Restricted Delivery? (Extra Fee)   ☐ Yes

2. Article Number
(Transfer from service label)   7002 0510 0000 7913 4384

PS Form 3811, August 2001     Domestic Return Receipt     102595-02-M-1035

# EXHIBIT 3

# THE LAW OFFICE OF MARKUS BRAKHAN

**VERMONT**
P.O. Box 5851
44 Church Street, Suite 1
Burlington, VT 05402-5851
Voice: (802) 660-8210
Fax: (802) 660-8211

http://sover.net/~brakhanm/index.html
brakhanm@sover.net

September 4, 2002

**WYOMING**
P.O. Box 4761
480 Henley Road
Jackson, WY 83001-4761
Voice: (307) 734-9650
Fax: (307) 734-9651

Philip H. Dyson, Esq.
8461 La Mesa Blvd.
La Mesa, CA
    91941

**BY FACSIMILE AND U.S. MAIL**
**(619) 462 - 3382**

Re:      Cone Editions Press, Ltd., and InkjetMall.com, Ltd. v. Gary Rogers and Equin
Technology, Inc.
U.S. Federal District Court for the District of Vermont
Docket No.: 2:02-CV-173

Respond to:    Vermont

Dear Mr. Dyson:

I am in receipt of the letter dated August 29, 2002 executed by Mark Bagula, Esq., regarding the
agreement between CEP and "R9 Corporation" relative to distributing certain software developed by
Rogers ("Piezzography BW" or the "Plug In Software") and distributed by CEP.

Please note that there are completely separate issues with respect to the other product developed
jointly by Rogers and CEP ("Piezzography BWPro" or the "BWPro Software").

The letter seems to demand arbitration, but it is so unclearly written that I really have no idea what
you want or what you are alleging. In sum, however, we dispute that either Rogers or R9 has any
right to demand arbitration for any of the issues raised in either the above-referenced lawsuit or that
one that "Sundance Image Technology, Inc." has instituted against CEP in California state court.

Because R9 does not exist and because Rogers is not the signatory to such agreement relating to the
Plug-In Software, neither R9 nor Rogers has legal capacity or standing to enforce the "R9" - CEP
agreement for the Plug In Software. Thus, the Plug In Software Agreement is void and what you call
"Provision 22" is invalid and unenforceable.

With respect to the copyright claim raised by CEP for the BWPro Software, you should be aware
that there was no written agreement executed between the parties with respect to the BWPro
Software, and therefore "Provision 22" certainly does not apply to the BWPro Software or to CEP's
claims relating to the BWPro Software. Furthermore, as elaborated in my Response to DAS's
Motion to Dismiss, the United States District Courts have original and exclusive jurisdiction over

copyright disputes, and Vermont is the most convenient forum in which to litigate all of the issues presented by this dispute. *See:* 28 U.S.C. § 1338 (jurisdiction) *and* 28 U.S.C. § 1400 (venue).

Accordingly, to the extent you demand arbitration, we deny Rogers or R9's demand and purported right to arbitration and instead will litigate this matter in the proper forum. We will oppose any motion to dismiss or otherwise to enforce the arbitration provision on the basis set forth in this letter.

Sincerely,

Markus Brakhan, Esq.

Cc:  Jon Cone, CEP (By Facsimile: (802) 222-3334 w/ Letter 08/29/02)
     David Putter, Esq. (By Facsimile: (802) 229-2023 w/ Letter 08/29/02)
     Peter Maretz, Esq. (By Facsimile: (619) 232-4840 w/ Letter 08/29/02)
     Chris Garber, Esq. (By Facsimile: (619) 238-8707 w/ Letter 08/29/02)
     Allan R. Keyes, Esq. (By Facsimile: (802) 786-1100 w/ Letter 08/29/02)

# EXHIBIT 4

8461 LA MESA BOULEVARD
LA MESA, CALIFORNIA 91941
TELEPHONE     619.462.3311
FACSIMILE     619.462.3382

September 17, 2002

Markus Brakhan
P.O. Box 5851
44 Church Street, Suite 1
Burlington, VT 05402-5851

Peter B. Maretz, Esq.
Chapin Shea Mcnitt & Carter
501 West Broadway
15th Floor
San Diego, Ca 92101-3541

By United States mail, postage prepaid.

Re: Sundance, R9 and Cone Editions Press

Dear Mr. Brakhan and Mr. Maretz,

Please find enclosed additional documentation regarding R9's corporate status.  If you
have any questions, please call.

Sincerely,

Mark Scott Bagula, Esquire
LAW OFFICES OF PHILIP H. DYSON



# State of California

## SECRETARY OF STATE

## CERTIFICATE OF QUALIFICATION

I, BILL JONES, Secretary of State of the State of California, hereby certify:

That on the **6TH day of SEPTEMBER, 2002, R 9 CORPORATION,** a corporation organized and existing under the laws of **NEVADA,** complied with the requirements of California law in effect on that date for the purpose of qualifying to transact intrastate business in the State of California, and that as of said date said corporation became and now is qualified and authorized to transact intrastate business in the State of California, subject however, to any licensing requirements otherwise imposed by the laws of this State.



IN WITNESS WHEREOF, I execute this certificate and affix the Great Seal of the State of California this day of September 11, 2002.

BILL JONES
Secretary of State

NP-24 A (Rev. 1-96)                                                           OSP 99 21630

2291355



# State of California

### SECRETARY OF STATE

I, *BILL JONES*, Secretary of State of the State of California, hereby certify:

That the attached transcript of ⎍ page(s) has been compared with the record on file in this office, of which it purports to be a copy, and that it is full, true and correct.



*IN WITNESS WHEREOF*, I execute this certificate and affix the Great Seal of the State of California this day of

SEP 1 1 2002

_____

*Bill Jones*

Secretary of State

Rec/State Form CE-107 (rev 8/98)

QSP 90 13524

**STATEMENT AND DESIGNATION
BY FOREIGN CORPORATION**

**ENDORSED – FILED**
In the Office of the Secretary of State
of the State of California

SEP – 6 2002

**BILL JONES, Secretary of State**

R 9 CORPORATION
_____
(Name of Corporation)

_____, a corporation organized and existing under the

laws of STATE OF NEVADA _____, makes the following statements and designation:
(State or Place of Incorporation)

1.  The address of its principal executive office is   1736 E. CHARLESTON BLVD. #222. LAS VEGAS, NV 89104

_____

2.  The address of its principal office in the State of California is   _____

2144 NEWCASTLE AVENUE. CARDIFF-BY-THE-SEA. CALIFORNIA 92007

**DESIGNATION OF AGENT FOR SERVICE OF PROCESS IN THE STATE OF CALIFORNIA**
(Complete either Item 3 or Item 4.)

3.  (Use this paragraph if the process agent is a natural person.)

