1
2
3
4
5
6
7
8                   UNITED STATES DISTRICT COURT

9                  SOUTHERN DISTRICT OF CALIFORNIA

10  SUNDANCE IMAGE TECHNOLOGY, INC., a          CASE NO. 02 CV 2258 JM (AJB)
    California Corporation, et al.,
11                                              **ORDER (1) DENYING  MOTION
                                       Plaintiffs,   FOR PRECLUSION SANCTIONS,
12                                              (2)SUSTAINING OBJECTIONS TO
         vs.                                    TESTIMONY OF ARTHUR
13                                              DIAMOND, AND (3) GRANTING IN
                                                PART AND DENYING IN PART
14                                              DEFENDANTS' MOTION FOR
                                                PARTIAL SUMMARY JUDGMENT
15  CONE EDITIONS PRESS, LTD., a Vermont        REGARDING LIBEL AND TRADE
    Corporation, et al.,                        LIBEL**
16
                                      Defendants.  **[See Docket Nos. 439, 440, 445]**
17
    _____
18  And Related Cross-claims
19

20          This case arises out of a soured business relationship between the parties who at some point

21  in time agreed to sell ink products designed for fine digital photographic printing. Pending before the

22  court is Defendants' Motion for Partial Summary Judgment ("MSJ") on Plaintiffs' libel and trade libel

23  claims.  Related to the MSJ are Defendants' motion for preclusion sanctions and motion to preclude

24  Plaintiff's expert Arthur Diamond from testifying on causation with respect to the trade libel claim.

25  On March 2, 2007, counsel for the parties appeared before the court to argue the motions.  After

26  considering the papers and the oral argument of counsel, the court hereby **DENIES** the motion for

27  / / /

28  / / /

1  preclusion sanctions, **SUSTAINS** Defendants' objections to Arthur Diamond's testimony,[1] and

2  **GRANTS IN PART** and **DENIES IN PART** the motion for partial summary judgment for the

3  reasons set forth below.

4  **I.      BACKGROUND**

5          After a long and tortured procedural history, the pertinent parties and claims in this case have

6  been whittled down to the following.  Plaintiffs R9 Corporation ("R9") and Sundance Image

7  Technology, Inc. ("Sundance") are Nevada corporations doing business in San Diego County.  R9 is

8  the creator and copyright owner of software for wide format printers.  Sundance manufactures printer

9  inks.  Defendants are Inkjetmall.com ("IJM"), a Vermont corporation doing business in San Diego

10  County, and Jonathon Cone ("Cone"), an individual.  Cone is the founder and owner of IJM until IJM

11  was incorporated in 2001.  This court has jurisdiction pursuant to 28 U.S.C. § 1332(a) in that no

12  defendant is a citizen of the same state as any plaintiff and the amount in controversy exceeds

13  $75,000.

14          In December 1999, defendant Cone entered into a software licensing agreement whereby

15  plaintiff R9's software was to be sold by non-party Cone Editions Press ("CEP"), an entity owned by

16  Cone, through defendant IJM.  IJM is the agent of and online presence for CEP.  In February 2000,

17  Cone entered into an agreement with plaintiff Sundance whereby CEP agreed to sell Sundance's inks

18  through IJM.  The ink and software were "bundled" and designed to work together.

19          The agreements above were so-called private label agreements, which means that although

20  Plaintiffs produced the products, the products were sold under Defendants' brand names.

21          In 2002, the business relationship deteriorated and the parties ended their agreements.

22  Thereafter, this suit was filed.  Plaintiffs now allege that for a period of time, defendant Cone posted

23  libelous statements on the Internet about Plaintiffs' products, causing Plaintiffs' revenues to fall

24  dramatically.  Plaintiffs also allege that Defendants without permission altered Plaintiffs' products

25  before resale.  According to Plaintiffs, these alterations caused the products to experience performance

26  / / /

27  _____

28          [1] For the reasons set forth in this order, the court construes Defendants' Motion to Exclude Purported
Expert Testimony, Docket No. 445, as an objection to Arthur Diamond's testimony in connection with the MSJ.

1   problems, problems which Defendants then wrongfully blamed on Plaintiffs in published Internet

2   postings.