STUART M. HURWITZ. ESQ. _____, a natural person residing in the State of

California, whose complete address is   3585 FOURTH AVENUE, SAN DIEGO, CA 92103   (619) 574-1040

_____, is designated as agent upon whom process directed to
this corporation may be served within the State of California, in the manner provided by law.

4.  (Use this paragraph if the process agent is a corporation.)

_____, a corporation organized and existing

under the laws of _____, is designated as agent upon whom process directed
to this corporation may be served within the State of California, in the manner provided by law.

**NOTE:**  Corporate agents must have complied with California Corporations Code Section 1505
prior to designation.

5.  It irrevocably consents to service of process directed to it upon the agent designated above, and to service
of process on the Secretary of State of the State of California if the agent so designated or the agent's
successor is no longer authorized to act or cannot be found at the address given.

_____
(Signature of Corporate Officer)

GARY ROGERS, PRESIDENT
_____
(Typed Name and Title of Officer Signing)

Secretary of State Form
S&DC-STOCK/NONPROFIT (01-0:

# EXHIBIT 5

# PHILIP H. DYSON
## ATTORNEY AT LAW

8461 LA MESA BOULEVARD
LA MESA, CALIFORNIA 91941
TELEPHONE    619.462.3311
FACSIMILE    619.462.3382

September 26, 2002

Markus Brakhan
P.O. Box 5851
44 Church Street, Suite 1
Burlington, VT 05402-5851

Peter B. Martez, Esq.
Chapin Shea Mcnitt & Carter
501 West Broadway
15th Floor
San Diego, Ca 92101-3541

By United States mail, postage prepaid.

Re: Sundance, R9 and Cone Editions Press

Dear Mr. Brakhan,

I have received your letter refusing to arbitrate the present software disputes between R-9 and CEP, despite the agreement to the contrary.   Presently, the royalty payments are very overdue.  The last payment made was for June, 2002.

This is another basis upon which arbitration is demanded.  If refusal continues, a lawsuit will follow to enforce the terms of the agreement.

In addition, please be notified that any sale of the products or software covered under the agreement should cease unless these royalties have been paid.  This is your notice that absent immediate payment, the contract is considered terminated on September 30, 2002 pursuant to Section 16.2(i).

Sincerely,

Mark Scott Bagula, Esquire
LAW OFFICES OF PHILIP H. DYSON

# SUPERIOR COURT OF CALIFORNIA, COUNTY OF SAN DIEGO

INDEPENDENT CALENDAR CLERK
330 W. Broadway
San Diego, CA 92101

**TO:**

PHILIP H. DYSON
8461 LA MESA BOULEVARD
LA MESA, CA  91941

| | |
|---|---|
| R9 CORPORATION | Case No.:  GIC797940 |
| Plaintiff(s) | |
| | **NOTICE OF CASE ASSIGNMENT** |
| vs. | |
| | Judge:  ROBERT E. MAY |
| CONE EDITIONS PRESS LTD | Department:  63 |
| Defendant(s) | Phone:  619-685-6021 |
| | This case **IS NOT** eligible to participate in a pilot mediation program. |

**COMPLAINT FILED** 10/11/02

IT IS THE DUTY OF EACH PLAINTIFF (AND CROSS-COMPLAINANT) TO SERVE A COPY OF THIS NOTICE WITH THE COMPLAINT (AND CROSS-COMPLAINT).

ALL COUNSEL WILL BE EXPECTED TO BE FAMILIAR WITH SUPERIOR COURT RULES WHICH HAVE BEEN PUBLISHED AS DIVISION II, AND WILL BE STRICTLY ENFORCED.

**TIME STANDARDS:**  The following timeframes apply to general civil cases and must be adhered to unless you have requested and been granted an extension of time.  General civil consists of all cases except:  Small claims appeals, petitions, and unlawful detainers.

**COMPLAINTS:** Complaints must be served on all named defendants, and a CERTIFICATE OF SERVICE (SUPCT CIV-345) filed within 60 days of filing. This is a mandatory document and may not be substituted by the filing of any other document. (Rule 5.6)

**DEFENDANT'S APPEARANCE:** Defendant must generally appear within 30 days of service of the complaint. (Plaintiff may stipulate to no more than a 15 day extension which must be in writing and filed with the Court.) (Rule 5.7)

**DEFAULT:** If the defendant has not generally appeared and no extension has been granted, the plaintiff must request default within 45 days of the filing of the Certificate of Service. (Rule 5.8)

**CASE MANAGEMENT CONFERENCE:** A Case Management Conference will be set within 150 days of filing the complaint.

THE COURT ENCOURAGES YOU TO CONSIDER UTILIZING VARIOUS ALTERNATIVES TO LITIGATION, INCLUDING MEDIATION AND ARBITRATION, PRIOR TO THE CASE MANAGEMENT CONFERENCE.  MEDIATION SERVICES ARE AVAILABLE UNDER THE DISPUTE RESOLUTION PROGRAMS ACT AND OTHER PROVIDERS.

YOU MAY ALSO BE ORDERED TO PARTICIPATE IN MEDIATION OR ARBITRATION PURSUANT TO CCP 1730 OR 1141.10 AT THE CASE MANAGEMENT CONFERENCE.  THE FEE FOR THESE SERVICES WILL BE PAID BY THE COURT IF ALL PARTIES HAVE APPEARED IN THE CASE AND THE COURT ORDERS THE CASE TO MEDIATION UNDER THE MEDIATION PILOT PROGRAM, OR TO ARBITRATION PURSUANT TO CCP 1141.10.  THE CASE MANAGEMENT CONFERENCE WILL BE CANCELLED IF YOU FILE FORM SUPCT CIV-357 OR 358 PRIOR TO THAT HEARING.

ALSO SEE THE ATTACHED NOTICE TO LITIGANTS.

### CERTIFICATE OF SERVICE

I, STEPHEN THUNBERG, certify that: I am not a party to the above-entitled case; on the date shown below, I served this notice on the parties shown by personally handing it to the attorney or their personal representative at  SAN DIEGO California.

Dated:  10/11/02

STEPHEN THUNBERG _____ Clerk of the Superior Court
by Cindy Reed, Deputy Clerk

SDSC CIV-721(Rev 3-00)           ASG-NOTICE OF CASE ASSIGNMENT

**You are required to serve a copy of the following documents with the Summons and Complaint on all defendants in accordance with San Diego Superior Court Rule 5.6:**

- A copy of this Notice to Litigants; and
- A copy of the Notice of Case Assignment.