3          The Modified Consolidated Third Amended Complaint ("TAC") alleges libel, trade libel, and

4   unfair trade practices in violation of California Business & Professions Code section 17200 and §

5   43(a) of the Lanham Act. See Docket No. 404.  Plaintiffs allege that the following six statements are

6   libelous:

7          (1) that Plaintiffs had caused Defendants $200,000.00 in damage;

8          (2) that Sundance lacked responsibility, or was otherwise irresponsible in handling its
           business affairs, refused to respond and/or cure purported problems;

9
           (3) under aliases, including without limitation a purported "PhD" credentials [sic],
10         which CONE did not have, and knowing that "BWGUYS" was a website belonging to
           Plaintiffs, or either one of them, accused Plaintiffs of being illegitimate or otherwise
11         false suppliers of their product, and was so understood by those who read the
           publication(s) because the website identified Sundance as the Operator of the website;
12
           (4) accused Plaintiffs of a lack of integrity, unprofessional, dishonest practices and/or
13         questionable business conduct or methods in the conduct of its business/trade;
           outwardly announcing a general disqualification in those respects which occupation
14         requires;

15         (5) accused Plaintiffs of fraud, deception and unfair dealing with their customers, taking
           advantage of them, and banking at their expense, and abandoning them;
16
           (6) unprofessional and questionable business conduct or methods, at a very least, if not
17         totally unconscionable conduct and unfair dealing.

18   TAC ¶ 107.  Statement (1) was allegedly made in an internal company email from defendant Cone to

19   other employees.  See Dyson Decl., Ex. 11 at 3 (copy of email).  All other statements Cone allegedly

20   made either in a report posted on the Internet or in various Internet chat rooms.

21          Because the court's decision on Defendants' motion for preclusion sanctions could dispose of

22   Plaintiffs' trade libel claim, thereby mooting the MSJ with respect to that claim, the court will address

23   that motion first.

24   ///

25   ///

26   ///

27   ///

28   ///

## II.   <u>MOTION FOR PRECLUSION SANCTIONS</u>[2]

Defendants argue that Plaintiffs have repeatedly failed to comply with discovery orders and therefore should be precluded from introducing any evidence on the issue of causation in connection with the trade libel claim.

A court may refuse to allow a party who has disobeyed discovery orders "to support or oppose designated claims or defenses, or [prohibit] that party from introducing designed matters in evidence[.]"  Fed. R. Civ. P. 37(b)(2)(B).  Whether the disobedient party's evidence should be precluded pursuant to Rule 37 depends on

> 1) the public's interest in expeditious resolution of litigation; 2) the court's need to manage its docket; 3) the risk of prejudice to the defendants; 4) the public policy favoring disposition of cases on their merits; 5) the availability of less drastic sanctions.

<u>Wendt v. Host Intern., Inc.</u>, 125 F.3d 806, 814 (9th Cir. 1997); <u>Malone v. United States Postal Serv.</u>, 833 F.2d 128, 130 (9th Cir. 1987) (same).

During discovery, Defendants asked each plaintiff to identify persons who did not purchase plaintiff's product because of a derogatory statement by a defendant.  Plaintiffs responded by referencing 1690 pages of documents previously produced by IJM listing all IJM customers during 2000-2005 and hundreds of internet postings.  <u>See</u> Mot at 2; Sklar Decl., Ex. E at 45, 51.  On Defendants' motion to compel, Magistrate Judge Anthony J. Battaglia ordered Plaintiffs to supplement the response.  Oct. 16, 2006 Order at 7.  Judge Battaglia also imposed sanctions in the form of attorney's fees because "Plaintiffs have blatantly disregarded the Court's direction in answering Document Requests and Interrogatories in this current discovery request."  <u>Id.</u> at 13.

Thereafter, Plaintiffs supplemented their response by identifying all persons who were IJM customers who, at some point in time, did not purchase inks from Sundance.  <u>See</u> Sklar Decl., Ex. E at 55, 60.  Defendants argue this supplemental response is also non-responsive.  Mot. at 3.  Defendants further argue that Plaintiffs have identified in their supplemental response persons who have already been deposed and who have already testified that they had never heard of Sundance and have never read anything derogatory about Sundance.  <u>Id.</u>; Sklar Decl., Ex. F.