Filing the Certificate of Service will signify that this information has been served on all defendants.

---

### SAN DIEGO SUPERIOR COURT MEDIATION PILOT PROGRAM
(Effective for cases filed on or after February 28, 2000)

This case has been assigned to a department that is <u>NOT PARTICIPATING</u> in the mediation pilot program and has been designated "not eligible" for mediation. Accordingly, your case CANNOT BE ORDERED TO THE COURT REFERRED MEDIATION PROGRAM. However, we are providing the following information to explain the new program in the event you have other cases that fall within its scope and to clarify your available alternative dispute resolution options.

**Program Overview:** The San Diego Superior Court has been selected by the Judicial Council to participate in a pilot program for the early mediation of civil cases (referred to as the "mediation pilot program") established by Code of Civil Procedure section 1730 et seq. and the California Rules of Court rules 1640 et seq. The former court-ordered mediation program (established by CCP 1775 et seq. and applicable to all cases filed **on or before February 27, 2000**) shall end upon completion of mediation of all cases under that program. No case filed after that date may be ordered to the old mediation program.

In addition, no case filed **on or after February 28, 2000** and assigned to a non-participating department at the time of filing may be ordered to mediation under the new mediation pilot program. The department to which this matter has been assigned is a non-participating department. Accordingly, this matter cannot be ordered to the new mediation pilot program.

The new mediation pilot program is designed to assess the benefits of early mediation and authorizes the court to 1) schedule early Case Management Conferences (ECMC), 2) order cases to mediation, and 3) allow parties to stipulate to early mediation in advance of the ECMC. San Diego Superior Court Rule 2.31 addresses the program specifically.

**Available Alternatives to Litigation:** For more information about Civil Alternative Dispute Resolution, please refer to the court's web site at http://www.sandiego.courts.ca.gov/superior .

**Voluntary Mediation:** Because your case has been assigned to a department that is not participating in the mediation pilot program and designated "non-eligible", your case will not be ordered to mediation by the court. However, you may stipulate to voluntary mediation outside the court system. If you choose to do so, mediator fees must be paid by the litigants and will not be paid by court. The existing option of private mediation is unaffected by the new mediation pilot program.

**Judicial Arbitration:** No changes in arbitration procedures have been made. The judicial arbitration program remains available to all cases in San Diego County. Please refer to Superior Court Rules 2.24 and 2.25.

Voluntary mediation and other alternative dispute resolution services are available in San Diego County, including Dispute Resolution Programs Act (DRPA) funded programs. For a listing of DRPA funded community mediation programs, please contact the County's DRPA Program Office at (619) 338-2797. To stipulate to Alternative Dispute Resolution options outside the court system, please complete CIV-359 Stipulation to Use of Private Alternative Dispute Resolution Process.

**Program Evaluation:** The Judicial Council has requested that the court collect information from civil litigants and their attorneys about what methods they used to try to resolve their case, how long it took to resolve the case, the costs associated with resolving the case, and how satisfied they were with the process(es) used to try to reach resolution. In order to obtain this information, the court will be sending written surveys to parties in some civil cases, including those cases not included in the pilot mediation program. Researchers working on the program may also be contacting parties in some civil cases to conduct brief telephone interviews. The court appreciates your cooperation in this information collection effort. The time you spend providing us with information about your experience will help both this court and other courts throughout California in providing high quality appropriate dispute resolution services to civil litigants.

Thank you for your cooperation and assistance in this matter.
SDSC CIV-731 (Rev. 12-01)

| | | |
|---|---|---|
| NAME AND ADDRESS OF SENDER:<br>PHILIP H. DYSON, ESQ.   SBN#097528<br>LAW OFFICES OF PHILIP H. DYSON<br>8461 LA MESA BLVD.<br>LA MESA,                      CA    91941 | TELEPHONE NO.: 619-462-3311 | For Court Use Only: |

Insert name of court, judicial district or branch court, if any, and Post Office and Street Address:
THE SUPERIOR COURT OF CALIFORNIA          CENTRAL DIVISION
330 W. BROADWAY
SAN DIEGO, CA 92101
CENTRAL JUDICIAL DIVISION

PLAINTIFF: R9 CORPORATION

DEFENDANT: CONE EDITIONS PRESS, LTD.

| NOTICE AND ACKNOWLEDGMENT OF RECEIPT | Case Number:<br>GIC797940 |
|---|---|

TO: PETER B. MARTEZ, Attorney for Cone Editions Press, Ltd.
(Insert name of individual being served)

This summons and other document(s) indicated below are being served pursuant to Section 415.30 of the California Code of Civil Procedure. Your failure to complete this form and return it to me within 20 days may subject you (or the party on whose behalf you are being served) to liability for the payment of any expenses incurred in serving a summons on you in any other manner permitted by law.

If you are being served on behalf of a corporation, unincorporated association (including a partnership), or other entity, this form must be signed by you in the name of such entity or by a person authorized to receive service of process on behalf of such entity. In all other cases, this form must be signed by you personally or by a person authorized by you to acknowledge receipt of summons. Section 415.30 provides that this summons and other document(s) are deemed served on the date you sign the Acknowledgment of Receipt below, if you return this form to me.

Dated: October  15 , 2002

_____
(Signature of sender)

## ACKNOWLEDGMENT OF RECEIPT

This acknowledges receipt of: (To be completed by sender before mailing)
1. ☒ A copy of the summons and of the complaint.
2. ☐ A copy of the summons and of the Petition (Marriage) and:
   ☐ Blank Confidential Counseling Statement (Marriage)
   ☐ Order to Show Cause (Marriage)
   ☐ Blank Responsive Declaration
   ☐ Blank Financial Declaration
   ☐ Other: (Specify)

(To be completed by recipient)

Date of receipt:. . . . . . . . . . . . . . . . . . . . . . .

_____
(Signature of person acknowledging receipt, with title if
acknowledgment is made on behalf of another person)

Date this form is signed:. . . . . . . . . . . . . . . . . .