---

[2] The court notes that this motion should have been brought before Magistrate Judge Anthony J. Battaglia.

Plaintiffs argue that they adequately supplemented their response by specifically identifying the relevant names and even summarizing them in an Appendix C ("AC"). <u>See</u> Oppo. at 3; Dyson Decl., Ex. 106.  Plaintiffs contend that the AC identifies documents previously produced which are relevant to R9 and those which are relevant to Sundance, <u>see</u> Dyson Decl., Ex. 106 at 16, 21, but it is not clear whether the AC is responsive to the interrogatory.

It is apparent that the purpose behind Defendants' motion is to avoid any unfair surprise that may result if a heretofore undisclosed witness were to be called by Plaintiffs during trial.  Although it is a stretch to say that Plaintiffs' supplemental response complied with the letter and spirit of Judge Battaglia's order of October 16, 2006, precluding Plaintiffs from presenting *any* evidence on causation is too drastic a sanction under the circumstances.  This is especially so since both parties have had the opportunity to depose some of the relevant witnesses on causation.

Therefore, as proposed by the court during oral argument and assented to by counsel thereto, the following compromise solution is appropriate.  The court **DENIES** the motion for preclusion sanctions and **ORDERS** that any witness who Plaintiffs propose as a putative purchaser who avoided Plaintiffs' products, who has not already been disclosed to and deposed by Defendants, may not be called to testify at trial.

### III.   MOTION TO PRECLUDE EXPERT TESTIMONY

Defendants, in correct anticipation that Plaintiffs will rely on Arthur Diamond's opinion in opposing the motion for partial summary judgment, move to exclude Diamond's testimony relative to the causation element of Plaintiffs' trade libel claim.[3]  To the extent Defendants seek to bar Diamond's opinions for all purposes, this motion is premature and should be brought separately in connection with the other pretrial motions in limine or when Diamond is called to testify.  Instead, the court deems the motion an objection to Diamond's opinion in connection with the instant MSJ.  The court **SUSTAINS** the objections on the ground that Diamond's opinion lacks foundation for the reasons set forth below.

///

---

[3] Defendants reserve their right to object to Diamond's testimony on other issues.  Mot. at 2.

Diamond owns and operates an imaging materials consulting firm.  The testimony on which Plaintiffs rely concerns Diamond's opinion that the Statements caused Plaintiffs' sales to plummet and that individuals who purchase Plaintiffs' products are "computer savvy people" who typically research their purchasing decisions on the internet.  Id. (citing Diamond report, excerpted at Dyson Decl., Ex. 90, filed under seal, and Ex. 91).

Defendants argue Diamond is not an expert qualified to testify on whether consumers did not buy Plaintiffs' products because of the Statements.  This is because, according to Defendants, Diamond is not a qualified consumer behavior expert, and his opinion is not reliable because his hypothesis was never tested.  Plaintiffs respond that 50% of Diamond present professional focus is on the marketing of digital imaging products.

**A.    Rule 702**

Under the Federal Rules of Evidence,

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

Fed. R. Evid. 702.  Before admitting expert testimony, the trial court must conduct "a preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning or methodology properly can be applied to the facts in issue."  Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579, 592-93 (1993).   The Daubert analysis applies to all experts, not only scientific experts.  Kumho Tire Co. v. Carmichael, 526 U.S. 137, 147 (1999). The proffered expert must be "qualified . . . by knowledge, skill, experience, training, or education[.]" Fed. R. Evid. 702.  The party offering the expert bears the burden of establishing that Rule 702 is satisfied.  Allison v. McGhan Medical Corp., 184 F.3d 1300, 1306 (11th Cir. 1999) (citing Daubert, 509 U.S. at 592, n.10)).