_____
(Type or print your name and name of entity, if any,
on whose behalf this form is signed)

Form Adopted for Mandatory Use
Judicial Council of California
Revised Effective January 1, 1975
[982(a)(4)]

**NOTICE AND ACKNOWLEDGMENT OF RECEIPT**

CEB

CCP 415.30, 417.10;
Cal. Rules of Court,
Rule 1216

1  PHILIP H. DYSON, Esq.
   State Bar No. 097528
2  8461 La Mesa Boulevard
   La Mesa, California 91941
3  (619) 462-3311

4

5  Attorney for Plaintiff
   R9 CORPORATION
6

7

8         SUPERIOR COURT OF THE STATE OF CALIFORNIA

9                  COUNTY OF SAN DIEGO

10 R9 CORPORATION, a California      )   Case No. GIC 797940
   Corporation                      )
11                                   )
                Plaintiff,           )   **PROOF OF SERVICE.**
12                                   )
        vs.                          )
13                                   )
                                     )
14 CONE EDITIONS PRESS, LTD., a      )
   Vermont Corporation and DOES 1    )
15 through 10,                       )
                                     )
16         Defendants.               )
                                     )
17 ————————————————————

18 / / / /

19 / / / /

20 / / / /

21 / / / /

22 / / / /

23 / / / /

24 / / / /

25 / / / /

26 / / / /

27 / / / /

28 / / / /

*Proof of Service*

## PROOF OF SERVICE

**CASE NAME:** *R9 CORPORATION. vs. CONE EDITIONS PRESS, LTD.*
**CASE NUMBER:** GIC 797940
**COURT:** SUPERIOR COURT OF CALIFORNIA - COUNTY OF SAN DIEGO

I, Jodi Dossegger, declare that I am, and was at the time of service of the papers herein referred to, over the age of eighteen years, and not a party to the action; and that I am employed in the County of San Diego, State of California, in which county the within-mentioned service occurred. My business address is 8461 La Mesa Boulevard, La Mesa, California 91941.

I served the following documents entitled:

1. CIVIL CASE COVER SHEET, SUMMONS & COMPLAINT FOR ENFORCEMENT OF ARBITRATION; OR ALTERNATIVELY BREACH OF CONTRACT, FOR GOODS SOLD AND DELIVERED, DECLARATORY RELIEF; CONTRACT TERMINATION, AND INJUNCTION

2. NOTICE OF CASE ASSIGNMENT

3. NOTICE AND ACKNOWLEDGMENT OF RECEIPT

to the party(ies) at the address(es) shown below.

Edward D. Chapin, Esq.
Peter B. Maretz, Esq.
Chapin Shea McNITT & CARTER
501 West Broadway
15th Floor
San Diego, Ca 92101-3541

Attorney for Defendant
**CONE EDITIONS PRESS, LTD.**

TEL: 619-232-4261
FAX: 619-232-4840

Markus Brakhan, Esq.
Law Office of Markus Brakhan
P.O. Box 5851
44 Church Street, Suite 1
Burlington, VT 05402

Attorney for Plaintiff **CONE EDITIONS PRESS, LTD., INKJETMALL.COM, LTD. VERMONT CORPORATION**

Tel: (802) 660-8210
Fax: (802) 660-8211

[X] **(BY MAIL)** I placed the original or a true copy of the document(s) in an envelope addressed to the party noted above, then sealed the envelope, and with the postage thereon fully prepaid, deposited in the United Sates Mail at La Mesa, California.

I am readily familiar with our law firm's practice for collection and processing of correspondence for mailing with the United States Postal Service, that this mailing will be deposited with the United States Postal Service on this date in the ordinary course of business and that I sealed and placed each envelope for collection and mailing on this date following ordinary business practices.

Executed on October 15, 2002, at La Mesa, California. I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

JODI DOSSEGGER

POS #1 Summons & Complaint 101502.wpd

**EXHIBIT 3**

1   PHILIP H. DYSON, Esq.
    State Bar No. 097528
2   8461 La Mesa Boulevard
    La Mesa, California 91941
3   (619) 462-3311

4

5   Attorney for Plaintiff,
    SUNDANCE IMAGE TECHNOLOGY, INC.

6

7

8                  SUPERIOR COURT OF THE STATE OF CALIFORNIA

9                        FOR THE COUNTY OF SAN DIEGO

10  SUNDANCE IMAGE TECHNOLOGY,        )    Case No.
    INC, a California Corporation,     )
11                                     )
                Plaintiff,             )
12                                     )    PLAINTIFF'S FIRST AMENDED
                                       )    COMPLAINT FOR BREACH OF
13        vs.                          )    CONTRACT, AND DECLARATORY
                                       )    RELIEF: CONTRACT
14  CONE  EDITIONS  PRESS,  LTD.,  a   )    TERMINATION.
    Vermont  Corporation,  and  DOES  1 )
15  through 10,                        )
                                       )
16              Defendants.            )
                                       )
17  _____)

18        Plaintiff, SUNDANCE IMAGE TECHNOLOGY, INC complains and alleges as

19  follows:

20  **ALLEGATIONS COMMON TO AND INCLUDED IN ALL CAUSES OF**

21  **ACTION**

22  1.    Plaintiff SUNDANCE IMAGE TECHNOLOGY, INC is, and at all times mentioned

23  as relevant to Defendants' acts herein, was a Nevada Corporation, doing business in San

24  Diego County, State of California.  Plaintiff is qualified to do business in California, as

25  noted in the files of the Secretary of State.  Plaintiff's primary manager regarding all

26  matters involving Defendant is Gary Rogers.  Gary Rogers is a resident of San Diego,

27  California.  All contacts relevant herein originated in San Diego with Gary Rogers acting

28  on behalf of Plaintiff.

RECEIVED
SEP - 9 2002

2.       Defendant CONE EDITIONS PRESS, LTD. (hereinafter referred to as "Defendant" or "CEP"), is a Vermont Corporation, and at all times mentioned herein was, doing business in San Diego County, State of California.

3.       Plaintiff is ignorant of the true names and capacities of defendants sued as DOES 1 through 10, inclusive, and therefore sues these defendants by fictitious names.  Plaintiffs will amend this Complaint to allege true names and capacities when ascertained.

4.       Plaintiff is informed, believes and alleges that each, every and all Defendants are responsible in some manner for the occurrences alleged, and that the harm alleged was proximately caused by the conduct of said Defendants.

5.       Plaintiffs are informed, believe and thereon allege that each Defendant, including DOES 1 through 10, inclusive, is, and at all relevant times herein mentioned was, the servant, agent, employee, and/or joint venturer of each and every other Defendant, or in some manner allied in interest with each other Defendant such that each acted within the course, scope, purpose and authority of said allied interest, agency or employment, and that each Defendant ratified and approved the actions of the others.

6.       This court is the proper court because the contracts upon which the complaint is based were entered into here, were to be performed here; and because the actions complained of herein occurred within its jurisdiction.

### FIRST CAUSE OF ACTION
**(Breach of Contract)**
**(Against CEP and Does 1-10)**

7.       Plaintiffs here incorporate, allege and reallege each and every allegation contained in paragraphs numbered 1-6 of the Complaint as though fully set forth herein.

8.       On or about February 14, 2000, Plaintiffs entered into an agreement with Defendant, which is attached as Exhibit A.  This agreement was drafted in California.  Prior to, and after, entering this contract, oral contracts were entered, and contracts arose as implied in fact.  Each contract has an implied provision of good faith and fair dealing.