**B.    Diamond's Qualifications**

Diamond's Curriculum Vitae ("C.V.") reflects that he operates a high technology consulting and chemical engineering firm specializing in imaging materials development, manufacturing, and

1  marketing.  See Dyson Decl., Ex. 73, filed under seal.  His firm provides marketing consultation

2  services to companies in the imaging materials industry.  Id.; see also Dyson Decl, Ex. 99 at 83

3  (Diamond deposition).  Diamond chairs an imaging materials trade show management firm and has

4  authored marketing reports on toner and developer materials.  Id.  Much of Diamond's C.V. reveals

5  experience in technical, not marketing, work.  On balance, however, there is enough in the C.V. to

6  qualify Diamond as someone with some degree of experience or expertise in the relevant field of

7  marketing.

8          **C.       Diamond's Opinion Lacks Foundation**

9          In addition to any finding that Diamond is a qualified expert, the court must also, before

10  factoring his opinion into a decision on the MSJ, assess whether the "reasoning or methodology

11  underlying the testimony is . . .  valid" and "whether that reasoning or methodology properly can be

12  applied to the facts in issue."  Daubert, 509 U.S. at 592-93.

13          The relevant portion of Diamond's opinion is found in his written Supplemental Report

14  ("SR").  Dyson Decl., Ex. 90, filed under seal.  Because the SR is filed under seal, the court is unable

15  to cite in this order the relevant excerpts contained therein.  However, after carefully reviewing the

16  SR in its entirety, the court finds that Diamond does not provide any objective, measurable foundation

17  for his opinion that the statements of which Plaintiffs complain had a negative impact on Plaintiffs'

18  revenues.  Therefore, Diamond's opinion that the statements caused consumers to refrain from buying

19  Plaintiffs' products is not reliable.  Daubert, 509 U.S. at 592-93; Kumho Tire, 526 U.S. at 149.  The

20  following exchange during Diamond's deposition is emblematic of the problem with Diamond's

21  opinion in this regard:

22          Q.     Did you do anything to verify that these people that buy ink for digital
                   fine art printing primarily shop on the Internet?
23
24          A.     I don't know how you would verify that, except for an intensive study.
                   But intuitively and from my many years in the industry, I feel that's
                   true, and from people that I deal with who are experts in this field.
25          . . .

26          Q:     Do you have any empirical basis for your conclusion [that the relevant
                   individuals shop on the Internet primarily]?
27
28          A.     Nothing.

1    Dyson Decl, Ex. 99 (Oct. 25, 2006 deposition of Arthur Diamond at 8, 10).

2         Accordingly, Defendants' objections to Diamond's opinion are **SUSTAINED** for purposes of

3    the MSJ only and the court will give no weight to Diamond's opinion in connection therewith.

4    **IV.    MOTION FOR PARTIAL SUMMARY JUDGMENT**

5         Finally, Defendants move for partial summary judgment on the libel and trade libel claims.

6    As to the libel claim, Defendants argue that the statements are not "fixed representations" within the

7    meaning of the libel statute and, in the alternative, that the statute of limitations has expired on that

8    claim.  As to the trade libel claim, Defendants argue Plaintiffs have not come forth with any evidence

9    that the statements caused damage to Plaintiffs.

10        **A.    Summary Judgment Generally**

11        A court may grant summary judgment when the pleadings, affidavits, and other supporting

12   papers permitted by Federal Rule of Civil Procedure 56(c) demonstrate that there is no genuine issue

13   of material fact such that the moving party is entitled to prevail as a matter of law.  Fed. R. Civ. P.

14   56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).  Once the movant has made such a showing,

15   "the nonmoving party may not rely on the mere allegations in the pleadings in order to preclude

16   summary judgment."  Nillson, Robbins, Dalgarn, Berliner, Carson & Wurst v. Louisiana Hydrolec,

17   854 F.2d 1538, 1542 (9th Cir. 1988) (internal quotations omitted).  Rather, the opposing party must

18   "go beyond the pleadings and by her own affidavits, or by the depositions, answers to interrogatories,

19   and admissions on file, designate specific facts showing that there is a genuine issue for trial."

20   Celotex, 477 U.S. at 324 (internal quotations omitted).  At least some "significant probative evidence"

21   must be produced to create a genuine issue of fact for trial.  Nilsson, 854 F.2d at 1542.  An issue is

22   "genuine" only if "the evidence is such that a reasonable jury could return a verdict for the nonmoving

23   party."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

24        **B.    Libel**

25        Defendants contend that (1) statements made on the Internet are not "writings" or "fixed

26   representations" and therefore are not actionable as libel as a matter of law, and (2) even if such

27   postings were actionable as libel, the statute of limitations has already expired.