///

///

9.      The provisions of the written contract, the oral contracts, the implied contracts (as implied in fact), and the implied provisions of good faith and fair dealing, were breached by Defendants' failure to fulfill their obligations in several ways, including:

a) failure to pay invoices in the amount of approximately $28,000.00 (the agreed credit limit which could not be exceeded to be shipped product) which is more than 60 days past due;

b) failure to make timely payments, according to the terms (2%, 10 days, net 30-days; Provision 2.b)), by consistently violating these terms over the last six months;

c) failure to actually market the goods, despite demand for exclusive rights, and in breach of the spirit of Clause 1.c) of Exhibit A, and the oral agreements of the parties; and

d) Defendant's use of another ink supply, despite the oral agreements of the parties to the effect that Defendant would be dealing with only Sundance due to the uniqueness of the product Sundance sold;

e) improperly claiming an exclusive right to all Sundance monochromatic ink products; and

f) and disparaging the products of Sundance to the general and consuming public.

10.     Plaintiff fully performed the contracts.  In the last two years, the contracts discussed in Paragraph 9 were breached.

11.     The above breaches of contract have caused Plaintiff damage.  These breaches, including the insistence upon the exclusivity, have caused a loss of profits.  Damages exceed $25,000.00.  Such damage includes the cost of hiring an attorney to gain proper payment.

12.     Defendant's conduct in breaching the agreements has not been excused, waived, accepted or compromised.

///

///

///

///

## SECOND CAUSE OF ACTION

### (Declaratory Relief- Contract Termination)

### (Against CEP and Does 1-10)

13.     Plaintiff here incorporates, alleges and realleges each and every allegation contained in paragraphs numbered 1-12 of the Complaint as though fully set forth herein.

14.     Plaintiff entered into the contract at issue (Exhibit A), and would not have entered such contract with Defendant had Defendant not agreed to pay promptly: 2%, 10 days, net 30-days (Exhibit A, Provision 2.b).

15.     Plaintiff provided an exclusive agreement to Defendant upon the understanding that there would be mutual exclusiveness.  Furthermore, there was no expectation that Defendant would make disparaging remarks regarding Sundance products.

16.     Defendant agreed to purchase a minimum number of cartridges per month, and upon proof to the Court that the minimum has not been purchased pursuant to the terms of the contract regarding payment and otherwise, the exclusive nature of the contract should be terminated pursuant to the contract.  Exhibit A, provision 1.

17.     An actual controversy has developed in that Plaintiff has attempted to terminate the contract, and Defendant has been unwilling.  See Exhibits B and C.

18.     Complainant seeks the exercise of the court's power to make a declaratory order regarding the termination of the contract.  There is no duration stated in the contract, and in that the contract has been performed for over two years by Plaintiff, a reasonable time has passed, and the contract is alleged to now be terminable at will.

19.     Declaratory relief is necessary in light of the conflicting claims: Plaintiff claims the contract (Exhibit A) is terminated; and Defendant denies termination.

20.     Alternatively, the contract, Exhibit A, is void because its execution was not authorized by the lawful board of directors of Plaintiff.

///

///

///

First Amended Complaint: Sundance v. Cone Editions Press          4

21.     An order of the court is necessitated under the policy principals that: economic relations are not to be discouraged by the courts; the freedom to contract is hampered by unclear exclusive contracts; and the free flow of capital is discouraged by unclear contractual relations binding one party to only contract with one other party.

22.     Plaintiffs will suffer substantial harm and injury in the event the contract is not terminated.  This is due to the inability to market the product elsewhere, despite the poor payment history and failure to order as expected.

23.     A judicial declaration is necessary and appropriate at this time, under the circumstances, in order that Plaintiff may ascertain its rights, and Plaintiff may manage its corporate affairs.

## ON THE FIRST CAUSE OF ACTION:

1.     For general and compensatory damages in a sum to be proved at the time of trial, plus interest thereon.

2.     For special damages in a sum to be proved at the time of trial, plus interest thereon.

3.     For other relief the Court deems necessary, or equitable.

## ON THE SECOND CAUSE OF ACTION:

1.     For a declaration by the Court that the exclusive contract attached as Exhibit A has been terminated.

2.     Alternatively, for a declaration by the Court that the contract attached as Exhibit A is rescinded.

3.     For other relief the Court deems necessary, or equitable.

Dated: September 5 , 2002.

Respectfully submitted,

PHILIP H. DYSON,
Attorney for Plaintiff

First Amended Complaint: Sundance v. Cone Editions Press          5

EXHIBIT A

2011c San Elijo Aven...  Cardif-by-the-Sea,  CA  92007, and Con...  ditions Press, Ltd., with its principal place of business located at Powder Spring Road, East Topsham, VT/have made and entered into an Exclusive Ink Distribution Agreement dated 2/14/00 , whereby Sundance Image Technology, Inc. granted Cone Editions Press, Ltd. an  agreement to exclusively distribute Sundance's MAGMA (four density) Inks.

1. Exclusivity will be predicated on:
   a) CONE placing an initial order of one hundred (100) sets of MAGMA 3000 cartridges; and
   b) CONE reaching an order rate of one hundred (100) sets of MAGMA 3000 cartridges per month, within ninety (90) days after receipt of the initial order.
   c) If the order rate is less than 75 ink sets /month for 3 consecutive months or below 25 ink sets for any month SUNDANCE has the right to terminate the exclusive agreement.

2. Price and payment:
   a) The price when ordering in quantities of twenty-five (25) sets (four cartridges per set) is thirty dollars ($30.00) per cartridge. For quantities of less than 25 sets the price is thirty-five dollars ($35.00) per cartridge.
   b) Payment terms are 2% 10 days, net 30 days.
   c) Prices are F.O.B. Cardiff, California.

3. In the event that the order rate from CONE drops below the rate required for exclusivity, CONE will be able to purchase cartridges at the thirty dollar ($30.00) per cartridge price in lots of twenty-five (25) sets or greater.

4. SUNDANCE reserves the right to sell to OEM customers that either manufacture a printer or sell a system including computer, printer and software and do not sell ink cartridges to anyone other than their system customers.

5. CONE reserves the right to sell to other retailers.

6. CONE reserves the right to distribute Sundance's MAGMA (four density) inks under another product name such as, but not limited to, ConeTech PiezographBW inks.