28   / / /

1    "Libel is a false and unprivileged publication by writing, printing, picture, effigy, or other

2    fixed representation to the eye, which exposes any person to hatred, contempt, ridicule, or obloquy,

3    or which causes him to be shunned or avoided, or which has a tendency to injure him in his

4    occupation." Cal.Civ.Code § 45.

5        Furthermore, an action for libel must be commenced within one year. Cal. Code Civ. Proc §

6    304(c). The court has already determined that Plaintiffs' libel claim will relate back to the date the

7    first complaint was filed, October 15, 2004. See Order of April 28, 2006 at 2. Therefore, only

8    statements published on or after October 16, 2003 are actionable.

9        Defendants' first argument lacks merit because it cites no authority in support thereof and at

10   least one California court has adjudicated a libel suit for statements made on the Internet. See

11   Traditional Cat Ass'n, Inc. v. Laura Gilbreath, 118 Cal. App. 4th 392 (2004); see also Condit v.

12   Dunne, 317 F. Supp. 2d 344, 359-60, 367 (S.D.N.Y. 2004) (applying California law to plaintiffs'

13   slander action for statements defendant made in an internet celebrity gossip column).

14       With respect to Defendants' second argument–expiration of the statute of limitations–Plaintiffs

15   do not dispute that the alleged statements were first made some time before October 16, 2003. Rather,

16   Plaintiffs argue that (1) the single publication rule ("SPR"), discussed infra, does not apply to

17   statements made on the web, and (2) the statements were republished on or after October 16, 2003

18   because there is evidence showing that the website header was changed after that date, thereby giving

19   rise to a new cause of action.

20                    *1. The Single Publication Rule and the Republication Rule*

21       In a libel action, the statute of limitations begins to run when the statement is published.

22   Shively v. Bozanich, 31 Cal. 4th 1230, 1247 (2003). Publication occurs when the defendant

23   communicates the defamatory statement to a third person. Id.

24       Under the SPR, any single edition of a newspaper or book gives rise to only one cause of

25   action for any defamatory statement contained therein, regardless of how many copies of the

26   newspaper or the book were distributed. Id. at 1245. The statute of limitations begins to run once the

27   defamatory statement is published, which in the case of mass media occurs on the "first general

28   distribution of the publication to the public." Id. at 1245 (citing Belli v. Roberts Furs, 240 Cal.App.2d

1   284, 289 (1966)).

2       However, <u>republication</u> of the statement gives rise to a new cause of action and thus a new

3   limitations period. <u>Id.</u> at 1245 (providing that "repetition of the defamatory statement in a new edition

4   of a book or newspaper constitutes a new publication of the defamation that may give rise to a new

5   cause of action, with a new accrual date.").  Republication occurs when the new edition is issued.  <u>See</u>

6   <u>id.</u> at 1246, n7.

7           *2. The Arguments*

8       Plaintiffs' first argument–that the SPR does not apply to statements made on the Internet–is

9   foreclosed by <u>Traditional Cat Ass'n</u>, 118 Cal.App.4th 392.[4]  Addressing a matter of first impression,

10  <u>Traditional Cat Ass'n</u> held that the SPR applies to Web page publication.  <u>Id.</u> at 402, 404 (relying on

11  <u>Firth v. State</u> 98 N.Y.2d 365 (2002)).

12      Next, Plaintiffs premise their republication argument on the following evidence which they

13  contend creates a genuine issue of fact as to whether the statements were republished on or after

14  October 16, 2003.  <u>See</u> Pl. Separate Statement of Controverted and Uncontroverted Facts at 1:5-15.

15      **Evidence that Defendants' website has been accessed by 4,000,000 visitors**.  Plaintiffs

16  submit print outs from Defendants' website, showing "You're Visitor 4,173,305".  <u>See</u> Dyson Decl.,

17  Exs. 27, 28.  This evidence is irrelevant.  The number of website visitors is not probative of when a

18  statement is published.