SUNDANCE IMAGE TECHNOLOGY, INC.:

Signature _Stuart M. Hurwitz_

Name _STUART M. HURWITZ_

Title _ATTORNEY_

Date _FEBR. 18, 2000_


CONE EDITIONS PRESS, LTD.:

Signature _Jon Cone_

Name _JON CONE_

Title _PRESIDENT_

Date _2-14-00_


*Agreement for Exclusive Distribution of Sundance four density black inks   Feb 14, 2000*

EXHIBIT B

# THE LAW OFFICE OF MARKUS BRAKHAN

**VERMONT**
P.O. Box 5851
44 Church Street, Suite 1
Burlington, VT 05402-5851
Voice: (802) 660-8210
Fax: (802) 660-8211

http://sover.net/~brakhanm/index.html
brakhanm@sover.net

June 10, 2002

**WYOMING**
P.O. Box 4761
480 Henley Road
Jackson, WY 83001-4761
Voice: (307) 734-9650
Fax: (307) 734-9651

Stuart M. Hurwitz, Esq.
3585 Fourth Avenue
San Diego, CA
    92103-4912

**BY FACSIMILE AND U.S. MAIL**
(619) 574 - 1344

Re:       Cone Editions Press, Ltd. - Sundance Image Technology, Inc.
          Agreement for Exclusive Distribution of Sundance Four Density Inks

Respond to:    Vermont

Dear Mr. Hurwitz:

Please be advised that this office represents Cone Editions Press, Ltd. ("CEP") and that all future communications from your office regarding CEP should be directed to this office. I am in receipt of your letter to CEP dated June 6, 2002. CEP disagrees with your hypothesis that payment within sixty (60) days is a material breach of the CEP-Sundance Agreement for Exclusive Distribution dated February 14, 2002 (the "Agreement").

CEP believes there are issues with respect to Sundance's performance under the Agreement as well, and that these issues are far more significant than slow, but reasonable, payment. CEP believes that quality control has been unacceptably low, that delivery has been unacceptably slow and unpredictable, and that Sundance is already liable to CEP for substantial amounts of unusable product. CEP has been gathering evidence regarding specific numbers and the associated costs of the breach of the warranty for product already purchased, and has already been considering legal action on this matter for some time.

However, breach of the Agreement's exclusivity provision is completely unacceptable. If Sundance distributes any of the MAGMA inks to any other person or entity in contravention of the Agreement, CEP will bring legal action both against Sundance and such other party to immediately enjoin such distribution, to enforce the Agreement as executed, and for damages.

Please encourage your client to reconsider its position in this matter and to maintain the status quo, and provide a written retraction of the notice of termination immediately.

Sincerely,

Markus Brakhan, Esq.

Cc:    Jon Cone, CEP

EXHIBIT C

Certified Specialist in Taxation
The State Bar of California Board of Legal Specialization

3585 Fourth Avenue • San Diego, CA 92103-4912 • Tel (619) 574-1040 • Fax (619) 574-1344

June 6, 2002

Jon Cone
Cone Editions Press
Powder Spring Road
East Topsham, VT 05076

Dear Mr. Cone

Under the terms of the "Agreement for Exclusive Distribution of Sundance four density black inks Feb 14, 2000" (the "Agreement") between Cone Editions Press Ltd. (CEP) and Sundance Image Technology, Inc. (Sundance), CEP agreed to payment terms of 2% 10 days, net 30 days. During the past 6-month period payments have continually exceeded these terms by significant amounts. Currently there is a balance of $18,170 past due of which $5,520 is aged over 47 days.

Other examples include:

| Invoice Number | Date | Date Paid | Days Aging |
|---|---|---|---|
| 98753 | 3/7/02 | 4/29/02 | 53 |
| 98733 | 2/13/02 | 3/29/02 | 44 |
| 98723 | 1/14/02 | 3/5/02 | 50 |
| 98702 | 12/7/01 | 2/1/02 | 56 |
| 98709 | 12/21/02 | 2/6/02 | 47 |

Due to this ongoing breech of the terms of the Agreement, Sundance is terminating, effective immediately, CEP's rights to exclusively distribute Sundance's MAGMA (four density) inks as granted in the Agreement.

Sincerely,

Stuart M Hurwitz
Attorney

PHILIP H. DYSON, Esq.
State Bar No. 097528
8461 La Mesa Boulevard
La Mesa, California 91941
(619) 462-3311

Attorney for Plaintiff
SUNDANCE IMAGE TECHNOLOGY, INC.

SUPERIOR COURT OF THE STATE OF CALIFORNIA

COUNTY OF SAN DIEGO

SUNDANCE IMAGE TECHNOLOGY, )   Case No. GIC 709397
INC. a California Corporation )
                             )
        Plaintiff,           )   **PROOF OF SERVICE.**
                             )
    vs.                      )
                             )
                             )
CONE EDITIONS PRESS, LTD., a )
Vermont Corporation and DOES 1 )
through 10,                  )
                             )
        Defendants.          )
_____)

////
////
////
////
////
////
////
////
////
////
////
////

*Proof of Service*

- 1 -

## PROOF OF SERVICE

**CASE NAME:** *SUNDANCE IMAGE TECH. INC. vs. CONE EDITIONS PRESS, LTD.*
**CASE NUMBER:** GIC 790397
**COURT:** SUPERIOR COURT OF CALIFORNIA - COUNTY OF SAN DIEGO

     I, Jodi Dossegger, declare that I am, and was at the time of service of the papers herein referred to, over the age of eighteen years, and not a party to the action; and that I am employed in the County of San Diego, State of California, in which county the within-mentioned service occurred. My business address is 8461 La Mesa Boulevard, La Mesa, California 91941.

I served the following documents entitled:

1.    PLAINTIFF'S FIRST AMENDED COMPLAINT FOR BREACH OF CONTRACT, AND DECLARATORY RELIEF: CONTRACT TERMINATION

to the party(ies) at the address(es) shown below.

Edward D. Chapin, Esq.
Peter B. Martez, Esq.
Chapin Shea Mcnitt & Carter
501 West Broadway
15th Floor
San Diego, Ca 92101-3541

Attorney for Defendant
**CONE EDITIONS PRESS, LTD.**

TEL: 619-232-4261
FAX: 619-232-4840

Markus Brakhan, Esq.
Law Office of Markus Brakhan
P.O. Box 5851
44 Church Street, Suite 1
Burlington, VT 05402

Attorney for Plaintiff **CONE EDITIONS PRESS, LTD., INKJETMALL.COM, LTD. VERMONT CORPORATION**

Tel: (802) 660-8210
Fax: (802) 660-8211

[X]    **(BY MAIL)** I placed the original or a true copy of the document(s) in an envelope addressed to the party noted above, then sealed the envelope, and with the postage thereon fully prepaid, deposited in the United Sates Mail at La Mesa, California.