19      **Evidence that IJM linked to the Statements in March 2005.**  Plaintiffs appear to argue that

20  the statements were republished when IJM's website provided links to the statements in March 2005.

21  Oppo. at 18 (citing ¶ 15 of a prior declaration of Gary Rogers, a principal of both R9 and Sundance,

22  and two internet postings allegedly written by Cone providing links to the statements.)  Putting aside

23  that the court has deemed copies of internet postings inadmissible evidence in this case, <u>see</u> Docket

24

25  _____

26      [4] Plaintiffs cite <u>Hebrew Academy of San Francisco v. Goldman</u>, 129 Cal. App. 4th 391 (2005) in
    support of their argument that the SPR should not apply here.  However, the California Supreme Court has
    granted a petition for review in <u>Hebrew Academy</u> and therefore that decision is not good authority at this point
27  in time and the court declines to address it.  <u>See</u> 33 Cal. Rptr. 3d 802 (Cal. Aug. 24, 2005) (granting petition
    for review); Cal. Rules of Court 8.1105(d)(1) ("an opinion is no longer considered published if the Supreme
28  Court grants review or the rendering court grants rehearing."), 8.115(a) (unpublished opinions "must not be
    cited or relief on by a court or a party in any other action.").

1  No. 250 (order of June 14, 2005), Plaintiff cites no authority holding that providing links to statements

2  already published on the Web, without more, republishes those statements.  Rather, the court finds that

3  such linking is more reasonably akin to the publication of additional copies of the same edition of a

4  book, which is a situation that does not trigger the republication rule. <u>See</u> <u>Shively</u>, 31 Cal. 4th at 1245.

5        **Evidence that Defendants modified the headers of the web page on which the statements**

6  **appear.**  Plaintiffs submit copies of Defendants' website showing header as "Piezography BW", <u>id.</u>,

7  Ex. 27 at 1, and Defendants' website showing header as "Piezography Bwicc", <u>id.</u>, Ex. 28 at 1.[5]

8  Plaintiffs argue that the header change evidences a "new edition" of the website and therefore a

9  republication of the Statements.  Oppo. at 18.[6]

10        A new edition of a book containing previously published defamatory statements gives rise to

11  a fresh claim for libel.  <u>Shively</u>, 31 Cal. 4th at 1246, n.7.  A rational trier of fact could find that the

12  header change, which was made because Defendants wanted to promote BW ICC and stop promoting

13  its original product known as "PiezographyBW", could constitute a new edition of the website since

14  it appears the change was made deliberately and for a substantive purpose: to sell BW ICC and cease

15  selling the original product.  <u>See</u> Cone Decl. Second ¶ 4.  This evidence is relevant when considered

16  alongside the Spence Declaration, <u>infra</u>.

17        **Spence Declaration.**  Geoffrey Spence is or was IJM's Director of Research and

18  Development.  Spence contends that "I completed the development of technology for the BW ICC

19  product in or about March 2003.  The product was released in or about the summer of 2003." <u>See</u>

20  Dyson Decl., Ex. 100 ¶ 6.[7]  Plaintiffs argue that the Spence Declaration creates a genuine issue of

21  material fact that the header change described above, which Plaintiffs contend constituted a

22  / / /

23

---

24      [5]According to Defendants, this change was made to reflect Defendants' new product called "BW ICC".

25  <u>See</u> Cone Decl. Second ¶ 5.

26      [6]Defendants' boilerplate relevancy and lack of authentication objections to exhibits 27 and 28 are
overruled because these exhibits are material since they speak to the republication issue and they are admissible

27  as an admission by a party-opponent pursuant to Fed. R. Evid. 801(d)(2)(A).

28      [7]Defendants' objection to the Spence declaration on the grounds that it is irrelevant is overruled because
the declaration, as set forth in this order, is probative of the republication issue.

1  republication of the website, occurred on or after October 16, 2003, since the BW ICC product was

2  released some time during summer 2003.