I am readily familiar with our law firm's practice for collection and processing of correspondence for mailing with the United States Postal Service, that this mailing will be deposited with the United States Postal Service on this date in the ordinary course of business and that I sealed and placed each envelope for collection and mailing on this date following ordinary business practices.

[ ]    **(BY NEXT DAY MAIL)** I sent the original or a true copy thereof enclosed in a sealed envelope to be delivered for overnight service to the office(s) of the addressee(s).

     Executed on September 5, 2002, at La Mesa, California. I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

JODI DOSSEGGER

POS #2 First Amended Complaint 090502.wpd

Sundance Image, et al. v. Cone Editions, et al.
Case No. GIC 790397 (Consolidated with GIC 797940)

## PROOF OF SERVICE

I, Lorri Ann Taylor-Daigle, declare as follows:

I am over the age of eighteen years and not a party to the case. I am employed in the County of San Diego, State of California, where the mailing occurs; and my business address is 501 West Broadway, 15th Floor, San Diego, California 92101-3541.

On November 14, 2002, I served the foregoing document(s) described as

1.      Notice of Removal

on the interested parties in this action by placing a true copy thereof enclosed in a sealed envelope addressed as stated on the attached mailing list.

☒      BY MAIL. I am readily familiar with the firm's practice of collection and processing of correspondence for mailing with the United States Postal Service, and that the correspondence shall be deposited with the United States Postal Service this same day in the ordinary course of business pursuant to Code of Civil Procedure Section 1013(a).

☐      BY FAX. In addition to service by mail as set forth above, a copy of said document(s) also were delivered by facsimile transmission to the addressee pursuant to Code of Civil Procedure Section 1013(e).

☐      BY PERSONAL SERVICE. I hand-delivered said document(s) to the addressee pursuant to Code of Civil Procedure Section 1011.

☐      BY EXPRESS MAIL. I caused said document(s) to be deposited in a box or other facility regularly maintained by the express service carrier providing overnight delivery pursuant to Code of Civil Procedure Section 1013(c).

Executed on November 14, 2002, at San Diego, California.

I declare that I am employed in the office of a member of the bar of this Court at whose direction the service was made.

I declare under penalty of perjury under the laws of the State of California that the above is true and correct.

Lorri Ann Taylor-Daigle

## SERVICE LIST

| | |
|---|---|
| 1 | |
| 2 | |
| 3 | |
| 4 | Philip H. Dyson, Esq. | Attorney for Plaintiff |
|   | 8461 La Mesa Blvd., | **SUNDANCE IMAGE TECHNOLOGY,** |
| 5 | La Mesa, CA 91941 | **INC**. and **R9** |
|   | Phone: (619) 462-3311 | |
|   | Fax: (619) 462-3382 | |

Philip H. Dyson, Esq.
8461 La Mesa Blvd.,
La Mesa, CA 91941
Phone: (619) 462-3311
Fax: (619) 462-3382

Attorney for Plaintiff
**SUNDANCE IMAGE TECHNOLOGY, INC**. and **R9**

**CIVIL COVER SHEET**
(Reverse Side)

## AFTER COMPLETING THE FRONT SIDE OF FORM JS-44C, COMPLETE THE INFORMATION REQUESTED BELOW.

**VIII(b). RELATED CASES:** Have any cases been previously filed that are related to the present case? _____ No __x__ Yes

If yes, list case number(s): 2:02 CV-173 USDC, District of Vermont _____

CIVIL CASES ARE DEEMED RELATED IF A PREVIOUSLY FILED CASE AND THE PRESENT CASE:

(CHECK ALL BOXES  [X] A. Appear to arise from the same or substantially identical transactions, happenings, or events;
THAT APPLY)  [X] B. Involve the same or substantially the same parties or property;
 [X] C. Involve the same patent, trademark or copyright;
 [X] D. Call for determination of the same or substantially identical questions of law, or
 [X] E. Likely for other reasons may entail unnecessary duplication of labor if heard by different judges.

**IX. VENUE:** List the California County, or State if other than California, in which **EACH** named plaintiff resides. (Use an additional sheet if necessary)

[ ] CHECK HERE IF THE US GOVERNMENT, ITS AGENCIES OR EMPLOYEES IS A NAMED PLAINTIFF.

List the California County, or State if other than California, in which **EACH** named defendant resides. (Use an additional sheet if necessary).

[ ] CHECK HERE IF THE US GOVERNMENT, ITS AGENCIES OR EMPLOYEES IS A NAMED DEFENDANT.

List the California County, or State if other than California, in which **EACH** claim arose. (Use an additional sheet if necessary.)

**NOTE:** In land condemnation cases, use the location of the tract of land involved.

Vermont

**X. SIGNATURE OF ATTORNEY (OR PRO PER): X** _____ Date 11/15/02

**NOTICE TO COUNSEL/PARTIES:** The CV-71 (JS-44) Civil Cover Sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law. This form, approved by the Judicial Conference of the United States in September 1974, is required pursuant to Local Rule 3.3 is not filed but is used by the Clerk of the Court for the purpose of statistics, venue and initiating the civil docket sheet. (For more detailed instructions, see separate instructions sheet.)

Key to Statistical Codes relating to Social Security Cases:

| NATURE OF SUIT CODE | ABBREVIATION | SUBSTANTIVE STATEMENT OF CAUSE OF ACTION |
|---|---|---|
| 861 | HIA | All claims for health insurance benefits (Medicare) under Title 18, Part A, of the Social Security Act, as amended. Also, include claims by hospitals, skilled nursing facilities, etc., for certification as providers of services under the program. (42 U.S.C. 1935FF(b)) |
| 862 | BL | All claims for "Black Lung" benefits under Title 4, Part B, of the Federal Coal Mine Health and Safety Act of 1969. (30 U.S.C. 923) |
| 863 | DIWC | All claims filed by insured workers for disability insurance benefits under Title 2 of the Social Security Act, as amended; plus all claims filed for child's insurance benefits based on disability. (42 U.S.C. 405 (g)) |
| 863 | DIWW | All claims filed for widows or widowers insurance benefits based on disability under Title 2 of the Social Security Act, as amended. (42 U.S.C. 405 (g)) |
| 864 | SSID | All claims for supplemental security income payments based upon disability filed under Title 16 of the Social Security Act, as amended. |
| 865 | RSI | All claims for retirement (old age) and survivors benefits under Title 2 of the Social Security Act, as amended. (42 U.S.C. (g)) |