3       The court finds that although Plaintiffs' evidence may create a genuine issue of fact as to

4  whether the statements were republished (by virtue of the header change), Plaintiffs ultimately have

5  failed to come forth with significant, probative evidence that such republication, if any, was made on

6  or after October 16, 2003. Spence's contention that the BW ICC product was issued in summer 2003

7  would not permit a rational trier of fact to conclude that the header on Defendants' website was

8  changed to "PiezographyBWicc" on or after October 16, 2003. Therefore, the libel claim with regard

9  to the statements is barred by the expiration of statute of limitations as a matter of law.

10            ***3.       The Email is Not Libelous Because it is a Statement of Opinion***

11      With respect to the email statement, the parties dispute how the limitations period should be

12  measured. The court need not address that issue because the email is not libelous as a matter of law.

13  In the email, which is an internal company email from defendant Cone to other employees, the

14  statement at issue is "R9 and Sundance has [sic] cost this company about $200,000 this year on this

15  problem." <u>See</u> Dyson Decl., Ex. 11 at 3 (copy of email).[8] It is plainly apparent, given the context of

16  the email, that the statement is one of belief or opinion, not of fact–that the Defendants believed they

17  were owed amounts from Plaintiffs. Such a statement is not actionable as libel. <u>Smith v. Maldonado</u>,

18  72 Cal. App. 4th 637, 645 (1999) ("Defamation is an invasion of the interest in reputation. The tort

19  involves the intentional publication of a *statement of fact* that is false, unprivileged, and has a natural

20  tendency to injure or which causes special damage.") (emphasis added).

21      For all of the foregoing reasons, the motion for partial summary judgment on the libel claim

22  is granted.

23  / / /

24  / / /

25  / / /

26  _____

27      [8]Defendants object that the email lacks foundation and that it is immaterial to the present motion.
    However, the email appears to be written by defendant Cone and he is free to dispute its authenticity, which
28  he has not. Moreover, the email is not immaterial because it contains one of the statements alleged to be
    libelous.

**C.     Trade Libel**

Defendants contend that Plaintiffs have not produced any admissible evidence that the statements caused consumers not to buy from Plaintiffs and therefore their trade libel claim fails as a matter of law.

Trade libel is "an intentional disparagement of the quality of property, which results in pecuniary damage to plaintiff. . . . .  Usually,...the damages claimed have consisted of loss of prospective contracts with the plaintiff's customers." Atlantic Mutual Ins. Co. v. J. Lamb, Inc., 100 Cal. App. 4th 1017, 1035 (2002) (quoting Nichols v. Great American Ins. Cos., 169 Cal. App. 3d 766, 773 (1985) and Erlich v. Etner, 224 Cal. App. 2d 69, 73 (1964)).  To prevail, a plaintiff must prove that the defendant's statements caused damage to plaintiff.  See Erlich v. Etner, 224 Cal. App. 2d 69, 75 (1964) (finding that there was insufficient evidence to support verdict in favor of plaintiff for trade libel when plaintiff did not present any evidence, other than his own conclusory testimony, that particular customers stopped purchasing from plaintiff because of defendant's statements); Mann v. Quality Old Time Service, Inc., 120 Cal. App. 4th 90, 109 (2004) (noting that a trade libel plaintiff may not "rely on a general decline in business arising from the falsehood, and instead must identify particular customers and transactions of which it was deprived as a result of the libel.").

The court finds that the following evidence from Plaintiffs is enough to defeat summary judgment on the trade libel claim.[9]

**Depositions of Robert Walker and Eric Nielsen.**  Robert Walker testified that he is a retired professional photographer, that sometime during his career he saw the statements on the web, and that after being exposed to the statements he hesitated to buy further Sundance inks.  Dyson Decl., Ex. 91 at 55 ("Q.  And after viewing this information, you hesitated to buy further Sundance warm neutral; is that correct?  A.  Yes."), 73-74 ("Q.  Do you know if any of the information that you're viewing here today on Exhibit 2 impacted your decision not to buy Sundance inks at any time?  A.  I think this just was filed away, because so many things didn't pertain to me . . . I don't think this directly caused me to change, no.  But indirectly I think it did, because it was back there in my mind.").

---

[9] Defendants' relevancy objections to any of this evidence are overruled because the evidence is relevant to the causation issue for the reasons set forth in this order.