# CIVIL COVER SHEET

| I (a) PLAINTIFFS | DEFENDANTS |
|---|---|
| SUNDANCE IMAGE TECHNOLOGY, INC. | CONE EDITIONS PRESS, LTD |

FILED
02 NOV 15 AM 11:55
U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA

| **(b)** COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF  San Diego <br> EXCEPT IN U.S. PLAINTIFF CASES | COUNTY OF RESIDENCE OF FIRST LISTED DEFENDANT  Vermont |
|---|---|
| **(c)** ATTORNEYS (FIRM NAME, ADDRESS, AND TELEPHONE NUMBER) <br> Philip H. Dyson <br> 8461 La Mesa Blvd. <br> La Mesa, CA 91941 <br> Ph:(619) 462-3311 | ATTORNEYS (IF KNOWN) <br> Peter B. Maretz <br> CHAPIN SHEA McNITT & CARTER <br> 501 West Broadway, 15th Floor <br> San Diego, CA 92101 |

## II. BASIS OF JURISDICTION (PLACE AN x IN ONE BOX ONLY)

- ☐ 1 U.S. Government Plaintiff
- ☒ 3 Federal Question (U.S. Government Not a Party)
- ☐ 2 U.S. Government Defendant
- ☐ 4 Diversity (Indicate Citizenship of Parties In Item III)

## III. CITIZENSHIP OF PRINCIPAL PARTIES (PLACE AN x IN ONE BOX FOR PLAINTIFF AND ONE FOR DEFENDANT)
(For Diversity Cases Only)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. ORIGIN (PLACE AN x IN ONE BOX ONLY)

- ☐ 1 Original Proceeding
- ☒ 2 Removed from State Court
- ☐ 3 Remanded from Appellate Court
- ☐ 4 Reinstated or Reopened
- ☐ 5 Transferred from another district (specify)
- ☐ 6 Multidistrict Litigation
- ☐ Appeal to District Judge from Magistrate Judgment

## V. REQUESTED IN COMPLAINT:
☐ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23

DEMAND $ 350,000    Check YES only if demanded in complaint:

JURY DEMAND: ☒ YES ☐ NO

## VI. CAUSE OF ACTION (CITE THE U.S. CIVIL STATUTE UNDER WHICH YOU ARE FILING AND WRITE A BRIEF STATEMENT OF CAUSE. DO NOT CITE JURISDICTIONAL STATUTES UNLESS DIVERSITY.)

28 U.S.C. Section 1338(a) - infringement of software copyright

'02 CV 2258 B (AJB) 28:1441 b(30)

## VII. NATURE OF SUIT (PLACE AN x IN ONE BOX ONLY)

| OTHER STATUTES | CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY |
|---|---|---|---|---|---|
| | | PERSONAL INJURY | PERSONAL INJURY | | |
| ☐ 400 State Reapportionment | ☐ 110 Insurance | ☐ 310 Airplane | ☐ 362 Personal Injury— Med Malpractice | ☐ 610 Agriculture | ☐ 422 Appeal 28 USC 158 |
| ☐ 410 Antitrust | ☐ 120 Marine | ☐ 315 Airplane Product Liability | ☐ 365 Personal Injury— Product Liability | ☐ 620 Other Food & Drug | ☐ 423 Withdrawal 28 USC 157 |
| ☐ 430 Banks and Banking | ☐ 130 Miller Act | ☐ 320 Assault, Libel & Slander | ☐ 368 Asbestos Personal Injury Product Liability | ☐ 625 Drug Related Seizure of Property 21 USC 881 | |
| ☐ 450 Commerce/ICC Rates/etc. | ☐ 140 Negotiable Instrument | | | | PROPERTY RIGHTS |
| ☐ 460 Deportation | ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 330 Federal Employers' Liability | PERSONAL PROPERTY | ☐ 630 Liquor Laws | ☒ 820 Copyrights |
| ☐ 470 Racketeer Influenced and Corrupt Organizations | ☐ 151 Medicare Act | ☐ 340 Marine | ☐ 370 Other Fraud | ☐ 640 R.R. & Truck | ☐ 830 Patent |
| ☐ 810 Selective Service | ☐ 152 Recovery of Defaulted Student Loans (Excl. Veterans) | ☐ 345 Marine Product Liability | ☐ 371 Truth in Lending | ☐ 650 Airline Regs | ☐ 840 Trademark |
| ☐ 850 Securities/Commodities/ Exchange | ☐ 153 Recovery of Overpayment Of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 380 Other Personal Property Damage | ☐ 660 Occupational Safety/Health | SOCIAL SECURITY |
| ☐ 875 Customer Challenge 12 USC 3410 | ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle Product Liability | ☐ 385 Property Damage Product Liability | ☐ 690 Other | ☐ 861 HIA (1395ff) |
| ☐ 891 Agricultural Act | ☒ 190 Other Contract | ☐ 360 Other Personal Injury | | LABOR | ☐ 862 Black Lung (923) |
| ☐ 892 Economic Stabilization Act | ☐ 195 Contract Product Liability | | | ☐ 710 Fair Labor Standards Act | ☐ 863 DIWC/DIWW (405(g)) |
| ☐ 893 Environmental Matters | REAL PROPERTY | CIVIL RIGHTS | PRISONER PETITIONS | ☐ 720 Labor/Mgmt. Relations | ☐ 864 SSID Title XVI |
| ☐ 894 Energy Allocation Act | ☐ 210 Land Condemnation | ☐ 441 Voting | ☐ 510 Motions to Vacate Sentence | ☐ 730 Labor/Mgmt. Reporting & Disclosure Act | ☐ 865 RSI (405(g)) |
| ☐ 895 Freedom of Information Act | ☐ 220 Foreclosure | ☐ 442 Employment | Habeas Corpus | ☐ 740 Railway Labor Act | FEDERAL TAX SUITS |
| ☐ 900 Appeal of Fee Determina- tion Under Equal Access to Justice | ☐ 230 Rent Lease & Ejectment | ☐ 443 Housing/ Accommodations | ☐ 530 General | ☐ 790 Other Labor Litigation | ☐ 870 Taxes (U.S. Plaintiff or Defendant) |
| ☐ 950 Constitutionality of State Statutes | ☐ 240 Torts to Land | ☐ 444 Welfare | ☐ 535 Death Penalty | ☐ 791 Empl. Ret. Inc. Security Act | ☐ 871 IRS - Third Party 26 USC 7609 |
| ☐ 890 Other Statutory Actions | ☐ 245 Tort Product Liability <br> ☐ 290 All Other Real Property | ☐ 440 Other Civil Rights | ☐ 540 Mandamus&Other <br> ☐ 550 Civil Rights <br> ☐ 555 Prison Condition | | |

## VIII(a). IDENTICAL CASES:
Has this action been previously filed and dismissed, remanded or closed?   x  No ____ Yes

If yes, list case number(s): ____

Pd $150.00   11/15/02   #88634 V3