1    In addition, Eric Nielsen, a consumer of ink products, testified that he saw information on an

2    Internet bulletin board that Defendants were coming to market with competing ink products

3    purportedly designed to overcome the kinds of problems posed by Plaintiffs' products. Dyson Decl.,

4    Ex. 114 at 31.[10]

5    **Deposition of Robert Maxwell.** Robert Maxwell testified that he constructed the website

6    entitled "BWGuys" through which Plaintiffs sold their products. Dyson Decl., Ex. 85 at 22-23.

7    Maxwell further testified that he received financial compensation for sales generated through that

8    website, id. at 54, and that after he became aware of the statements' presence on the Internet, he "felt

9    that it was going to be hard to counteract this type of negative publicity, so I de-emphasized the

10   marketing [of Plaintiffs' products]." Id. at 100.

11   **Evidence that over 4,000,000 individuals have visited Defendants' website.**[11] Plaintiffs

12   submit copies of pages from Defendants' website, showing that over 4,000,000 persons have visited

13   the site on which the statements were posted. See Dyson Decl., Exs. 27, 28. It is not clear whether

14   the 4,000,000-odd figure represents, for example, the number of individual visitors or the number of

15   page views. On the other hand, the evidence provides a sense of the extent to which the statements

16   may have been exposed to Internet users. At the hearing, counsel for Defendants pointed out that the

17   page showing over 4,000,000 visitors does not contain any of the statements. This is immaterial,

18   however, to the extent that the evidence remains probative of how many users frequent the site in

19   general.

20   **Evidence of Plaintiffs' Revenue Decline.** Plaintiffs submit the declaration of Gary Rogers,

21   principal of Sundance and R9, in which he asserts that "Sundance and R9 sales plummeted after June

22   2002 . . . Sundance ink sales for the first five months of 2002 were $171,188.00. Ink sales for the last

23   / / /

24

25   ───────────────────────

[10] Plaintiffs also point to the deposition of consumer Stephen Jennings, excerpted in the Sklar

26   declaration. See Sklar Decl, Ex. F (Jennings deposition Jul. 28, 2005). However, the excerpted Jennings

     testimony does not address the issue of whether Jennings stopped purchasing Plaintiffs' products because of

27   the Statements. The same is true of the excerpted deposition testimony of consumer Leslie Giuliani. See id.

     (Giuliani deposition Jul. 27, 2005).

28   [11] This evidence is not hearsay because, assuming Defendants were aware of the number of hits shown,

     it would be an adoptive admission by a party opponent. Fed. R. Evid. 801(d)(2).

1   seven months of 2002 were $28,197.00.  R9 sales plummeted also.  R9 software sales for the first six

2   months of 2002 were $98,659.00.  For the second half of 2002 R9 software sales were $20,190.00."

3   Dyson Decl., Ex. 95 ¶ 6.  The court notes that Defendants do not dispute that Plaintiffs experienced

4   a drop in revenues some time during 2002.

5          Viewed as a whole, the evidence above creates a genuine issue of fact as to causation.  Based

6   on the above, a rational trier of fact could conclude that consumers saw the statements on the Internet,

7   that consumers were deterred from buying Plaintiffs' products after being exposed to the statements,

8   that distributors were likewise deterred from selling Plaintiffs products, and that Plaintiffs lost

9   revenues as a result.  Accordingly, the motion for partial summary judgment on the trade libel claim

10  is denied.

11  **V.     CONCLUSION**

12         The motion for preclusion sanctions is **DENIED** with the conditions set forth in this order.

13  See Docket No. 439.  The motion to preclude the expert testimony of Arthur Diamond is construed

14  as an objection to Diamond's opinion for purposes of the MSJ only.  Those objections are

15  **SUSTAINED.**   See Docket No. 445.  Finally, the motion for partial summary judgment is

16  **GRANTED IN PART** as to the libel claim and **DENIED IN PART** as to the trade libel claim.  See

17  Docket No. 440.  Plaintiffs' libel claim is hereby **DISMISSED.**

18         **IT IS SO ORDERED.**

19  DATED:  March 7, 2007

20                                          _____

21                                          Hon. Jeffrey T. Miller
                                            United States District Judge

22  cc: All Parties

23

24

25

26

27

28

02cv2258